**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| DERRICK ANTHONY DEBRUCE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | )Case no.  1:04-cv-2669-IPJ-JEO |
| | ) |
| DONAL CAMPBELL, | ) |
| | ) |
| Respondent. | ) |

**Table of Contents**

I.      PROCEDURAL HISTORY
II.     FACTUAL BACKGROUND
III.    THE SCOPE OF FEDERAL HABEAS REVIEW
        A.      Exhaustion and Procedural Default
                1.      The "Cause and Prejudice" Standard
                2.      The "Fundamental Miscarriage of Justice" Standard
        B.      Rules Governing Habeas Corpus Cases Under § 2254
                1.      28 U.S.C. § 2254(d) and (e)
                2.      Procedural Rules Governing Habeas Corpus Cases
                        Under § 2254
IV.     DISCUSSION
        A.      DeBruce was deprived of effective assistance of counsel  (Doc. 1
                ("Petition"), pp. 7-38) and (Doc. 20 ("Brief"), pp. 1-189)
                1.      Introduction
                2.      Pre-trial  (Doc. 1, ¶¶ 30-39, pp. 9-12)
                3.      Voir Dire  (Doc. 1, ¶¶ 40-41, p. 12)
                4.      Guilt Phase  (Doc. 1, pp. 13-17) and (Doc. 20, pp. 34-91)
                        a.      Impeachment of State's star witness.  (Doc. 1,
                                ¶¶ 42-49, pp. 13-16) and (Doc. 20, pp. 15-34)
                        b.      Impeachment and use of other witnesses  (Doc. 1,
                                ¶¶ 50-52, pp. 16-17)
                        c.      Other guilt phase issues  (Doc. 1, ¶¶ 53-57, p. 17)
                5.      Penalty Phase  (Doc. 1, ¶¶ 58-59, pp. 17-18)
                        a.      Aggravating circumstance  (Doc. 1,  ¶¶ 60-67,
                                pp. 18-22)
                        b.      Mitigating circumstances  (Doc. 1,  ¶¶ 67-88,
                                pp. 22-30)

1

          i.      **Gastrointestinal illness**

          ii.     **Family Background**

          iii.   **Mental Health Mitigation**

    c.     **Other penalty phase issues  (Doc. 1,  ¶¶ 89-99, pp. 31-33)**

**B.**    **DeBruce's family was unlawfully excluded from the courtroom during the capital murder trial (Doc. 1,  ¶¶ 109-12, pp. 38-39)**

**C**.    **DeBruce's constitutional right to be present at his capital murder trial was violated because he was absent during a material stage of the proceedings (Doc. 1,  ¶¶ 113-19, pp. 39-41)**

**D.**    **DeBruce was deprived of a fair and impartial jury  (Doc. 1, ¶¶ 120-136, pp. 42-48)**

    **1.**    **Jurors and the prosecution failed to disclose information during voir dire (Doc. 1, ¶¶ 121-24, pp. 42-43)**

    **2.**    **DeBruce's jury improperly and unconstitutionally considered extraneous information (Doc. 1, ¶¶ 125-30, pp. 43-45)**

    **3.**    **The trial court failed to excuse four venire members who knew the victims and their families  (Doc. 1, ¶¶ 131-34, p. 46)**

    **4.**    **In violation of the court's explicit instructions, venire members discussed the case outside of the courtroom (Doc. 1, ¶¶ 135-36, p. 47)**

**E.**    **DeBruce's jury was unconstitutionally constituted as the prosecutor exercised his peremptory challenges to systematically exclude black jurors (Doc. 1, ¶¶ 137-39, pp. 48-49)**

**F.**    **The State failed to correct false or misleading testimony and failed to disclose evidence that was favorable and material to the defense  (Doc. 1, ¶¶ 140-49, pp. 49-52)**

    **1.**    **The State represented that McCants would receive a life sentence for his involvement in the crime, but in fact McCants only received a twenty-five year sentence. (Doc. 1, p. 50)**

    **2.**    **The State failed to disclose that Mr. DeBruce was seriously ill, that he had received inadequate medical care, that the FBI investigated abuse by the Talladega police officers, and that at least one officer responsible for Mr. DeBruce's safety was disciplined for excessive force.  (Doc. 1, p. 50)**

    **3.**    **The State failed to disclose that attorney Anthony Falletta was simultaneously representing DeBruce and Barbara Jean Spencer.  (Doc. 1, p. 50)**

    **4.**    **The State failed to disclose that Mr. Garner, DeBruce's pre-trial mental health evaluator, was not a certified**

forensic examiner and that he had not performed appropriate testing.  (Doc. 1, p. 51)

5.     The State failed to disclose an oral statement by DeBruce in which DeBruce stated McCants shot the victim and Burton set up the robbery.  (Doc. 1, p. 51)

6.     The State relied upon a search warrant based on false testimony, resulting in unlawfully obtained evidence.  (Doc. 1, p. 51-52)

7.     The State failed to disclose the plea minutes of DeBruce's prior Jefferson County robbery conviction, in which "DeBruce was wrongly assured by the Jefferson County judge that his guilty plea in that case had 'nothing to do'" with the pending capital murder case.  (Doc. 1, p. 52)

8.     Cumulative error (Doc. 1, p. 52)

G.     The prosecution engaged in unconstitutional misconduct throughout DeBruce's trial.  (Doc. 1, pp. 52-62)

1.     The prosecution's misleading arguments impermissibly shifted the burden of proof on the issue of intent. (Doc. 1, ¶¶ 151-59, pp. 53-55)

2.     The prosecutor improperly commented on DeBruce's decision not to testify.  (Doc. 1, ¶¶ 160-61, pp. 55-56)

3.     The prosecutor's pervasive leading questions made him an unsworn witness.  (Doc. 1, ¶¶ 162-63, pp. 56-57)

4.     The prosecutor improperly appealed to the jurors' emotions.  (Doc. 1,  ¶ 164, p. 57)

5.     The prosecutor relied on "facts" not in evidence. (Doc. 1, ¶ 165, pp. 57-58)

6.     The prosecutor improperly vouched for his witnesses. (Doc. 1,  ¶¶ 166-69, p. 58)

7.     The prosecutor improperly told the jurors that it was their "duty" to sentence DeBruce to death. (Doc. 1, ¶¶ 170-73, pp. 58-60)

8.     The prosecutor improperly minimized the jury's role and sought a death sentence based on future dangerousness.  (Doc. 1, ¶¶ 174-75, pp. 60-61)

9.     Individually and cumulatively, the prosecutor's conduct requires a new trial and sentencing.  (Doc. 1, ¶ 176, p. 61)

H.     DeBruce was not competent to stand trial and the State failed to conduct a necessary hearing to determine whether DeBruce was able to assist in his own defense.  (Doc. 1, ¶¶ 177-80, pp. 62-63)

I.      DeBruce is mentally retarded.  (Doc. 1, ¶¶ 181-85, pp. 63-64)

J.      The State used unreliable and unconstitutionally obtained
        evidence.  (Doc. 1,  ¶¶ 186-89, pp. 65-66)

K.      The trial court improperly admitted evidence concerning
        DeBruce and his co-defendants, who were tried separately.
        (Doc. 1, ¶¶ 190-93, pp. 66-67)

L.      The State introduced unreliable and tainted identification
        evidence.  (Doc. 1,  ¶¶ 194-200, pp. 67-69)

M.      The trial court's instructions were unconstitutional.
        (Doc. 1, ¶¶ 201-04, pp. 69-70)

N.      Debruce's death sentence is unreliable and unconstitutional
        because the State relied upon improper aggravating
        circumstances and the jury was unaware of mitigating
        factors.  (Doc. 1, ¶¶  205-11, pp. 70-72)

O.      DeBruce's death sentence is unconstitutional because it is
        disproportionate in light of the offense and DeBruce's
        background.  (Doc. 1, ¶¶ 212-13, pp. 72-73)

P.      Newly discovered evidence that was not known to the
        defense at trial shows that DeBruce is innocent of the crime
        for which he was convicted and sentenced.  (Doc. 1, ¶ 214, p. 73)

Q.      DeBruce's conviction and sentence is unreliable and
        unconstitutional because it was based upon uncorroborated
        testimony of an accomplice whom the State coerced to testify.
        (Doc. 1, ¶¶ 215-16, p. 74)

R.      Race, gender, and economic discrimination in the formation
        and composition of the grand and petit juries, and the
        selection of respective forepersons, deprived DeBruce of a fair
        and reliable trial.  (Doc. 1, ¶ 217)

S.      The evidence was insufficient to support DeBruce's capital
        murder conviction and sentence of death as a matter of law,
        because there was insufficient evidence to establish an
        intentional murder during the commission of a robbery.
        (Doc. 1, ¶¶ 218-19, pp. 75-76)

T.      DeBruce was sentenced to death pursuant to an unconstitutional
        sentencing procedure.  (Doc. 1, ¶¶ 220-25, pp. 76-77)

U.      The State deprived DeBruce of a reasonable adjournment,
        proper discovery, and a complete transcript.  (Doc. 1, ¶¶ 226-28,
        p. 78)

V.      It was unreliable and unconstitutional for the court to conduct
        the trial and sentencing of DeBruce in Talladega County.
        (Doc. 1, ¶ 229, pp. 78-79)

W.      Alabama's method of execution is unconstitutional on its face
        and as applied to DeBruce.  (Doc. 1, ¶ 230, p. 79)

**X.**   **The State post-conviction hearing was unreliable and unconstitutional.  (Doc. 1, ¶¶ 231-241, pp. 79-83)**

**Y.**   **The cumulative effect of the errors of state and federal law discussed above violated DeBruce's rights protected by Alabama law and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  (Doc. 1,  ¶ 242, pp. 83-84)**

**V.**   **CONCLUSION**

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner's (or "DeBruce's") state court conviction and death sentence on a charge of capital murder. *See* 28 U.S.C. § 2254. Upon consideration, the court finds that the petitioner is not entitled to any relief.

## I.   PROCEDURAL HISTORY

On February 13, 1991, DeBruce was found guilty of capital murder during a robbery in violation of the Code of Alabama § 13A-5-40(a)(2), as charged in Count I of the Indictment. A penalty hearing followed and on February 14, 1991, the jury, by a vote of 11-1, recommended that he be sentenced to death.

A formal sentencing hearing as required by ALABAMA CODE § 13A-5-47 (1975) was conducted on March 13, 1991, and the trial court judge sentenced DeBruce to death.

DeBruce appealed his conviction and sentence to the Alabama Court of Criminal Appeals. On March 5, 1993, that court entered a published opinion affirming DeBruce's conviction and death sentence. *See DeBruce v. State*, 651 So. 2d 599 (Ala. Crim. App. 1993).

The Supreme Court of Alabama affirmed the conviction and sentence on September 16, 1994, finding no reversible error, plain or otherwise. *Ex parte DeBruce*, 651 So. 2d 624 (Ala. 1994).

On December 6, 1996, DeBruce filed a petition for relief from judgment pursuant to Rule 32 of the ALABAMA RULES OF CRIMINAL PROCEDURE. (Rule 32 C.R. Vol. 11, Tab. 37, pp. 153).[1]

---

[1]The court will utilize the following method of citation to the record. References to specific pages of the court record on direct appeal are designated "C.R.___", and references to the transcript on direct appeal are designated "R.___." References to the court record of the Rule 32 proceedings are designated "Rule 32 C.R. __", and references to the transcript on collateral appeal are designated "R.___." The court will strive to list any page number associated with the court records by reference

On February 25, 1997, the State filed an Answer, a motion for partial dismissal pursuant to

ALABAMA RULE OF CRIMINAL PROCEDURE 32.2(a), and a motion for partial dismissal pursuant to

ALABAMA RULE OF CRIMINAL PROCEDURE 32.6(b), or in the alternative, motion for an order

directing DeBruce to amend the petition.  *Id*. at Tab. 38, pp. 71-132.

After several years of litigation, during which time discovery requests and amended

pleadings were filed, and an order of partial dismissal of claims deemed to be procedurally

defaulted was entered, evidentiary hearings were held in July and October 1999.  On April 7,

2000, the petition was denied by the trial court.  *Id*. at Vol. 13-14, pp. 575-607.

On May 9, 2000, DeBruce filed a Notice of Appeal.  *Id*. at Vol. 14, pp. 808-16.  On

December 2, 2003, the Alabama Court of Criminal Appeals affirmed the trial court's decision.

*DeBruce v. State*, 890 So. 2d 1068 (Ala. Crim. App. 2004).

On April 30, 2004, the Supreme Court of Alabama denied certiorari review.  On

September 7, 2004, DeBruce filed the present Habeas Petition (the "Petition" or the "Habeas

Petition") in this court.

## II.    FACTUAL BACKGROUND

The following summary of the evidence relevant to the offense is taken from opinion of

the Alabama Supreme Court on direct appeal.

> The evidence tended to show that DeBruce and five other men were in the
> course of robbing a Talladega Auto Zone store and its customers when Doug
> Battle, unaware of the robbery, entered the store.  After the men had completed

---

to the numbers at the bottom of each page of a particular document, if said numbers are the most
readily discoverable for purposes of expedient examination of that part of the record.  Otherwise, the
page numbers shall correspond with those listed at the upper right hand corner of the record.
Additionally, if there is an easily identifiable tab number close to any cited material, the court has
made reference to that for the reader's benefit.

robbing the store and its customers, the men began to leave the store. As they started out the door of the store, DeBruce allegedly shot Battle in the back as he lay face down on the floor.

Some of the other customers were later able to identify photographs of the men involved in the robbery. The investigation that followed led to DeBruce's indictment and subsequent trial for the capital murder of Battle. At trial, DeBruce contended that it was Lujuan McCants, another of the robbers, who had shot Battle. DeBruce argued that McCants had bragged to two people about killing Battle. McCants, on the other hand, testifying in exchange for a sentence of life imprisonment, said it was DeBruce who had killed Battle.

*Ex parte DeBruce*, 651 So. 2d at 625.

## III.    THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court ..." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." In other words, this court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254. Thus, unless otherwise expressly stated, use of the word 'claim' in this opinion presupposes a claim of federal constitutional proportion.

### A.    Exhaustion and Procedural Default

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is first required to present his federal claims to the state court by exhausting all of the state's available procedures. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. As explained by the Eleventh Circuit:

In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State. ...").  "When the process of direct review ... comes to an end, a presumption of finality and legality attaches to the conviction. ...  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."  *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887(1983)).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted).  The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts. ... it is not sufficient merely that the federal habeas applicant has been through the state courts. ...  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, *i.e.,* the claim is procedurally defaulted.  Usually, if the last state court to examine a claim explicitly finds that the claim is defaulted because the petitioner failed to follow state procedural rules, then federal review of the claim is also precluded pursuant to federal procedural default principles.  As explained by the Eleventh Circuit:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted.  Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief.  *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988).  The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Federal deference to a state court's clear finding of procedural default under its own rules is so strong that a

> state court need not fear reaching the merits of a federal claim in an *alternative* holding.  Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n. 10, 109 S. Ct. 1038 (emphasis in original).  *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect ... of blurring the clear determination by the [Georgia habeas corpus] court that the allegations was

procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The Supreme Court defines an "adequate and independent" state court decision as one "[which] rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'"  *Lee v. Kemna,* 534 U.S. 362, 375 (U.S. 2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (emphases added)).  Whether or not a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal question.'"  *Id*.  (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

A state procedural rule is "independent of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law."  *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  To be considered "adequate," by a federal court, the state procedural rule must be both "'firmly established and regularly followed.'"  *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984).  In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find it to be adequate.  *James v. Kentucky*, 466 U.S. at 346. This does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy."  Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley*, 250 F.3d at 1313.  If it is adequate, then the federal court normally will foreclose its review.  If however, the rule is not firmly established, or if it is applied in an arbitrary,

unprecedented and manifestly unfair fashion, it is not adequate to preclude federal review. *Card v. Dugger*, 911 F.2d at 1517.

There are also instances where the doctrines of procedural default and exhaustion intertwine. For example, if a petitioner's federal claim is unexhausted, the district court will traditionally dismiss it without prejudice or stay the cause of action in order to allow the petitioner to first avail himself of his state remedies. However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile [under the state's own procedural rules,]" this court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect[.]" *Bailey v. Nagle*, 172 F.3d at 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971) and *Snowden v. Singletary*, 135 F.3d at 737).

There are only three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner had good "cause" for not following the state procedural rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g*., *Coleman v. Thompson*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496

(1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is

actually innocent, a federal habeas court may grant the writ even in the absence of a showing of

cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v.*

*Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental

miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one

who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting

*Murray v. Carrier*, 477 U.S. at 496)).

### 1.    The "Cause and Prejudice" Standard

As the "cause *and* prejudice" standard clearly is framed in the conjunctive, a petitioner

must prove both parts.  To show cause, a petitioner must prove that "some objective factor

external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray v.*

*Carrier*, 477 U.S.  at 488.

> Objective factors that constitute cause include "'interference by officials'" that
> makes compliance with the State's procedural rule impracticable, and "a showing
> that the factual or legal basis for a claim was not reasonably available to counsel."
> *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is
> cause."  *Ibid*.  Attorney error short of ineffective assistance of counsel, however,
> does not constitute cause and will not excuse a procedural default.  *Id*., at
> 486-488, 106 S. Ct., at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). *See also Reed v. Ross*, 468 U.S. 1, 16 (1984)

("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to

counsel, a defendant has cause for his failure to raise the claim in accordance with applicable

state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice.  Such a showing

must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they

worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

## 2.    The "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary,"[2] and "narrow class of cases,"[3] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. at 537-38 (quoting, respectively, *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496)[4], or if (2) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. at 323-27 & n.44 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

The court digresses momentarily to identify and examine the manner in which the questions of procedural default have been dealt with by the parties. The state procedural rules at

---

[2]*Schlup v. Delo*, 513 U.S. at 321 ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[3]*McCleskey v. Zant*, 499 U.S. at 494 ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (citing *Murray v. Carrier*, 477 U.S. at 485).

[4]Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U.S. at 496.

issue are ALABAMA RULES OF CRIMINAL PROCEDURE 32.2(a)(2)-(5), 32.3 and 32.6(b).  In his

answer and brief, the respondent argues that a number of DeBruce's claims are procedurally

defaulted because the state court found he had failed to comply with ALABAMA RULES OF

CRIMINAL PROCEDURE 32.2, 32.3 and/or 32.6(b).  *See generally* Doc. 14 & 15.

DeBruce filed a reply to the respondent's answer and brief, but in the reply he does not

dispute *any* of respondent's assertions of procedural default, including those involving the

aforementioned state procedural rules.  *See generally* Doc. 20.  It necessarily follows that

DeBruce does not deny that the procedural rules relied upon by the state to dismiss certain claims

are adequate and independent for federal preclusion purposes.  Moreover, DeBruce does not

attempt to overcome the procedural default of any claim either by arguing cause and prejudice or

that a miscarriage of justice will occur if the claim is not afforded habeas review.  Curiously,

DeBruce does not mention procedural default at all in his petition or reply brief.

Still, the court will examine the record to verify whether respondent's procedural default

defenses are indeed correct.  Additionally and importantly, one particular genre of respondent's

procedural default defenses is rejected.  Specifically, respondent alleges many of DeBruce's

ineffective assistance of counsel claims are

> procedurally defaulted because the Rule 32 court and/or the Alabama Court of
> Criminal Appeals found that DeBruce failed to present evidence in support of the
> claims during the post-conviction hearing.

(Doc. 15, pp. 13-15).

The respondent does not support his assertion with any precedent showing that Alabama

has interpreted its procedural rules to result in procedural default under these particular

circumstances.  Nor does he point to any case wherein the Eleventh Circuit has acknowledged

15

such a ruling as anything other than a merits ruling.  If DeBruce's claims were rejected by the

state court *after* an evidentiary hearing was held because he did not present the evidence

necessary to meet his burden of proof, then such an adjudication is a denial on merits, and one

which is subject to 2254(d) review.

Moving back to the general principles at hand, even when exhaustion and procedural

default are not at issue, federal review of a claim that has been decided on the merits by a state

court is fairly restrictive.

### B.       Rules Governing Habeas Corpus Cases Under § 2254

### 1.       28 U.S.C. § 2254(d) and (e)

When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

Congress significantly limited the circumstances under which a habeas petitioner may obtain

relief.  Indeed, under AEDPA, a petitioner is only entitled to relief on a federal claim if he shows

that the state court's adjudication of his claim "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court," or that the court's rulings "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(1) and (2).  *See also Williams v. Taylor*,  529 U.S. 362, 404

(2000); *Brown v. Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005);

*Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  "Moreover, a state court's factual

determinations are presumed correct unless rebutted by clear and convincing evidence."  *McNair*

*v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)).

16

A state court's adjudication of a claim will be sustained under § 2254(d)(1), unless it is "contrary to" clearly established, controlling Supreme Court precedent, or it is an "unreasonable application" of that law.  These are two different inquiries, not to be confused, nor conflated, as the Supreme Court explained in *Williams v. Taylor*:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States."  (Emphases added.)

*Id.*, 529 U.S. at 404.  The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at 412; *see Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. at 405.

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id*. at 407; *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001). Whether a particular application of Supreme Court precedent is "reasonable" turns not on subjective factors, but on whether the application of Supreme Court precedent at issue was "objectively unreasonable." The question is not whether the state court "correctly" decided the issue, but whether its determination was "reasonable," *even if incorrect. See Bell v. Cone*, 535 U.S. 685, 694 (2002).

Having explained the scope of this court's authority to review state court decisions, it is now appropriate to examine the federal procedural rules applicable to the controversy presently before the court.

### 2. Procedural Rules Governing Habeas Corpus Cases Under § 2254

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted). A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested. 28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*. A "general reference to the transcripts, case records and briefs on appeal patently

fails to comply with Rule 2(c)." *Phillips v. Dormire*, 2006 WL 744387, *1, (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *See Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) (the burden of proof is always on the petitioner); *Corn v. Zant*, 708 F.2d 549, 563 (11th Cir. 1983) (the petitioner bears the burden of producing substantive evidence in support of his claim). Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded. *See e.g. Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d 406 (11th Cir. 1983), *vacated on other grounds*, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984), on remand 739 F.2d 531 (11th Cir. 1984). That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation. The mere assertion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

With these principles in mind, the court now turns to DeBruce's claims.

## IV.   DISCUSSION

### A.   DEBRUCE WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL  (Doc. 1 ("Petition"), pp. 7-38) and (Doc. 20 ("Brief"), pp. 1-189)

#### 1.   Introduction

DeBruce's claims of ineffective counsel are divided into the pre-trial, voir dire, guilt, sentencing and post-sentencing phases of trial. (Doc. 1, pp. 7-38). The respondent argues the

sub-claims are procedurally defaulted in that DeBruce failed to raise some claims[5] at all in state

court or "the Rule 32 court and/or the Alabama Court of Criminal Appeals found that DeBruce

failed to present any evidence in support of [other] claims[6] during the post-conviction hearing[.]"

(Doc. 15, pp. 8-10, 13-15).  Regardless, the respondent declares that DeBruce cannot show he is

entitled to 28 U.S.C. § 2254(d) or (e)(2) relief.  (Doc. 14, pp. 4-62) and (Doc. 15, pp. 8, 13-15,

17-57).

### 2.        Pre-trial  (Doc. 1, ¶¶ 30-39, pp. 9-12)

DeBruce alleges that his initial counsel, Jonathon Adams, had never tried a capital case

and was appointed by the court at a time when payment for capital counsel in the State of

Alabama was limited by statute to $1,000.00.  (Doc. 1. p. 9).  DeBruce contends Adams was

"constrained" by this rate.  *Id*.  Moreover, even though Mr. Adams represented DeBruce for

several months, he was ineffective because "he did no work beyond filing one *pro forma*

motion."  *Id*. at 9-10 (citing *Strickland*; *United States v. Cronic*, 466 U.S. 648 (1984)).

DeBruce's second lead counsel, Mr. Mathis, was ineffective during pre-trial proceedings

because, after having been retained less than one month before trial he failed to

> hire an investigator, conduct his own investigation, adequately prepare, obtain any
> expert assistance, seek necessary adjournments, lodge timely and specific protests
> to prosecutorial misconduct, or familiarize himself with exculpatory material that
> was available or make use of evidence that would have severely damaged the
> prosecution's case and enhanced the defense case.  There was no strategic

---

[5] Specifically, the sub-claims found in the following paragraphs of Claim A: ¶54, ¶57, ¶ 95,
¶¶ 98-99, ¶¶ 101-102, and ¶ 103(g),(h) & (s).

[6] Specifically, the sub-claims found in the following paragraphs of Claim A:  ¶¶ 31-32, ¶¶
35-39, ¶¶ 40-41, ¶¶ 50-53, ¶¶ 55-56, ¶¶ 89-90, and ¶¶ 92-99.   For reasons set out in page 14, *supra*,
this court rejects that these sub-claims are procedurally defaulted.

explanation for these failures which, individually and cumulatively, resulted in substantial prejudice.

(Doc. 1, p. 9).

For the remainder of this sub-claim DeBruce contends:

Mr. Mathis assumed responsibility for Mr. DeBruce's defense after the court had informed him that a trial date had been set and that he would not be given any additional time to prepare. Mr. Mathis did not ask the court for more time. ... Mr. Mathis did not have the time or resources to properly prepare and investigate Mr. DeBruce's case.

....

Never before, or since, had trial counsel taken on a death penalty case at such a late stage. Contrary to his normal practice, he did not retain any investigator or commission any mitigation specialist. Counsel conceded that there was no strategic decision for his failure to seek investigative help.

Because of his busy schedule and lack of time, counsel did not: visit the crime scene, even though it was a short distance from the courthouse; investigate or speak to any prosecution witness; look for defense witnesses; obtain copies of newspaper accounts of the incident and arrests; or have more than a perfunctory conversation with one or two of the co-defendants' lawyers. Counsel conceded that, normally, he would contact attorneys for co-defendants and obtain copies of their clients' statements, but he did not have enough time to do that here. Instead, counsel's pre-trial investigation consisted of skimming through a box of discovery provided by the prosecution.

....

The defense did not retain or consult with any expert witnesses.

....

Counsel failed to adequately research, prepare and argue for a change of venue.

*Id*. at 9-12.

21

DeBruce's stream of consciousness pleading is too conclusory to state an ineffectiveness claim for federal pleading purposes. This claim is due to be dismissed. Alternatively, the claim is without merit. On collateral appeal, the Alabama Court of Criminal Appeals engaged in a lengthy discussion of what now appears in the habeas petition as cryptic, incomplete allegations, and determined that the claims were without merit. *DeBruce v. State*, 890 So. 2d at 1080-86. DeBruce does not dispute the state appellate court's factual findings, and his factually and legally bare habeas claim does not prove the state court's adjudication of either *Strickland* prong to be contrary to or an unreasonable application of clearly established Supreme Court precedent. This claim is due to be dismissed, or in the alternative, due to be denied.

###     3.      Voir Dire  (Doc. 1, ¶¶ 40-41, p. 12)

DeBruce alleges that

> Counsel failed to ask a panel of prospective jurors whether they or their family members were crime victims. Mr. DeBruce was prejudiced by counsel's omission because one sworn juror had a sister who had been murdered. Counsel's questioning of that same juror failed to elicit that the juror's father was Deputy Commissioner of the Alabama Department of Corrections and he visited his daughter as she sat on the jury. The same juror had a brother who was a police officer in Virginia Beach, Virginia and a second brother who was a security guard. In another round of voir dire[, defense counsel] failed to elicit that a different juror's husband had been a deputy sheriff. A third juror was on a first name basis with the manager of the Auto Zone store. Still other jurors knew the victims or their families. None of these facts came out in voir dire, at least in substantial part because Mr. Mathis failed to conduct an effective examination of the panel members.

> During voir dire, counsel repeatedly shifted and minimized the prosecution's burden of proof by defining reasonable doubt as a "doubt for which you can attach some reason," "a real reason," or a "sound and sensible reason."

(Doc. 1, p. 12).

The respondent correctly answers and this court finds that the above claim is due to be dismissed as insufficiently pleaded because DeBruce fails to "identify a single juror by name and does not even cite ... where in the record the alleged deficiency occurred during voir dire." (Doc. 15, p. 30). Even if it were not due to be dismissed for this reason, it is due to be denied on the merits because, as argued by the respondent, DeBruce's allegations do not show the state court's adjudication of the claim entitles him to 2254(d) relief.

The pertinent portion of Alabama Court of Criminal Appeals' opinion on collateral review reads:

> DeBruce argues that counsel was deficient during jury selection. He makes several different allegations to support this contention. However, few of the allegations were developed at the evidentiary hearing. Mathis was questioned about why he did not ask during voir dire whether any of the veniremembers or their family members had been the victims of a crime. It appears that he failed to ask one panel this question. Mathis admitted that he always asked that question and that he must have inadvertently failed to ask that panel that question. However, DeBruce failed to show any prejudice. The juror who had in fact been a victim of a crime was questioned extensively at the postconviction hearing and said that the fact that her sister had been murdered did not affect her decision and that she had not discussed her sister with any of the other jurors. Two other jurors testified at the evidentiary hearing that they were unaware that one juror had a sibling who had been murdered. "An accused is not entitled to error-free counsel. *Graham v. State*, 403 So. 2d 275 (Ala. Cr. App. 1980), *cert. quashed*, 403 So. 2d 286 (Ala. 1981)." *Phelps v. State*, 439 So. 2d 727, 735 (Ala. Crim. App. 1983). "An accused is entitled ' "not [to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance." ' " *Dobyne v. State*, 805 So. 2d at 758 (quoting *Thompson v. State,* 615 So. 2d 129, 134 (Ala. Crim. App. 1992), quoting in turn *Haggard v. Alabama,* 550 F.2d 1019, 1022 (5th Cir. 1977)).
>
> "'Even if counsel committed what appears in retrospect to have been a tactical error, that does not automatically mean that petitioner did not receive an adequate defense in the context of the constitutional right to counsel.' *Ex parte Lawley,* 512 So. 2d 1370 (Ala. 1987). '"An accused is not entitled to error-free counsel."'

> *Stringfellow* [*v. State*], 485 So. 2d [1238] at 1243 [(Ala. Crim.
> App. 1986)]."

*Hutchins v. State,* 568 So. 2d 395, 397 (Ala. Crim. App. 1990).

*DeBruce v. State*, 890 So. 2d at 1086.[7]

DeBruce does not dispute the correctness of the state court's factual findings.  Therefore, the state court's findings regarding deficient performance and prejudice are not an unreasonable application of the *Strickland* standard.  For the foregoing reasons, this claim is due to be dismissed, or in the alternative, due to be denied.

### 4.     Guilt Phase  (Doc. 1, pp. 13-17) and (Doc. 20, pp. 34-91)

#### a.     Impeachment of State's star witness  (Doc. 1,  ¶¶ 42-49, pp. 13-16) and (Doc. 20, pp. 15-34)

DeBruce alleges counsel "failed to gather and use powerful evidence that would have impeached the state's star witness." (Doc. 1, p. 13).  Defense counsel was informed prior to trial that co-defendant LuJuan McCants "was a cooperating witness."  *Id*.  Since there were no witnesses that could identify DeBruce as the shooter, he declares McCants's testimony was "pivotal" because McCants intended to and did testify that "immediately after he left the store, he heard a gunshot and Mr. DeBruce entered the getaway car, where [DeBruce] supposedly confessed."  *Id*. at 13.  The evidence counsel failed to gather and use was

> a videotaped statement by Mr. McCants to the police that would have fueled a
> devastating cross-examination and completely undercut Mr. McCants's story.

---

[7]Although the Alabama Court of Criminal Appeals did not make a specific ruling regarding this aspect of DeBruce's claim, even it were not due to be dismissed as insufficiently pleaded, it is due to be denied because it is without merit.   The quotes within the allegation, without context, do not reveal an incorrect statement of reasonable doubt or the state's burden of proof.  As such, DeBruce cannot show that counsel was objectively deficient for using such phraseology during voir dire nor can he show that he was prejudiced thereby.

The videotape was made available to trial counsel.  However, trial counsel did not realize the import of this material and he failed to use it.  The videotape reveals McCants's motive for falsely accusing Mr. DeBruce.  On the videotape, Mr. McCants initially denied knowing who fired the fatal shot.  Mr. McCants changed his tune after detectives threatened to charge him, the next morning, with capital murder if he did not cooperate.  Detectives further pressured Mr. McCants by telling him that a co-defendant had accused him of being the shooter.  The detectives told Mr. McCants that he needed to defend himself against a capital murder charge.

Following these threats, Mr. McCants asked whether co-defendant Burton had named him as the shooter.  When detectives responded that Mr. DeBruce had identified Mr. McCants as the shooter, Mr. McCants countered by declaring for the first time that Mr. DeBruce was the triggerman.  It was apparent from the videotape that Mr. McCants falsely accused Mr. DeBruce in retaliation and in an effort to "defend himself." ....[8]

Beyond showing Mr. McCants's motive to lie, the videotape would have provided valuable grounds for cross-examination and would have demonstrated that Mr. McCants was unworthy of belief.  The videotape contradicts Mr. McCants's trial testimony on more than two dozen material facts, including the type of gun that each culprit possessed and whether any inculpatory statements were made in the getaway car.

The videotape also contains a critical inconsistency regarding premeditation.  At trial, Mr. McCants averred that at a car wash, shortly before the hold up, co-defendant Burton told Mr. McCants and others that if any Auto Zone customers did not do what they were supposed to do, he would "take care of it."  In summation, the prosecution relied upon Mr. Burton's alleged statement as proof of premeditation.  On the videotape, however, Mr. McCants denied that any such discussion took place.  He told investigators that there was no plan, and he claimed that he did not speak with Mr. Burton at the car wash.

---

[8]This court has viewed the videotaped statement in its entirety.  While it can be argued that McCants named DeBruce as the shooter in retaliation for DeBruce having fingered McCants, and because McCants was told he would be charged with capital murder if he did not defend himself, the tone of the tape is not threatening.  Frankly, the interplay between the officers and McCants leads to an equally plausible scenario that McCants determined that, unlike himself, other members of the group broke the code of silence between them, not only by identifying the individuals involved in the robbery but by falsely accusing him of being the shooter in order to save themselves.  Once that occurrence was realized, McCants decided to begin telling some of what he knew about the crime.

Evidence that Mr. DeBruce was not the actual shooter, and that he did not
participate in a discussion about the use of force, undermines the reliability of the
capital murder verdict. *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989)
(counsel ineffective for failing to impeach the star witness's testimony concerning
the identity of the actual shooter).[9]

*Id*. at 13-14.

In addition to failing to utilize the videotape, DeBruce also contends Mathis failed to

adequately impeach McCants concerning his plea bargain agreement[10] with the State and his

other criminal activities, "including his large-scale drug trafficking[11]; ... evidence that Mr.

---

[9]In his reply brief, DeBruce tacitly concedes that the circumstances which supported a finding
of ineffectiveness in *Nixon* are not present in this case, and thus "*Nixon* does not necessarily render
the Alabama Court of Criminal Appeals' decision here an 'unreasonable application' of *Strickland
v. Washington*." (Doc. 20, p. 76). In *Nixon*, there were two named co-defendants, and a question
as to which defendant shot the victim. The victim's wife testified at the trial of both defendants, and
at each trial she claimed the particular defendant on trial was the shooter, to the exclusion of the other
other defendant.

[10]DeBruce erroneously alleges counsel failed to show that McCants "gave false and
misleading testimony concerning the price that the prosecution paid for his co-operation."  (Doc.
1, p. 15).  In support of this contention, DeBruce declares trial counsel was aware McCants "would
be prosecuted on lesser charges, carrying a sentence of twenty-five years in prison, not life...."  *Id*.
He then asserts counsel conceded that his failure to impeach McCants was not a tactical decision.
*Id*.  DeBruce did not prove McCants received a twenty-five year sentence during post-conviction
proceedings, nor did he ask Mr. Mathis any questions about a twenty-five year sentence. (*See* Claim
IV.F.1., *supra*., for discussion).  This aspect of DeBruce's claim is therefore without merit for
2254(d) purposes and is due to be denied.

[11]The court rejects this contention outright based on DeBruce's reply brief, in which he
admits

the charge of unlawful possession of 47 rocks of crack cocaine ... was dismissed,
apparently based either on a failure to adequately inform McCants of his right to have
a guardian or lack of corroboration for McCants' incriminating statement. ...

(Doc. 20, p. 57, n.25) (citing Ex. 6) (*See* [Rule 32 C.R. Vol. 20, pp. 315-26]), which is a transcript
of the October 23, 1991, certification hearing of LuJuan McCants as to the above-described criminal
activity)).  An examination of the transcript shows that the trial judge dismissed this charge *ore
tenus*, apparently because McCants was not properly informed of his right to have a guardian present

McCants purchased the murder weapon; and ... that McCants drove the get-away car on the day of the offense." *Id*. at 15.

The respondent answers that DeBruce cannot show the state court's denial of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. (Doc. 14, pp. 13-16 and Doc. 15, pp. 32-34). On collateral review, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> DeBruce argues that Mathis was ineffective for failing to adequately impeach his codefendant, Lujuan McCants. Specifically, he contends that counsel failed to question McCants about a prior statement he had made to police that was inconsistent with his trial testimony. The codefendant testified at trial that DeBruce was the shooter in the killing. However, McCants had made a pretrial statement that was inconsistent with his trial testimony. In his pretrial statement he said that he did not know who shot the victim. There were no inconsistent statements about DeBruce's involvement in the robbery/murder-only inconsistencies about the extent of his involvement.

> The circuit court, when denying relief on this issue, stated:

>> "The Court finds that, even though Erskine Mathis did not use the videotape to impeach McCants, in light of the evidence against DeBruce, this was not prejudicial. Further, regardless of whether DeBruce was the actual shooter, the theory of accomplice liability would have led to his prosecution for capital murder, and would have enabled the jury to reach the same verdict. Charles Burton was not the shooter, by all accounts; yet, he received a

during questioning. There was no other evidence showing that McCants was in possession of the crack cocaine other than his inadmissible assertion that he would "take the blame" for it. *Id*. Since the charge was dismissed on October 23, 1991, it is factually impossible for McCants to have believed there would be or that there was any agreement for him to get favorable treatment regarding this charge when he testified against DeBruce in February, 1992. DeBruce's speculation that his counsel could have somehow questioned McCants about the fact he was willing to take the blame for the crack cocaine out of loyalty to Barbara Spencer (the car containing the drug was found on her property) is so remote that in no sense would the Confrontation Clause have been implicated under the Supreme Court cases cited by DeBruce himself.

death sentence for his participation.  There is no likelihood that the result of the trial would have been different.  This claim is denied on the merits."

Mathis testified at the postconviction hearing that he was not aware of the existence of any pretrial statements by McCants.  However, the circuit court, in its detailed order, made the following finding as it related to DeBruce's alleged discovery violations:

"The Court finds that Erskine Mathis, contrary to his recollection, viewed the videotape in advance of trial.[12]  The State marked for identification two notes taken from the District Attorney's files, created by Surrett and in his own handwriting, where he made notes memorializing the occasion and noting who was present, as was his practice in every case."

(R. 600.)  Mathis was aware of the existence of the tape and of McCants's prior statement.  When Mathis cross-examined McCants he focused on McCants's motivation to lie about DeBruce's involvement in the robbery/murder and on the fact that he had been offered life imprisonment in exchange for his testimony, and he attempted to impeach McCants with evidence that McCants had told two individuals that he had committed the murder.  Mathis then offered the testimony of K.D.- DeBruce's 16-year-old niece.  K.D. testified that McCants told her and Lisa Taylor that he had killed a man because the man was crippled and he could not get down on the floor.  (Record on direct appeal, p. 951.)  Mathis did impeach McCants.  However, the evidence against DeBruce was overwhelming-numerous witnesses testified and detailed DeBruce's involvement in the robbery/murder.  DeBruce has failed to show how Mathis's performance was deficient.

*DeBruce v. State*, 890 So.2d at 1086-87.

DeBruce declares the appellate court's findings are contrary to and an unreasonable application of *Strickland v. Washington* and its progeny.  (Doc. 20, pp. 36-37).  After careful examination of McCants's videotaped statement and trial testimony, it is evident that Mr. Mathis was objectively deficient for failing to impeach McCants at trial with his inconsistent statements

---

[12]Before calling co-defendant McCants as a witness for the state's case-in-chief at trial, colloquy between the prosecutor and Mathis proves without question that Mathis was afforded the opportunity to view the video statement.  (R. Vol. 8,  p. 898).

in the tape.  The state court found that Mathis's performance was not objectively deficient simply because DeBruce's teenage niece testified that McCants had confessed to her and because the jury was apprised that McCants had entered into a plea bargain agreement for a life sentence in exchange for his testimony.

Such a determination was unreasonable.  First, the credibility of DeBruce's niece was uncorroborated and subject to question.  For instance, she asserted that McCants made his confession to her and a friend who was unrelated to the DeBruce family.  Yet, Mathis did not call this unrelated friend as a witness.  Additionally, DeBruce's niece never informed law enforcement that McCants had made such a statement.  A proper impeachment of McCants could have afforded some corroboration to the niece's testimony.

Second, Mathis did not question McCants in such a manner that the jury would have understood that McCants would be receiving a life sentence as opposed to a sentence of life without parole in exchange for his testimony.  In his brief cross-examination of McCants, the jury was made aware that McCants would receive a life sentence, but was not made aware that that particular sentence would allow McCants to be paroled.  In other words, Mathis did not distinguish a sentence of life without parole from a life sentence.  Nor was such a distinction made at any other time during the trial.  Therefore, the state court's reliance on this 'impeachment' to satisfy the *Strickland* standard rests on very shaky ground.

More importantly, the inconsistencies in McCants's August 24, 1991, videotaped statement (doc. 24) when compared to a February 7, 1992, written statement given three (3) days before trial, and his trial testimony are numerous.  Had counsel properly utilized the videotape, he could have argued to the jury that McCants did decide to place the blame for the actual

shooting on DeBruce when he found out DeBruce had told law enforcement that McCants was the shooter. *Id*. Counsel could have pointed out numerous inconsistencies in McCants's chronological version of the events, particularly regarding McCants's inconsistent statements regarding the extent of his (McCants's) *own* involvement in the crime. Finally, counsel could have pointed out that in the August 24,1991, statement, McCants stated that Burton never instructed or indicated anyone would be hurt during the robbery. *Id*. At trial, McCants agreed that Burton said if anyone needed to be hurt, he (Burton) would take care of it. (R. Vol. 6, p. 911).

In short, the inconsistencies in McCants's videotaped statement are significant and plentiful enough that the state court's determination that counsel was not deficient for failing to utilize them, simply on the basis that Mathis impeached McCants by way DeBruce's niece and McCants's plea bargain agreement, is an unreasonable application of *Strickland* and its progeny. No reasonable counsel would have foregone the opportunity to point out at least some of the most obvious inconsistencies in an effort to discredit McCants, the only 'witness' to the shooting of Doug Battle.

Neither the Rule 32 court or the Alabama Court of Criminal Appeals mentioned DeBruce's allegation that Mathis failed to impeach McCants on the basis that he had a pending charge for purportedly selling $25.00 worth of crack to an undercover officer, that McCants (possibly using the alias Warren) may have been with co-defendant Deon Long when Long purchased the murder weapon and that McCants drove the car on the day of the AutoZone crime.

This court agrees with DeBruce's contention that Mathis should have discovered and cross-examined McCants regarding his pending drug charge. (Doc. 20, pp. 56-57 (citing *Davis v.*

30

*Alaska*, 415 U.S. 308, 315-20 (1974) (holding that the Confrontation Clause required the defendant be permitted to cross-examine as to witness's bias even though doing so would expose otherwise secret juvenile adjudication)).[13]  Counsel also should have cross-examined McCants about his use of the aliases, Juan Williams or Warren Williams.  DeBruce concedes that co-defendant Deon Long[14] actually purchased the murder weapon (a Davis .380), but asserts that since a man named 'Warren' accompanied Long and McCants had used the name Warren Williams as an alias, counsel was objectively deficient for failing to use this incident to intimate that McCants had access to the murder weapon.  McCants also received a traffic ticket while driving the get away car on August 16, 1991, for driving without a license in the getaway vehicle and signed the ticket using the name "Juan Williams."  (Rule 32 R. Vol. 15, p.115 and Ex. 17, p. 2 & Rule 32 R. Vol. 21, p. 513).  However, none of this information is so impressive, such that counsel should be deemed objectively deficient for failing to attempt to impeach McCants with it.

Regardless of whether Mathis could and should have used *any* of this impeachment evidence against McCants, after a review of all the evidence against DeBruce at trial, this court

_____

[13]DeBruce also asserts that as a matter of state law,

> Alabama courts have recognized, "where . . . the accomplice is a key witness, the trial court has little, if any, discretion to curtail an accused's attempts to show bias or motive on the part of the witness."  *Starks v. State*, 594 So. 2d 187, 197 (Ala. Crim. App. 1991) (also quoting with approval from decision recognizing the right to cross-examine an accomplice regarding "'any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation'").

*Id.*

[14]*See* Rule 32 R. Vol. 15, p. 70-71 and Rule 32 C.R. Vol. 19, pp. 183-87 for Ex. 2 and  *id.,* at Vol. 20, pp. 315-29 for Ex. 6.

cannot find that the state court was unreasonable either in its determination of the facts or legal application of *Strickland* when it found that DeBruce could not show he had been constitutionally prejudiced.[15]

---

[15] Excepted from this finding is the appellate court's contention that the result of DeBruce's trial would not have been different because co-defendant Charles Burton was not the shooter, and yet he received a death sentence for his participation.  *See DeBruce v. State*, 890 So.2d at 1087 (quoting the circuit's court order).  Such a comparison is generally improper because it offends individualized sentencing concerns and particularly so in this case because Burton was 41 years old at the time of the robbery, had already spent the bulk of his adult life in prison and was the leader and organizer of the group who robbed AutoZone, all of whom were in their late teens or early twenties. *Burton v. State*, 651 So.2d 641, 643-44, 652, 656-57 (Ala. Crim. App. 1993).  *See also, Charles Burton v. Donal Campbell*, (4:05-cv-308-CLS-PWG (N.D. Ala. Mar. 27, 2009)) (unpublished memorandum)in which the district court quoted the sentencing court's order as to Burton, which reads in pertinent part:

> .... [Burton] possessed all of the requisite intent to sustain a conviction as charged in the indictment.  Further, [Burton] was forty-one years of age at this time and had been convicted of eight prior felonies, including one robbery.  He was the head of the gang and made plans for the robbery.  All of the other defendants were either juveniles or young adults.

(Doc. 32, p. 126) (quoting (Doc. 15, R. Vol. 1, Tab. 1 at 109)) (emphasis omitted) (brackets supplied) (copy attached as Exhibit A).

Additionally, there was an abundance of evidence[16] outside the testimony of McCants that supported a conviction for capital murder on the basis of accomplice liability.[17]  Under a different standard of review, this court might find that DeBruce has established that he was prejudiced by Mathis's deficient performance, at least as to the videotape in conjunction with the McCants plea agreement.[18]  However, given  the multitude of accomplice liability evidence against DeBruce, the state court did not unreasonably apply Supreme Court precedent when it found that there was no reasonable probability that the outcome of DeBruce's trial would have been different had counsel cross-examined McCants using the inconsistencies in his videotaped testimony or McCants's plea agreement.  Moreover, the jury was aware that McCants had associated himself with an unsavory group, actively participated in the AutoZone robbery in which he admitted he

---

[16]*See* (R. Vol. 3, pp. 342-370; *id.,* at Vol. 4, pp. 453-464, 494-558;  *id.* at Vol. 5, 789-900; *id.* at Vol. 6, pp. 801-69).  Witnesses also testified that there were up to six robbers and they came into the AutoZone armed with at least three (3) weapons to accomplish the crime.  Numerous witnesses identified DeBruce's vehicle as being the get away car, two witnesses identified DeBruce as being one of the robbers, and one of those witnesses saw DeBruce holding a silver/nickel plated gun.  Approximately one week after the crime, police confiscated DeBruce's car in Montgomery, Alabama, at a residence where DeBruce and other co-defendants were present.  Two (2) weapons were retrieved fro m the car.  The third was recovered in the back yard of the residence.  It was determined to be the murder weapon.  Moreover, police also retrieved duct tape and other items from the trunk of DeBruce's car that were determined to have been used in the robbery.  Finally, it is undisputed that the victim was lying in a helpless position face down on the floor when he was shot in the lower back.

[17]Moreover, even if Mathis had vigorously cross-examined McCants with his prior inconsistent statements, the jury still could have credited McCants's testimony, particularly those portions that could be independently corroborated by other evidence.

[18]Considering McCants's confessed involvement in the crime, the court is unimpressed that McCants's selling of $25.00 worth of crack to an undercover agent, his use of an alias on a traffic ticket or the inference that McCants had access to the murder weapon would have influenced the jury such that there is a reasonable probability the outcome of the trial would have been different, whether this information was used individually or in conjunction with other impeachment evidence.

33

was armed.  Therefore, there is no reasonable probability that the jury's impression of McCants

would have been substantially changed even if they had been made aware of the drug charge and

the situations in which McCants used an alias.  This claim is due to be denied.

### b.   Impeachment and use of other witnesses  (Doc. 1, ¶¶ 50-52, pp. 16-17)

DeBruce alleges that counsel was ineffective because he failed to adequately impeach

Larry McCardle, the AutoZone store manager, and failed to interview another AutoZone

employee named Tim Calhoun.  (Doc. 1, p. 16-17 and Doc. 20, pp. 59-65, 85).   The respondent

declares the Rule 32 court properly denied the claims on the merits and DeBruce cannot show he

is entitled to 2254(d) relief from that decision.  The circuit court held:

> Debruce could have produced McCardle as a witness on the issue of his
> cross-examination, but failed to do so.  Moreover, the record reflects that Mathis
> adequately cross-examined McCardle on his viewing Debruce in a pre-trial
> newspaper photograph, and that he did not identify Debruce through police photo
> line-ups.  This claim, also, is denied on the merits.
>
> Debruce failed to meet his burden of proof regarding Tim Calhoun . . .
> There was no evidence presented regarding this issue.

(Rule 32 C.R. Vol. 13, pp. 591-92).

DeBruce specifically alleges trial counsel failed to "effectively" impeach witness

McCardle about his exposure to pre-trial publicity.  (Doc. 1, p. 16).  DeBruce contends the State

tried to make it appear as though it was "scrupulously" fair  because it did not present any photo

lineups of DeBruce to McCardle once McCardle asserted that he had seen DeBruce's picture in a

newspaper article, yet McCardle was allowed to identify another co-defendant after looking at the

paper by the same procedure.  *Id*.  DeBruce makes no citations to any portion of the record in

support of this contention.  Nor does he dispute that Rule 32 counsel could have, but did not

question McCardle during post-conviction proceedings.  Finally, it is undisputed that McCardle did not identify DeBruce from any out of court photo lineup, and the fact that he saw DeBruce in the newspaper was before the jury.  The jury was well equipped to draw its own conclusions about whether McCardle was accurate about DeBruce's identity from the relevant evidence before it.

DeBruce also declares that, immediately before McCardle testified, the district attorney told Mathis that McCardle had just looked through the courtroom window and identified DeBruce as one of the robbers.  (Doc. 1, p. 16).  DeBruce suggests that this was an "unnecessarily suggestive and unreliable identification procedure."  *Id*.  This court would be hard pressed to find that simply because an eyewitness views the defendant *during* the trial and concludes that the defendant is indeed an individual he saw committing a crime, that such an identification is suggestive or unreliable.  Even if Mathis had questioned McCardle about that matter, the impeachment impact would have been slight, if at all.[19]  DeBruce is not entitled to habeas relief on this claim because he has not shown the state court's adjudication of the claim is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.

As far as witness Tim Calhoun, DeBruce's dissatisfaction with trial counsel boils down to a statement written in a police report to the effect that Calhoun, who was working at AutoZone on the day of the crime, purportedly told police that he saw three (3) chrome guns.  (Doc. 20, p. 61).  DeBruce declares that such information "called out for investigation" because at trial

---

[19]Further, as his last question to McCardle on cross-examination, Mathis asked McCardle, "Of course, as a matter of record, he is the only black man sitting up here today, isn't he?", to which McCardle answered, "Yes."  (R. Vol. 4, p. 553).

> McCants [testified] that only two other robbers had shiny handguns[20], the[re was a] change in McCants' account from the August 24th statement to his testimony as to whether he was carrying a shiny weapon, and the[re was a] lack of testimony from other witnesses about the sort of gun McCants had ....

*Id*. Further, at the Rule 32 hearing, Mathis admitted he had not seen the statement in the box of discovery given to him by the district attorney (while conceding he may have missed it), and if he had, he would have called Tim Calhoun[21] to the stand.  *Id*. at 62.  Calhoun was not questioned during the Rule 32 hearing either.

DeBruce's theory as to the importance of Tim Calhoun's statement, even if it is true, is misguided.  The statement would show, at most, that McCants testified there were only two shiny guns and Calhoun saw three shiny guns.  In light of all other evidence presented at trial, such a revelation means little or nothing for a number of reasons.

First, there were no less than five eyewitnesses in the AutoZone during the robbery who testified before the jury that they saw either silver/nickel guns and/or blue steel guns.  (*See* R. Vol. 3-4, pp. 365-69, 457-58, 507-08, 521-24, 536).  None of the testifying witnesses or the attorneys clarified the distinction between what was interpreted to be a chrome, or nickel plated gun or a silver gun.  It is certainly unknown what Calhoun meant by three (3) chrome guns since DeBruce did not call Calhoun as a witness at the Rule 32 hearing.  Second, while only three (3) weapons were introduced as being involved in the crime at trial, the jury was not left with the impression that these were all of the guns used in the robbery.

---

[20]This is accurate.  *See* R. Vol. 6, p. 916.

[21]DeBruce also speculates that had he not been able to call Tim Calhoun to the stand, he could have called the police officer who took the statement, and then questioned the officer about potentially sloppy police work.  The court finds no reason to engage in any discussion regarding this obtuse, hypothetical situation.  *Id*. at 63-65.

The court digresses a moment to note that the gun proven at trial to be the murder weapon was a nickel plated Davis .380.  (R. Vol. 6, pp. 836-37 & 869-70).  The Davis was found in a plastic bag in Barbara Spencer's back yard, and a silver Bersa .380 and a Dan Wesson .357 were found in DeBruce's car, which was parked in Spencer's driveway.  *Id*. at 800-50.  DeBruce and McCants were arrested at the same residence.  DeBruce's vehicle, the weapons and other evidence from the robbery were taken into police custody.

DeBruce alleges there were inconsistencies in McCants's statements regarding the type of weapon held by himself and DeBruce during the robbery.  DeBruce argues that McCants stated during his August 24, 1991, videotaped statement that he had a .357 at the time of the robbery. (Doc. 20, p. 42).  However, DeBruce is relying on a transcript that was not admitted into evidence, and even the transcript shows that McCants simply answered, "Uh-huh" to the police officer's question as to whether he had a .357.  (Rule 32 R. Vol. 19, p. 200).

On the videotape, which was admitted into evidence, McCants stated he had a silver gun with brown handles.  (Doc. 24).  When told by police that he had been identified as having a .380, McCants's response was ambiguous.  When asked later by a police officer if the gun he was carrying was a .357, McCants appears to nod in the affirmative.  *Id*.  In his February 5, 1992 written statement,  McCants stated that he had the black .380.  (Rule 32 R. Vol. 21, p. 530).  At trial, DeBruce claimed he possessed the Bersa .380.  (R. Vol. 6, p. 914).  McCants's statements are more confusing than inconsistent, especially since there has never been any real distinction between the shiny/chrome/nickel plated guns and the color of the handles on each gun.  Moreover, the statements certainly do not conclusively dove tail with what Calhoun purportedly would have testified.

37

For the foregoing reasons, this court finds that the state court's adjudication of this claim was neither contrary to or an unreasonable application of clearly established federal law. Counsel was not objectively deficient for failing to investigate and present Calhoun as a witness. Even if Calhoun had testified that he saw three (3) shiny guns, in light of all of the other evidence pertaining to the weapons in the AutoZone, including McCants's statements regarding how many weapons were in the store and who was carrying which weapon, the alleged impeachment information is neither clear nor compelling and there is no reasonable probability that the jury would have acquitted DeBruce had Calhoun been added as a piece to the impeachment puzzle.

For the foregoing reasons, these claims are due to be denied.

### c.    Other guilt phase issues  (Doc. 1, ¶¶ 53-57, p. 17)

The respondent asserts, DeBruce does not dispute and this court's independent review of the record shows that two aspects of this claim are procedurally defaulted because DeBruce did not raise them at any time during state court proceedings:

(1)    **¶ 54 -** counsel was ineffective for failing to argue that the shooter lacked the specific intent to kill; and

(2)    **¶ 57 -**  counsel was ineffective for failing to adequately investigate and argue that his physical and mental limitations made him unable to assist in his defense at trial.

(Doc. 15, p. 8).  The failure to present these particular claims in state court "means that [DeBruce] deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas  proceeding.'"  *Bailey v. Nagle*, 172 F.3d at 1305 (citing *Picard v. Connor*, 404 U.S. at 276).  Further, they are "procedurally defaulted, even absent a state court

38

determination to that effect, [because] it is clear from state law that any future attempts at exhaustion would be futile." *Id*. (citing *Snowden v. Singletary*, 135 F.3d at 737 (1998)).

If DeBruce were to attempt to raise these portions of Claim III.A.4.c. in another Rule 32 petition, the petition would be defaulted on numerous grounds: namely, it would be an impermissible successive petition filed outside the statute of limitations that contains claims DeBruce was required to, but did not raise during collateral proceedings. ALABAMA RULE OF CRIMINAL PROCEDURE 32.2 (b)(c) & (d). For the foregoing reasons, the claims in paragraphs 54 and 57 are procedurally defaulted.

The remaining allegations in this subsection of DeBruce's guilt phase ineffectiveness claims are that counsel failed to

> elicit that the police later recovered $502 from the decedent's body...[,] argue that because the hold-up had already been completed the shooting was an afterthought and not "in furtherance of" a robbery....[,] argue that Mr. DeBruce's drug and alcohol use at the time of the offense negated the intent necessary to commit capital murder.... [,] and to secure complete transcript of proceedings.... [including] an untranscribed conversation with the court about a possible adjournment.... [and] an untranscribed conversation with the prosecutor regarding a suggestive identification procedure involving Mr. McCardle.

(Doc. 1, p. 17).

The respondent asserts that these claims are procedurally defaulted because DeBruce failed to present any evidence in support of the claims during the Rule 32 hearing, or alternatively, that DeBruce is not entitled to any relief. (Doc. 14, pp. 18-26 and Doc. 15, pp. 35-37).

On collateral appeal, the Alabama Court of Criminal Appeals held:

> DeBruce makes other claims concerning his counsel's performance in the guilt phase of the capital proceedings; however, he failed to present any evidence

in support of the remaining contentions.  As the circuit court stated in its order -
DeBruce failed to meet his burden of proof.

*DeBruce v. State*, 890 So. 2d at 1088.

DeBruce does not dispute the state court's factual finding that he failed to present any
evidence in support of the above allegations at the Rule 32 hearing.  Since there was no evidence
to support his allegations, the state court's adjudication of the claims is neither contrary to or an
unreasonable application of clearly established federal law.  These claims are due to be denied.

5.      **Penalty Phase**  (Doc. 1, ¶¶ 58-59, pp. 17-18)

DeBruce prefaces the subdivision of this claim by alleging that defense counsel's failure
to impeach McCants and use available evidence tending to show DeBruce was not the shooter
also rendered him ineffective at the penalty phase of trial because the aforementioned evidence
could have influenced the jury as to DeBruce's lack of moral culpability.  (Doc. 1, ¶¶ 58-59, pp.
17-18).  The respondent refers to the foregoing allegations as introductory paragraphs and
answers the same with a denial.  (Doc. 14, p. 26).

DeBruce declares "[c]ounsel's entire performance at the penalty phase was grossly
ineffective...." because he failed to investigate and prepare for it.  (Doc. 1, p. 18).  He alleges that
he was prejudiced because the lack of investigation allowed a prior robbery conviction to be used
against him as an aggravating factor, and neither the jury nor the trial judge were aware of
mitigating background evidence in favor of DeBruce.  *Id.*

a.      **Aggravating circumstance**  (Doc. 1,  ¶¶ 60-67, pp. 18-22)

DeBruce alleges he "was prejudiced by trial counsel's complete unfamiliarity with" his
prior Jefferson County robbery conviction, when the conviction was presented as an aggravating

40

factor at the penalty phase of trial.  (Doc. 1, pp.18-22).  He contends the state court's denial of

the claim on collateral appeal was contrary to or an unreasonable application of clearly

established federal law or an unreasonable determination of the facts in light of the evidence

before it.  (Doc. 20, pp.  120-49).  The respondent answers that DeBruce cannot show he is

entitled to 2254(d) relief.  (Doc. 14, p. 27).

When examining this claim on collateral review, the Alabama Court of Criminal Appeals

quoted the decision of the Rule 32 court, which reads:

> "Debruce claims that Mathis failed to challenge the aggravating
> circumstances relie[d] upon by the State.  The basis of his argument is the
> Jefferson County conviction.  Mathis was not ineffective for failing to challenge
> this conviction.  The proper forum for such an attack is a separate Rule 32 petition
> direct[ed] at the prior conviction and filed in Jefferson County, where the prior
> conviction took place.  *Young v. State*, 600 So. 2d 1073, 1075 (Ala. Crim. App.
> 1992); *Bryant v. State*, 565 So. 2d 290 (Ala. Crim. App. 1990).  Mathis would not
> have been able to challenge the conviction in a Talladega County Court.  The
> same is true inasmuch as Debruce makes claims against Anthony Falletta for
> ineffective assistance of counsel.  These claims are denied on the merits."

*DeBruce v. State*, 890 So. 2d at 1088-89 (quoting the circuit court's opinion at (Rule 32 C.R.

Vol. 13, p. 594)).

DeBruce argues that a reasonably competent lawyer, upon being told about a prior

robbery conviction by the prosecutor,[22] would have examined the conviction in an effort to

prevent it from being used as an aggravating factor during the penalty phase of trial.  (Doc. 20,

pp. 122-23).  DeBruce also contends that reasonable counsel could have examined the youthful

offender report in his case, filed January 7, 1992, and easily discovered the September 14, 1991,

---

[22]During a January 31, 1992, motions hearing, Mathis was twice told by District Attorney
Rumsey that he (Rumsey) believed DeBruce had a prior robbery conviction in Jefferson County,
Alabama.  *See generally* R. Vol. 2, Tab. 4.

robbery conviction listed therein.  (C.R. Vol. 1, pp. 56-58).  Yet, counsel did not investigate the conviction, and as such, Mathis's only argument against the use of the conviction at the penalty phase of trial was based on a conversation between DeBruce and Mathis on the day the penalty phase was to begin wherein DeBruce stated that he had not been considered for youthful offender status before pleading guilty to the Jefferson County robbery offense.  (R. Vol. 7, Tab. 15, p. 1080).

After contacting the Jefferson County Clerk and finding there was no evidence in the Clerk's file that DeBruce had been denied youthful offender status, Talladega County District Attorney Rumsey contacted Judge James Hard, the circuit judge who presided over the robbery case, and Judge Hard directed his court reporter to prepare a transcript of the plea colloquy.  *Id.* at 1089-90.  Rumsey indicated that a certified copy of the transcript would be sent by fax to the Talladega circuit court.  *Id.* at 1091.  Counsel for DeBruce commented that the Jefferson County court reporter, Walter Enoch, and Judge Hard were "fine m[en] ... but [w]e haven't had the opportunity to listen to the tapes or listen to the record if it is in fact is transcribed.  We don't know.  We don't have any choice but to object to it [the admission of the certified copy of the robbery conviction as an aggravating factor] until we do."  *Id.* at 1097-98.

DeBruce does not deny that a certified copy of the Jefferson County colloquy was received by the court on February 14, 1992, marked as Exhibit 82 for identification purposes by the state, and placed into the record by the trial court.  (Doc. 20, p. 129 (quoting R. Vol. 7, Tab. 18, p. 1123)).  The transcript of the plea and sentencing in Jefferson County affirmatively shows that DeBruce was denied youthful offender status.  (R. Vol. 21, p. 461 (see also Doc. 20, p. 129, n. 60)).  He does argue, however, that trial counsel still must not have carefully examined the

transcript because, if he had he would have discovered that the Jefferson County trial judge, upon

accepting DeBruce's plea of guilty to robbery second degree, engaged in the following discussion

with DeBruce:

> THE COURT: Let's face it, you have two serious cases pending against
> you in the other county.
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: This has nothing to do with those, you know that?
>
> THE DEFENDANT: Yes, sir.

(Rule 32 R. Vol. 21, pp. 461-62).

DeBruce relies upon *Rompilla v. Beard*, 545 U.S. 374 (2005), to support his contention

that counsel was objectively deficient for failing to investigate the Jefferson County robbery

conviction after having notice from at least two sources that it existed and could be used as an

aggravating factor in the penalty phase of trial.[23]  (Doc. 20, p. 130).  Moreover, DeBruce alleges

he was prejudiced by counsel's failure because, if counsel had investigated the matter, he could

have moved to exclude the use of the conviction as an aggravating factor in the capital case under

the auspices of *Santobello v. New York*, 404 U.S. 257, 262 (1971) (enforceability of promises by

the prosecutor to induce a plea).

DeBruce contends the Alabama Court of Criminal Appeals opinion on this issue

erroneously focused on a successful postconviction attack of the Jefferson County conviction as

---

[23]In *Rompilla*, the Supreme Court stated that counsel's performance was deficient "because
they failed to make reasonable efforts to review the prior conviction file, despite knowing that the
prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of
conviction into evidence but by quoting damaging testimony of the rape victim in that case." *Id.*,
543 U.S. at 389.

the only possible avenue that would have afforded DeBruce relief from its use as an aggravating

factor[24], when it should have viewed the rub of the problem as an issue of specific performance

pursuant to *Santobello v. New York*.  However, *Santobello*[25] involves remedies from convictions

when the *State/prosecutor* has breached a plea agreement with a defendant.  DeBruce has not

shown that Judge Hard's instruction was made as part of a plea bargain agreement between

DeBruce and the State of Alabama.  Since DeBruce has not shown that Mathis would have been

successful with a *Santobello* argument[26] even if it had been made, he cannot establish that he was

prejudiced by Mathis's alleged failure to investigate and move to exclude the robbery conviction

on that ground.

The court also cannot accept DeBruce's assertion that a distinction in his case entitles him

to relief in his case where the same relief was denied in *Lackawanna County District Attorney v.*

*Coss*, 532 U.S. 394 (2001), *Daniels v. United States*, 532 U.S. 374 (2001) and *Hubbard v. Haley*,

317 F.3d 1235, 1254-57 (11th Cir. 2003).  In *Coss*, the Supreme Court held

> once a state conviction is no longer open to direct or collateral attack in its own
> right because the defendant failed to pursue those remedies while they were

---

[24]Although exemplary counsel would have filed a postconviction attack in the Jefferson County court upon discovery of the plea minutes, this court cannot find that the state court's opinion is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the facts before it.  To do so would in effect judicially mandate that in order for an attorney to render constitutionally effective assistance to a defendant in one criminal case, he must also examine and attempt to attack that client's prior convictions if same might be used to enhance punishment in the case in which he is hired or appointed.

[25]As well as all of the other Supreme Court, federal and state court cases cited by DeBruce on the particular issue.  *Id.* at 129-33.

[26]Certainly, arguing exclusion of the conviction based on a specific performance theory, with the underlying basis being the *trial court's reassurances*, would have been logical, but DeBruce has presented no federal constitutional law applicable to this scenario.

> available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid.[27]  *See Daniels, post,* at 382, 121 S. Ct. 1578.  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

532 U.S. at 403-404.

> DeBruce argues that unlike his case, *Coss, Daniel*s and *Hubbard*
>
> involved defects in the prior convictions, that, if meritorious, would have justified a timely challenge to them even if the subsequent prosecution had never occurred. In contrast, here, ... it was only the admission of evidence concerning the Jefferson County plea in the Talladega County case that was improper.  Moreover, none of the precedents cited in the preceding paragraph involved specific performance of a representation made on the record in one case with to a then pending case.

(Doc. 20, pp. 142-43).

In essence, DeBruce argues that his case is different because the underlying controversy did not become ripe until use of the prior robbery conviction as an aggravating factor at the penalty phase of his trial became a reality.  The court declines to engage in this line of analysis because it would be a matter of first impression in a case where DeBruce has already failed to establish that *Santobello* provides any relief.[28]

The opinion of the Alabama Court of Criminal Appeals was neither an unreasonable application of *Strickland* nor was it based upon an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

      **b.**      **Mitigating circumstances**  (Doc. 1,  ¶¶ 67-88, pp. 22-30)

---

[27]There is no indication that DeBruce has ever attempted to collaterally attack the Jefferson County robbery conviction.

[28]The court similarly finds that Petitioner's challenges to his representation by Anthony M. Falletta in the Jefferson County case (doc. 1, ¶¶ 63-64) do not entitle him to relief in this proceeding.

45

DeBruce alleges he was prejudiced by Erskine Mathis's failure to investigate " ' "*all*

*reasonably available*" 'mitigating evidence"[29] in preparation for the penalty phase of trial

because Mathis "consulted with no experts, examined no school records, interviewed none of Mr.

DeBruce's siblings, and reviewed no prison or medical records."  *Id*. at 27.  Instead, Mathis

relied on a benign history provided to him by DeBruce and his mother,[30] and failed to "timely

obtain" and examine a pre-trial mental health evaluation he requested which contained mitigating

"leads" that contradicted the history he had been given.  (Doc. 20, p. 162).

Mathis was retained by Petitioner's mother Jessie DeBruce approximately one month

before the February 10, 1992, trial date.[31]  Mathis was well aware when he entered an appearance

that the trial court would not continue the trial date.  *DeBruce v. State*, 890 So. 2d at 1085-86.

Mathis testified that due to this time constraint, he did not investigate or hire any investigators as

he normally would have done in a capital case.  (*See* Rule 32 R. Vol. 15, Tab. 45, pp. 58-64, 136-

---

[29](Doc. 1, p. 22) (quoting *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (in turn, quoting *Williams v. Taylor*, 529 U.S. at 396), and American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines" 11.4.1(1989) (emphasis added by the United States Supreme Court)).

[30](Doc. 1, pp. 27-28).

[31]Mathis first contacted Jon Adams, Petitioner's appointed counsel, about representing DeBruce around January 10, 1992.  The first trial date was January 13, 1992, but it was continued until February 10, 1992.  Mathis filed various motions between January 16, 1992 and January 31, 1992.  About one week before trial, Mr. Bill Delgrosso entered the case as co-counsel.  (Rule 32 R. Vol. 15, at 185).  Mathis testified, "I don't think he got into it until I realized how big a task I had and asked him would he help me."  *Id.*  DeBruce has made no ineffectiveness allegations against Adams or Delgrosso.  In any event, trial commenced February 10, 1992, and ended on February 13, 1992.  DeBruce was sentenced to death on March 19, 1992.

37).  Therefore, he solely relied on Jessie and Derrick DeBruce[32] to provide mitigating information for the penalty phase.

Based on a conversation[33] with DeBruce's mother, Mathis did request a pre-trial mental health evaluation.  (R. Vol. 2, Tab. 4, pp. 11-12).  At a January 31, 1992, motions hearing, Mathis stated he did not believe the evaluation would result in a finding of incompetency or insanity, but did agree it might be might be useful for the penalty phase of trial.  *Id*.  On Friday, February 7, 1992, Talladega County social worker Gary Garner evaluated DeBruce.  Mathis testified that he was aware that "a cursory examination [had been] performed, and ... the state's expert indicated that [DeBruce] was all right and we should go forward, so we went forward from that point."  (Rule 32 R. Vol. 15, p. 174) (brackets added).  DeBruce's trial began on Monday, February 10, 1992, and he was convicted on February 13, 1992.

The penalty phase of trial began on February 14, 1992.  Mathis called Jessie DeBruce to the stand and she testified that Petitioner was the youngest of eleven children, that all six of his brothers were either in prison or had been in prison, that DeBruce had graduated from high school and had attended college at UAB, and that he had one child.  *DeBruce v. State*, 890 So. 2d at 1091.  Although unmentioned by the state appellate court, the following exchange took place between Mathis and Jessie DeBruce during her testimony:

---

[32]Mathis testified that he "assumed Derrick was not real bright, that he could get by, but that he was not real bright, that I was going to have to do most of this myself, and reacted accordingly so."  (Rule 32 R. Vol. 15, p. 174).  Mathis further stated,  "I could talk to [DeBruce].  I could elicit answers from him.  He was not as communicative and forthcoming as I would like but you can't expect somebody who's just met you to be, and we never had time to develop a relationship."  *Id*. at p. 183 (brackets added).

[33]The specifics of this conversation are unknown.

MR. MATHIS: You may come down.

MS. DEBRUCE: I want to ask ya'll something else.

THE COURT: You need to ask her a question and let her respond to that.

**REDIRECT EXAMINATION BY MR. MATHIS**:

Q Do you have something else you would like to say to this jury, Ms. DeBruce?

A Yes, sir.

Q What is it?

A About Derrick, about his behavior and his mind.

Q What about his mind?

A His mind is not good.

Q What makes you say that, Ms. DeBruce?

A I know it.  I'm his mother and I [had] a lot of hard times.

Q Yes, ma'am.  Has Derrick ever been treated for a mental disorder, Ms. DeBruce, that you are aware of?

A Yes, in '84.

Q In 1984?

A Yes.

Q Do you know what it was?

A No, I don't know, but they had a psychiatrist doctor come.  Because we had a lot of problems with him in school.

Q Yes ma'am.  What was it that caused y'all to think that something was wrong?

A Well, we knowed it was, because he would go off.  He would get nervous and get to shaking and somebody would - -

Q Ma'am?

A And somebody would have to be there to stop him.

Q When was the last time you know of something like that happening, Ms. DeBruce?

A In October.

Q October?

A Yes.

Q Where was that?

 A I was living over in West End.

. . . .

Q And where was Derrick?

A He was home.  We did call the police to talk to him.  They didn't take him to jail.  They just took him and talked to him. He would listen at me . . .

. . . .

A But if I wasn't there, he wouldn't listen.  I don't know how Derrick got as far as Montgomery.  We tried not to let Derrick get that far away.  His mind is critical - -

. . . .

A It was critical, his mind is.  We tried to keep up with him.

Q When was the last time he went to the doctor that you are aware of, Ms. DeBruce?

A He went to Cooper Green and they sent him to the university - - I think it was in September.

. . . .

A 1991.

Q Do you know what he went to Cooper Green for?

A Well, they[34] gave him some medicine and told us to give it to him and after he took
that up, to bring him back and see if he needed any more. So he did. He's easily lead.

(R. Vol. 7, pp. 1138-41).

After Jessie DeBruce finished her testimony, there was a break in the proceedings. At

that time the prosecutor expressed his intention to call social worker Gary Garner as a witness.

The prosecutor stated that Garner would testify that DeBruce had denied receiving any mental

health treatment/hospitalization and having prior felony charges. *Id*. at pp. 1145-1150. Mathis

continually responded that DeBruce's statements to Gary Garner could not be used to impeach

Jessie DeBruce. *Id*. at p. 1146-1151. The trial court stated that it wanted the matter cleared up.

*Id.* at p. 1151.

Garner was summoned into the courtroom. *Id*. at p. 1152. He indicated that he would

testify but that he needed to pick his child up at school, whereupon the court instructed Garner to

do so and return to court at 3:00 p.m. *Id*. When the court turned its attention back to the parties,

Mathis said, "We are just going to go ahead and rest judge." *Id*. The State then rested as well

and Mathis asked for a copy of the Garner report for his file. *Id*. at pp. 1152-53.

DeBruce was allowed to make his own closing argument. *DeBruce v. State*, 651 So.2d

599, 608 (Ala. Crim. App. 1993). He stated that he loved his son and mother. *Id*. (quoting R.

1169-70) (quotations omitted). He also apologized, begged forgiveness and asked the jury to let

him live so he could see his son grow up. *Id*. However, the jury recommended by a vote of 11 to

1 that he be sentenced to death.

_____

[34]This court has examined the Cooper Green Hospital records submitted by Petitioner. None
of these records show that DeBruce was ever treated for any mental problems. Instead, the medical
records chronicle DeBruce's digestive problems from childhood forward.

50

DeBruce contends that had Mathis conducted a reasonable investigation, "the 'entire [penalty phase] evidentiary picture would have been altered."  (Doc. 20, p. 179) (quoting *Strickland*, 466 U.S. at 696) (brackets added).  Specifically, he states:

> Rather than a high school graduate and one-time university student who had inexplicably turned to crime, the jury would have heard about someone whose developmental problems began at birth.  If Mathis had done his homework, the jury would have heard about someone with an extremely low IQ who had dropped out of school with a seventh-grade education after having been held back in school four times.  However, counsel's deficient performance deprived the jury of information about DeBruce's troubled life, including beatings from a sibling and being kept in a dark closet as punishment for hours on end.  A competent investigation would have discovered DeBruce's four suicide attempts by the age of 20.  With that information, a jury would have had reason to consider the sort of life that would lead a young man toward self-destruction.  In addition, the jury would have been presented with documentation showing DeBruce's physical problems dating to the age of seven that culminated in two hospitalizations related to his digestive system just in the months before trial.  Finally, a reasonably competent investigation would have given the jury the opportunity to consider that, in spite of these hardships, DeBruce was able to show concern for others as reflected in his role in caring for his sister as she recovered from a stroke.

(Doc. 20, p. 179).

DeBruce alleges the Garner report "refers to absentee parents ...  and neglect [... , that] Debruce was repeatedly hospitalized prior to trial, had a history of problems since childhood, was left back multiple times, dropped out of school in the seventh grade at the age of sixteen, refused special education and attempted suicide four times."  (Doc. 1, p. 29) (brackets added).  Although many of his assertions about the content of the report are accurate, the report[35] makes no mention of *absentee parents or neglect*.  The pertinent portion of the report reads:

---

[35]The Garner report was never offered into evidence at the Rule 32 hearing.  (Rule 32 C.R. Vol. 15, pp. 183-85 and *id.*, at Vol. 16, Tab. 46, p. 4).  It was, for identification purposes, made a part of the trial record as Exhibit 6.  It was not made a part of the habeas record, and as such, the magistrate judge ordered that the record be expanded.  (Doc. 27 & 29).

The interview was conducted in an office at the Talladega City Jail.  This 20 year old black male was referred by Judge Jerry Fielding, Circuit Judge of Talladega County.  Mr. Debruce is scheduled to appear in circuit court of Talladega County for a capital murder charge.  He was arrested in August 1991 and has been in jail since that time.  He reports having to be hospitalized on two occasions during his jail stay for what he describes as "throwing up."  Mr. Debruce reports a history of problems since childhood including alcohol and marijuana abuse.  He has attempted suicide four times.  He denies any prior mental health treatment or psychiatric hospitalization.  Mr. Debruce admitted to on going problems in school.  He refused special education and dropped out of school in seventh grade at the age of 16.  He reports no gainful employment other than a couple of months washing dishes.  Mr. Debruce denies any prior felony charges but admits to numerous misdemeanors.  Family history indicates Mr. Debruce is one of 11 children.  Both of his parents are still living.  He has had one brother to die in prison.  He admits his father is probably an alcoholic.

(Doc. 27, p. 1).

The Alabama Court of Criminal Appeals began its analysis of this issue by quoting the Rule 32 court's findings of fact with regard to DeBruce's presentation of mitigating evidence at the Rule 32 hearing as that evidence pertained to counsel's ineffectiveness at the penalty phase of trial for failure to investigate.  *DeBruce v. State*, 890 So. 2d at 1088.  It then applied the *Strickland* standard and found no constitutional error after reweighing the aggravating factors against the mitigating factors at the penalty phase of trial and post-conviction proceedings.  *Id*. at pp. 1090-92.

The appellate court's opinion is set out below.  The reader is advised that additional factual findings either made by the state court or pertinent historical facts found in the state record will be set out in footnotes.  The opinion reads:

The circuit court made the following findings of fact in regard to this issue:

"A. *Claim of Failure to Investigate and Present Mitigation*.

During Rule 32 proceedings, the focus is not on whether DeBruce suffers from Crohn's disease or brain damage; rather, the focus is on whether Mathis was ineffective for failing to pursue these matters.

"Regarding family members who could have been called to testify, this claim is denied on the merits. At the Rule 32 hearing, DeBruce presented the testimony of two family members, both of whom were incarcerated at the time.[36] Notably, DeBruce did not question Mathis about why he did not present the testimony of DeBruce's convicted relatives during the trial.[37] DeBruce has not established deficient performance or prejudice arising therefrom.

"DeBruce also presented the testimony of two mental health experts, Dr. David Williamson[38] and Dr. Catherine Boyer. Dr. Williamson is not a certified forensic psychologist (Rule 32 vol. II R. 29) and has never been accepted as an expert in court (*id.* at 31).[39] The Court finds that trial counsel considered then

---

[36]Elsewhere, the Rule 32 court found that "Debruce presented family members who testified about the violence that they, including Debruce, witnessed in the neighborhood. The Court received a clear picture of the environment in which Debruce was reared." (Rule 32 C.R. Vol. 14, p. 606).

[37]DeBruce does not deny that he never told counsel about childhood problems or assisting his sister.

[38]Elsewhere, the Alabama Court of Criminal Appeals noted: "Dr. David Williamson, a neuropsychologist, testified ... that ... DeBruce's verbal IQ was 79 and that he had borderline intell[ectual] functioning." *DeBruce v. State*, 890 So. 2d at 1084.

[39]Dr. Williamson, a practicing neuropsychologist, testified that he held a Ph.d "in clinical psychology with specialization in both neuropsychology and medical psychology, and ... post doctoral training in neuropsychology." (Rule 32 R. Vol. 16, Tab. 46, p. 22). The referral question was whether DeBruce had brain damage and it was Williamson's opinion that DeBruce had brain dysfunction. *Id.* at Vol. 17, pp. 40, 43. Williamson was not a certified forensic psychologist. *Id.* at p. 29. Moreover, the only exams he had ever performed in a forensic setting were for "personal injury" cases, and he did not express familiarity with the phrase 'forensic setting.' *Id.* ("you'll have to further define that term I guess."). Further, other than DeBruce, he had never examined a defendant in a criminal case, and had never testified in a court of law. *Id.* at pp. 30-31. Williamson was not familiar with competency evaluations, mitigating circumstances or death penalty law. *Id.* at p. 65. He also was not familiar with the facts of DeBruce's case and did not read any transcripts. *Id.* at p.70. Williamson only read medical records and had no opinion about anything related to DeBruce's crime. *Id.* Dr. Williamson did administer a Personality Assessment Inventory test (PAI), designed to look at personality traits and emotional adjustment. *Id.* at Vol. 17, pp. 57-58. The test was also used in forensic settings and was geared to look for malingering. *Id.* at pp. 58-59. At first, Williamson suspected some malingering, but discounted it because the test had not been normed on

rejected a mental health defense at trial.[40] This was a strategic decision, and was not deficient. Moreover, DeBruce's experts' opinions have been rebutted by the State, through the testimony of Dr. Glen King. Dr. King testified that DeBruce suffered from no serious mental illness or mental defect. (Rule 32 vol. II R. 231). He also believed that DeBruce was malingering, or 'faking' psychological[41] and

_____

inmates. Williamson did not administer another personality test, known as the Minnesota Multiphasic Personality Inventory (MMPI), even though that test contained a scale that could measure not only emotional malingering, but brain damage malingering. *Id*. at p. 59. Instead, Williamson expressed satisfaction with the results of his neurological and intellectual tests, and concluded he found no malingering in this arena. *Id*. at pp. 59-60. DeBruce also was taking the prescription medication Vicodin, a drug known to have a sedating effect, when he was administered Williamson's tests. *Id*. at p. 67.

[40]As set out earlier in the body of this section, Mathis testified that he did request an exam for competency/insanity purposes, and knew that the state's expert opined that DeBruce was competent to stand trial before the trial began on February 10, 1992. DeBruce did not tell his counsel that he had difficulty in school, or mental health issues, or that he had a difficult childhood and was reared in a violent neighborhood. DeBruce has never denied that his counsel spoke with him many times, and he never told counsel, or the probation officers who prepared his Youthful Offender report, and Pre-Sentence Investigation Report that he had such troubles. DeBruce also testified at a suppression hearing and made his own closing argument. In neither did he reveal the troubles he reported to Gary Garner. Instead, he continually represented he had an average home life, graduated from high school and attended some college. (*See* detailed discussion set out in Claim IV.C, *infra*.).

[41]Dr. King did testify that DeBruce was malingering emotional symptoms or mental illness as evidenced by scores he received on the "Instructed Interview Reported Symptoms, which is specifically designed to identify unusual response patterns involving psychiatric symptoms." (Rule 32 R. Vol. 18, pp. 237-238). King also administered a short form oral MMPI, a "personality assessment device used to assess psychological and emotional problems" (*id*., at p. 242), which he admitted was only a screening instrument and did not meet standardized practice, and stated that it seemed to indicate "the presence of rather dramatic symptoms that [DeBruce] did not evidence during any time when I was with him." *Id*. at p. 237-38. However, Dr. King actually *agreed* that the results of Dr. Boyer's (also a licensed, certified forensic psychologist) IQ test, showing borderline intellectual functioning, were more accurate than his intelligence test results. *Id*. at p. 240. He also agreed that the "information about his intelligence level" qualified to be considered as mitigating evidence. *Id*. at p. 242. Dr. King testified that he examined DeBruce's trial record and noted that DeBruce had testified in his own behalf at a suppression hearing and presented his own argument at the penalty phase of trial. The court notes that DeBruce's ability to handle himself during his penalty phase argument seemed to be of great interest to the Rule 32 court as well.

Unlike Dr. Boyer, however, Dr. King saw nothing in his testing or observations that

psychiatric symptoms.  (*Id*. at 237).  Dr. King did not conduct a neuropsychological screening because he did not see any need for it. (*Id*. at 243).  Hence, DeBruce also cannot meet the prejudice prong of *Strickland*.  This claim is denied on the merits.

"With regard to his physical condition, Mathis stated that DeBruce did not appear to be in pain during trial.  His performance was not deficient.  DeBruce has also failed to establish prejudice.  This claim is denied on the merits. ....

"G. *Claim of Failure to Object to Mental Health Evaluation*

"Mathis testified that he did not see a reason to pursue the mental health defense.  Yet, he still requested an examination, and was satisfied with the results.  Mathis considered this line of defense, then rejected it.  This was a strategic decision by Mathis, and is entitled to deference.  The Court denies relief on the merits of this claim.["]

(R[ule 32 C.R. Vol. 13,] 592-9[3] [and 595]). ....

DeBruce argues that counsel's performance at the penalty phase was deficient for failing to uncover and present evidence of his low intelligence, the fact that he had Crohn's disease,[42] and the fact that he had been reared in a high crime area.

DeBruce was sentenced to death based on the application of two aggravating circumstances - (1) a previous conviction of a felony involving the use or threat of violence to the person, § 13A-5-49(2), Ala. Code 1975, and (2) the fact that the murder occurred during the course of a robbery, § 13A-5-49(4), Ala.

---

necessitated additional neurological screening to determine DeBruce suffered from brain disorder. *Id*. at p. 243.  Although counsel for DeBruce protested heavily that Dr. King, as a forensic psychologist, was not qualified to rebut Dr. Williamson's expert opinion that DeBruce suffered from organic brain disorder, she herself ultimately asked Dr. King's opinion on the matter, and he responded that, based on the results of Dr. Williamson's tests, it was his opinion that DeBruce did not suffer from brain disorder.  *Id*. at p. 284.

[42] In reviewing the transcript of the Rule 32 hearing, Judge Fielding stated, "I sat here and watched [DeBruce], and he wasn't in pain when I was trying him that week." (Rule 32 R. Vol. 16 at p. 276).  The Alabama Court of Criminal Appeals also held: "Dr. Jackson Kuan, a gastroenterologist, testified that DeBruce had Crohn's disease; he characterized the disease as a debilitating disorder.  However, DeBruce was not diagnosed with the disease until 1993 - two years after he was tried and convicted of capital murder."  *DeBruce v. State*, 890 So. 2d at 1084.

Code 1975.  The trial court determined that one statutory mitigating circumstance was present - the defendant's age at the time of the murder.  See § 13A-5-51(7), Ala. Code 1975.  The trial court found no nonstatutory mitigating evidence.  We also note that when this Court reviewed this case on direct appeal we made the following observation in our opinion:

> " 'Although we have reviewed "worse" crimes of robbery-murder, the apparent cold-blooded, senseless, and unmerciful manner in which the defendant executed this crime impresses this Court as it did the trial judge.  Other than the general arguments for not imposing a punishment of death in any case, we find no reason to spare the defendant's life.' "

*DeBruce*, 651 So. 2d at 623 (quoting *Kuenzel v. State*, 577 So. 2d 474, 530 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991)).

In *Daniels*, we stated the following concerning the standard for reviewing allegations of ineffective assistance of counsel in the penalty phase of a capital trial:

> " '[W]hile "[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness," *see Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985), it is unclear how detailed an investigation is necessary to provide a defendant with the effective assistance of counsel.  *Strickland* [*v. Washington*, 466 U.S. 668, 104 S. Ct. 205 2, 80 L. Ed. 2d 674 (1984),] only requires that counsel's actions fall within the wide spectrum of what can be considered reasonable assistance of counsel.'

"*White v. Singletary*, 972 F.2d 1218, 1224 (11th Cir. 1992).  The principles regarding an attorney's duty to conduct an investigation into mitigating evidence have been summarized as follows:

> " 'An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.  *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986).  First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence.  If so, then a determination must be made whether the failure to put this evidence before the

56

> jury was a tactical choice by trial counsel.  If so, such a choice
> must be given a strong presumption of correctness, and the inquiry
> is generally at an end.  *Funchess v. Wainwright*, 772 F.2d 683,
> 689-90 (11th Cir. 1985).  If, however, the failure to present the
> mitigating evidence was an oversight, and not a tactical decision,
> then a harmlessness review must be made to determine if there is a
> reasonable probability that, but for counsel's unprofessional errors,
> the result of the proceeding would have been different.  Thus, it
> must be determined that defendant suffered actual prejudice due to
> the ineffectiveness of his trial counsel before relief will be
> granted.'
>
> "*Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988)."

650 So. 2d at 568-69.

Here, the record shows that DeBruce's mother, Jessie DeBruce, testified in his behalf at the penalty phase.  She testified that DeBruce was the youngest of eleven children and that all six of his brothers were either in prison or had been in prison.  She said that DeBruce had graduated from high school and had attended college at the University of Alabama in Birmingham ("UAB").  Jessie DeBruce further testified that DeBruce had one child.  [R. Vol., pp. 1124-41)].

Also, evidence of DeBruce's mental condition was not presented because a preliminary examination had been conducted before trial, and, as a result, Mathis felt there was no reason to proceed with a mental-health defense.  Mathis testified that he had no reason to doubt DeBruce's mental competency after reviewing the preliminary report.  [(Rule 32 C.R. Trans., p. 174).]

Moreover, the presentence report reflects that DeBruce reported to the probation officer the following:

> "Dedrick Anthony DeBruce is a twenty (20) year old, black
> male.  He was born in Sumter County, Alabama and his family
> moved to Birmingham in 1973.  DeBruce was raised in the
> Birmingham area by both of his true parents.  He reported a good
> relationship with both of his parents and his numerous siblings.
> There were no significant problems noted during his formative
> years.
>
>          "....

> "DeBruce claims to have attended high school at Ramsey, in Birmingham, Alabama and was in the 'Gifted' program. The Probation Office report from Birmingham indicated that DeBruce finished high school at Hayes High School. DeBruce then attended the University of Alabama in Birmingham for one semester. He has had no other formal education."

We find significant the above comments that DeBruce made to the probation officer who prepared the presentence report. DeBruce argues that his school records would have shown that he failed to graduate from high school. DeBruce, in effect, argues that Mathis should have disregarded DeBruce's statements and his mother's statements and checked the school records for himself. We do not agree.

The Florida Supreme Court, reviewing a claim that counsel's performance was deficient for failing to present mitigation evidence of the defendant's abusive childhood, stated:

> "Under *Strickland*, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' *Strickland*, 466 U.S. at 691, 104 S. Ct. 2052. However, '[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.' *Id*. While trial counsel has a duty to investigate, 'when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.' *Id*.; *see also Rose v. State*, 617 So. 2d 291, 294-95 (Fla. 1993) (trial counsel was not ineffective for failing to call family members where defendant told counsel that he had not had contact with his family for a number of years and that his family's testimony would not be helpful).

> "In *Stewart v. State*, 801 So. 2d 59 (Fla. 2001), this Court rejected a claim that trial counsel was deficient for failing to investigate and present evidence of the defendant's alleged childhood abuse by his stepfather. As in this case, Stewart generally described a happy childhood and never informed defense counsel, or the defense psychiatrist, about any abuse he suffered. Further, trial counsel indicated that he personally interviewed Stewart's stepsisters, but neither mentioned that Stewart was abused. Similarly, Stewart's stepfather never led trial counsel to believe anything other than that he was a loving and caring father to Stewart. Accordingly, this Court concluded, 'by failing to communicate to defense counsel

(or the defense psychiatrist) regarding any instances of childhood abuse, [the appellant] may not now complain that trial counsel's failure to pursue such mitigation was unreasonable.' *Id.* at 67 (citing *Cherry v. State*, 781 So. 2d 1040, 1050 (Fla. 2000)).  Stewart would appear to dictate the same result in this case."

*Marshall v. State*, 854 So. 2d 1235, 1247 (Fla. 2003).

Given DeBruce's mother's testimony, DeBruce's own comments, and the conflicting expert testimony about DeBruce's mental health, we hold that Mathis was not ineffective for failing to investigate further into DeBruce's mental health. Also, the United State Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:

> "In *Strickland*, we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.*, at 694, 104 S. Ct. 2052.  In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."

539 U.S. at 534, 123 S. Ct. at 2542.

As directed by the Supreme Court in *Wiggins*, we have reweighed the omitted mitigating evidence - evidence indicating that DeBruce had Crohn's disease and conflicting evidence of DeBruce's mental health - against the aggravating circumstances that were proven in this case - the fact that the murder was committed during a robbery and the fact that DeBruce had previously been convicted of a crime of violence.  Given the aggravating circumstances presented here and the cold blooded manner in which the killing occurred, we believe that DeBruce's death sentence was appropriate.

Mathis's strategy in the penalty phase was to beg for mercy.  DeBruce's mother testified and pleaded for her son's life, and DeBruce made a statement to the jury saying that he was sorry and begging the jury to spare his life.  This strategy, given the facts of this case, was not deficient.  *Cf. Hallford v. State*, 629 So. 2d 6 (Ala. Crim. App. 1992), cert. denied, 511 U.S. 1100, 114 S. Ct. 1870, 128 L. Ed. 2d 491 (1994).

*DeBruce v. State*, 890 So. 2d at 1088, 1090-93 (brackets added).

In the habeas petition, DeBruce's dissatisfaction with the state court's resolution of the ineffectiveness claim can be addressed by using three categories of mitigating evidence as points of reference: (i) his history of gastrointestinal illness, (ii) family background (i.e., difficult childhood and kindness to his sister), and (iii) mental health.  He declares that the Alabama Court of Criminal Appeals made unreasonable factual determinations and/or unreasonably applied clearly established federal law in connection with these categories.

### i.       Gastrointestinal illness

The court finds that the first category, DeBruce's gastrointestinal illness, does not require extensive analysis.  DeBruce does not deny or dispute the underlying validity of state appellate court's affirmation of the post-conviction court's factual findings, although he certainly believes his physical problems were significantly mitigating.  The state appellate court considered DeBruce's Crohn's disease when it reweighed aggravating and mitigating factors on collateral appeal.  The state court's rejection of this category of evidence as not having sufficient mitigating force to establish the prejudice necessary to reverse DeBruce's death penalty is not an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts before it.

### ii.      Family background

The second category of unpresented mitigating evidence is DeBruce's family background, which includes his difficult childhood and kindness to his sister.  DeBruce does not dispute that although Mathis spoke with him many times, neither he nor his mother told Mathis about this background.  Instead, DeBruce argues the state court's adjudication of the performance aspect of this claim is an unreasonable application of clearly established federal law because it is based on

a determination that counsel reasonably relied on DeBruce's representations.  (Doc. 20, p. 169).

DeBruce argues his

> statements cannot be used to excuse a failure to investigate further when counsel
> has other information that contradicts what his client has told him or for other
> reasons has a duty to look at documents that would provide information that
> contradicts what counsel has heard from his clients or the client's relatives.

*Id*.

The state court found that Mathis was not objectively deficient in this area because

DeBruce did not inform his counsel of his true background.  For several reasons, DeBruce cannot

show that the state court unreasonably applied clearly established federal law to this category of

mitigating evidence.  As general rule, it is true that:

> [i]n evaluating the reasonableness of a defense attorney's investigation, we
> weigh heavily the information provided by the defendant.  *Strickland*, 466 U.S. at
> 691, 104 S. Ct. at 2066 (1984) ("The reasonableness of counsel's actions may be
> determined or substantially influenced by the defendant's own statements or
> actions.  Counsel's actions are usually based, quite properly, on informed strategic
> choices made by the defendant and on information supplied by the defendant.  In
> particular, what investigation decisions are reasonable depends critically on such
> information.").  Indeed, "[b]ecause information about childhood abuse supplied
> by a defendant is 'extremely important' in determining reasonable performance,
> '[w]hen a petitioner ... does not mention a history of physical abuse, a lawyer is
> not ineffective for failing to discover or to offer evidence of abuse as mitigation.'
> "  *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1211 (11th Cir. 2007) (quoting
> *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002)).  As we
> stated in *Williams v. Head*, "[a]n attorney does not render ineffective assistance by
> failing to discover and develop evidence of childhood abuse that his client does
> not mention to him."  185 F.3d 1223, 1237 (11th Cir. 1999).

*Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008).

However, DeBruce argues that there was mitigating evidence from another source that no

reasonable counsel would have failed to review.  This source is the Garner report, a report that

trial counsel asked for and expressly stated may provide assistance to the defense in its mitigation

case, albeit counsel was referring to mental health issues.  Yet there is no evidence or indication

from the record that counsel ever reviewed the report or was aware of its contents, even while the

penalty phase of trial was underway.  Since it is DeBruce's contention that any reasonable

counsel would have reviewed the report under the circumstances it was requested, it is not

particularly relevant that it was initially anticipated that the report would be helpful only with

mental health issues.  *See Bobby v. Van Hook*, — U.S. —, 130 S. Ct. 13, 19 (2009) (A defense

attorney should act when "potentially mitigating evidence stare[s] them in the face, *cf. Wiggins*

[*v. Smith*, 539 U.S. 510, 525 (2003)[43]], or [it is] apparent from documents any reasonable

attorney would have obtained, *c.f. Rompilla v. Beard*, 545 U.S. 374, 389-393 (2005)"[44] (brackets

added and some parallel citations omitted)).

_____

[43]In *Wiggins*, counsel had social service records, a psychological report showing Wiggins had difficult coping and a borderline personality disorder, and a pre-sentencing report where Wiggins's childhood (most of which was spent in foster care) was self-described as "disgusting" and noted as "misery."  *Id*. at p. 523 (internal citations omitted).  Counsel knew about this information pre-trial but did nothing further.  (*See also, cf.*, *Williams v. Taylor*, 529 U.S. at 395 (counsel began preparing for the penalty phase one week before trial and failed to investigate and present social service records of childhood abuse because he mistakenly believed state law prohibited access to those records)).

[44]In *Rompilla*, the petitioner and his family led counsel to believe that there was no mitigating evidence.  *Id*. at pp. 381-82.  Moreover, three mental health experts examined Rompilla mental state at time of the offense and competency to stand trial and found "'nothing useful.'" *Id*. at p. 381.  However, counsel were aware that the prosecutor was going to use a prior rape conviction and the victim's testimony as support for an aggravating factor during the penalty phase of trial.  *Id.* at pp. 383-84.  Still, counsel did not review the prior conviction, nor did she review any of the contents of the file before the sentencing hearing even after she belatedly obtained a copy on the eve before the sentencing hearing.  *Id*. at p. 385.  Had she done so, she would have "found a range of mitigation leads no other source had opened up."  *Id*. at p. 390.  The Supreme Court found counsel objectively deficient because she knew long before trial that the prosecutor intended to use Rompilla's previous rape conviction as an aggravating factor, and knew she would have to defend against the prosecutor's use of that conviction, but did nothing.  *Id*. at pp. 386-87.

Following this line of reasoning, DeBruce argues the Garner report would have provided

the leads needed to discover his piteous home life and helpful spirit.  However, the information

in the report[45] does not clearly indicate either conclusion.  (Doc. 29 at pp. 3-4).  DeBruce is

responsible for the representations he made to others, and, in particular, his counsel.

Additionally, as discussed further herein (*see* Claim IV.C, *infra*), DeBruce told the probation

officer preparing his youthful offender report in December 1991 that he had an average

childhood and had attended UAB.  (C.R. Vol. 1, p. 56).  His own mother confirmed this history.

Moreover, during a mid-trial suppression hearing concerning the voluntariness of his statement,

DeBruce again testified that he had graduated from high school and attended some college.

Finally, after trial, it appears DeBruce may have made the same representation yet again to the

probation officer during pre-sentence proceedings.  (R. Vol., Tab 2, p. 211-218).  Therefore, with

regard to the family background described in this section, the state court correctly identified and

applied federal law, and this court cannot find any fact showing that the state court's factual

determination was unreasonable.

Even if this court were to assume that reasonably competent counsel would have clued in

to DeBruce's family background based on other Garner report's references (*i.e.*, a history of

problems since childhood - including alcohol and marijuana abuse, four suicide attempts, and the

thought that his father might be an alcoholic), DeBruce cannot establish constitutional prejudice.

During the post-conviction evidentiary hearing, DeBruce presented testimony from his

sisters in support of his mitigation case pertaining to family background.  The Rule 32 court was

not persuaded by that testimony.

---

[45]  *See* Doc. 27 (the Garner report).

DeBruce suggests that the state court did not consider his family background as an independent mitigating factor, although it acknowledged the significance of his family background evidence in the context of his mental health.  (Doc. 20, pp. 162-64).  This court agrees that the state court's opinion does not specifically separate this particular brand of mitigating evidence for discussion in its opinion.  Nonetheless, when the Alabama Court of Criminal Appeals' opinion is reviewed in its entirety (*see*, s*upra*., this section of the Memorandum Opinion,), it is clear that the Rule 32 court and the state appellate court considered the evidence and found that it was not of such mitigating force to constitutionally prejudice the penalty phase of trial.

Even if this court were to conduct a *de novo* examination of DeBruce's family background through the witnesses he argues should have been presented (his sisters), the court does not find the mitigating effect of the evidence to be particularly weighty.  Jackie DeBruce testified at the postconviction proceedings on behalf of her brother.  The essence of which is as follows.  (Rule 32 R. Vol. 16, pp. 334-57).  The DeBruce children were raised in violent, drug-infested, dangerous neighborhoods with substandard housing.  Derrick DeBruce as a child was a quiet, shy loner.  DeBruce was close to his mother although she worked much of the time.  DeBruce's father also worked, but was an alcoholic and when at home he was "just there" and did not interact with or chastise the children.  The oldest sister, Juanita DeBruce, was responsible for the care of the ten children.  The DeBruce children were not allowed to play outside the house or with other children.  Juanita would chastise DeBruce everyday, whip him (with extension cords and switches wrapped together) because he would stay to himself and not come around or sit like she asked, and "by not eating because he really liked what he wanted to eat."  Juanita

would also lock Petitioner in a closet or room if he didn't do as she said or because he could not understand his school work.  Jackie stated that Juanita pushed and hit the other children as well and would pull a knife on them if they made her really mad.

Jackie DeBruce did not see Petitioner as a normal child and she had to dress him and tie his shoes until he was seven or eight years old.  As a teenager DeBruce was twice "jumped" by neighborhood boys.  She also testified that at around age 15, DeBruce would blank out or have seizures twice a week and her mother would have to hold him.  Jackie further stated she wanted to come to trial, but did not because she had to be with her children.  However, she also was not asked to testify at Petitioner's trial, and had she been asked, she would have done so.

Linda DeBruce testified Derrick DeBruce nursed her back to health after she suffered a blood clot in her brain by feeding, bathing, dispensing  medicine, and helping her learn to walk again.  (Rule 32 R. Vol. 16, pp. 327-32).  She stated that no one ever contacted her about DeBruce's case and that she would have testified at trial had she been asked to do so.

As a final note, the court recognizes that Dr. Boyer indicated that during the post-conviction interviews of DeBruce's father, mother and three sisters (Jackie, Belinda and Linda), she was told[46] that as a teenager, DeBruce became involved in drugs, was frequently depressed and attempted suicide once.  (Rule 32 R. Vol. 17, p. 100).  There are no medical records to corroborate that DeBruce ever seriously attempted suicide.

––––––––––––––––––––––

[46]Dr. Boyer was also told by Jessie DeBruce that Derrick DeBruce was born with an umbilical cord around his neck after difficult pregnancy.  He had trouble breathing, at one point stopped breathing and required special care in an incubator for several days.  (R. Vol. 17, p. 96). DeBruce had crossed eyes as noted in medical and school records.  *Id*. at p. 97.  He would shake or tremble according to family members.  *Id*.

Based on the foregoing information, the court concludes that while DeBruce's childhood may have been difficult, painful and stressful, it pales in comparison to the nightmarish childhoods experienced by the petitioners in the line of Supreme Court cases he relies upon to support a prejudice argument: namely, *Williams*,[47] *Wiggins*,[48] and *Rompilla*.[49]  From a prejudice

---

[47]In *Williams v. Taylor*, 529 U.S. at 395, the Court noted:

Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings,[FN19] that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

> FN19. Juvenile records contained the following description of his home:
>
> > "The home was a complete wreck.... There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms.  There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash....  The children were all dirty and none of them had on under-pants.  Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them....  The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." App. 528-529.

[48]In *Wiggins v. Smith*, 539 U.S. at 516-17, the Court noted:

[P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. *Id.*, at 166a-167a. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization. *Id.*, at 167a-171a.  At the age of six, the State placed Wiggins in foster care.  Petitioner's first and second foster mothers abused him physically, *id.*, at 175a-176a, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him.  *Id.*, at 176a-179a. At age 16, petitioner ran away from his foster home and began living on the streets.  He returned intermittently to additional

standpoint, DeBruce's childhood simply does not carry with it the same horrors as these cases.

Nor are there any hospital, social services or school records that corroborate Jackie DeBruce's

contention that DeBruce was physically and emotionally abused, malnourished or suffered from

black outs or seizures.  The state court's rejection of this category as not having sufficient

mitigating force (along with all other mitigating factors considered ) to overcome the aggravating

factors in the case is not unreasonable and is not based on an unreasonable determination of the

facts before it.

### iii.        Mental Health Mitigation[50]

---

foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. *Id.*, at 190a. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor. *Id.*, at 192a.

[49]In *Rompilla v. Beard*, 545 U.S. at 391-92, the Court noted:

Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags. 355 F.3d, at 279 (citations omitted) (dissenting opinion).

[50] The reader is advised that this title is premised on the often-used reference in the state court opinion.

The third and final category of mitigating evidence involves DeBruce's organic brain disorder and low intelligence. After a review of the state post-conviction court's opinion concerning DeBruce's mental health, the court finds that it was reasonable for the state court to find that Mathis made a strategic decision not to pursue competency to stand trial and mental state at the time of the offense. Mathis testified during post-conviction proceedings that he was aware that Garner believed DeBruce to be competent.

However, the record does not and cannot support the same conclusion with regard to brain disorder and low intelligence because there is no indication in either the trial record or post-conviction record that Mathis examined the contents of the report before or during the penalty phase of trial. (R. Vol. 7, pp. 1154-53; Rule 32 R. Vol. 15, pp. 138, 173,[51] 183-85). Thus, counsel could not have made a strategic decision not to present evidence of these alleged conditions at the penalty phase.

Nonetheless, the state court examined the conflicting post-conviction expert testimony concerning organic brain disorder, and thereafter credited the opinion of the State's expert that DeBruce did not suffer from the disorder.[52] This finding still is entitled to a presumption of correctness. DeBruce has not overcome the deference owed to the state court's conclusion by

---

[51]At most, the record shows that Mathis was informed by the expert that Petitioner "was all right and we should go forward, so we went forward from that point." (Rule 32 R. Vol. 15 at p. 173).

[52]DeBruce argues that Dr. King was not qualified to render an opinion as to whether he suffered from brain disorder. However, the state court's acceptance of Dr. King and Dr. Williamson as expert witnesses in particular subjects is an evidentiary ruling that should not be disturbed absent due process of law. *See Felker v. Turpin*, 83 F.3d 1303, 1311 -1312 (11th Cir. 1996). Moreover, this question must viewed in light of the evidence as a whole. DeBruce's evidentiary hearing was not fundamentally unfair - DeBruce's own counsel asked Dr. King for his opinion as to DeBruce's brain dysfunction. (Rule 32 R. Vol. 18, pp. 283-84).

clear and convincing evidence.  DeBruce cannot base his claim on a condition that does not exist, and as such, cannot be considered mitigating evidence.

With regard to the question of DeBruce's borderline intelligence, the historical record shows that both the State's expert (Dr. King) and the defendant's expert (Dr. Boyer) agreed that the IQ test (resulting in the borderline intelligence range) as administered by Dr. Boyer was accurate.  Since there is no dispute that DeBruce is of borderline intelligence, and the state court's opinion is silent on that narrowly delineated mental health issue, this court finds that DeBruce has proven that his intelligence is in the borderline range and that it is a mitigating factor.  Even accepting all that, this still comports with the state court's post-conviction conclusion that the mitigating factors did not outweigh the aggravating factors.  To explain, Judge Fielding presided over DeBruce's trial and the Rule 32 proceedings.  During post-conviction proceedings, Fielding expressed that he had observed DeBruce testify and give his closing argument[53] and asked the expert if he had examined this material.  Thus, even though DeBruce is of borderline intelligence, the record shows that the judge was able to observe DeBruce speak and handle himself.  If the trial judge was able to do so, then the jury certainly was able to make its own observation of DeBruce's intelligence.  Therefore, this court does not find DeBruce's borderline intelligence to be particularly weighty mitigating evidence.

The only remaining question for this court is to determine whether the state court "unreasonably balance[d] the mitigating and aggravating factors" when it conducted its reweigh on collateral appeal.  *Porter v. Attorney General*, 552 F.3d 1260, 1275 (11th Cir. 2008), *rev'd in part on other grounds*, *Porter v. McCollum*, — U.S. —, 130 S. Ct. 447 (2009).  For all of the

_____

[53] DeBruce addressed his closing argument to the jury.

foregoing reasons, this court finds that the state court did not unreasonably balance the mitigating

and aggravating factors.[54]  This claim is due to be denied.

### c.        Other penalty phase issues  (Doc. 1,  ¶¶ 89-99, pp. 31-33)

The respondent asserts (doc. 15, p. 8), and DeBruce does not dispute, that three aspects of

this claim are procedurally defaulted because DeBruce did not raise them at any time during state

court proceedings:

> ¶ 95 - counsel was ineffective for failing to object to lethal injection as the State's
> method of execution;

> ¶ 98 - counsel was ineffective for failing to argue that his drug and alcohol use at
> the time of the crime was a mitigating circumstance; and

> ¶ 99 - counsel was ineffective for failing to argue that his physical and mental
> limitations made him ineligible for the death penalty.

The failure to present these particular claims in state court "means that [DeBruce]

deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a

federal habeas  proceeding.'"  *Bailey v. Nagle*, 172 F.3d at 1305 (citing *Picard v. Connor*, 404

U.S. at 276).  Further, they are "procedurally defaulted, even absent a state court determination to

that effect, [because] it is clear from state law that any future attempts at exhaustion would be

futile."  *Id*. (citing *Snowden v. Singletary*, 135 F.3d at 737).

If DeBruce were to attempt to raise these portions of Claim A(6) in another Rule 32

petition, they would be defaulted on numerous grounds: namely, they would be part of an

impermissible successive petition filed outside the statute of limitations applicable to

---

[54]Although not essential to the outcome of this claim, the court notes again that Judge
Fielding presided over DeBruce's trial and post-conviction proceedings, and was not persuaded by
DeBruce's additional mitigating evidence.

postconviction petitions, and they are claims DeBruce was required to, but did not raise, during collateral proceedings.  ALABAMA RULE OF CRIMINAL PROCEDURE 32.2 (b)(c) & (d).  For the foregoing reasons, the allegations in the paragraph listed above are procedurally defaulted.

As for the remaining sub-claims in this section, the respondent contends that DeBruce cannot show the state court's adjudication of the claims are contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  (Doc. 14, pp. 31-57).  DeBruce alleges that counsel failed to object to improper prosecutorial comment on his right not to testify.  (Doc. 1, p. 31).  DeBruce also raised a separate claim of prosecutorial misconduct in connection with this comment.  This aspect of the claim will be addressed later herein in the court's discussion of the substantive claim (*see* Claim IV.G.2, *infra*.) wherein it is determined that DeBruce is not entitled to habeas relief because the prosecutor's comment was proper.  As such, DeBruce cannot show that counsel was objectively deficient for failing to object to the comment.  It follows, therefore, that DeBruce was not prejudiced by the comment.  This claim is due to be denied.

DeBruce also contends that counsel failed to object when a relative of the victim had an outburst during DeBruce's argument.  (Doc. 1, p. 31).  However, the record shows that when the outburst occurred, the trial court immediately stopped the proceedings, asked the offending party to leave the courtroom, and stated that if anyone else could not control their emotions they should.  (R. Vol. 7, p. 1169).  The jury was brought back into the courtroom and DeBruce continued with his closing argument.  Counsel was not objectively deficient for failing to object to the outburst because the matter was adequately and immediately diffused by the trial court at the time it occurred.

DeBruce next claims that counsel failed to elicit that Garner was unqualified to do a competency examination because he was a social worker, and that counsel failed to object to the trial court's inadequate and improper instructions, "including but not limited to, the burden of proof and consideration of mitigating circumstances...." (Doc. 1, pp. 31-32). He also contends counsel did "not sufficiently clarify what findings the jury would have to make in order to conclude the ..." that, as an aggravating circumstance, DeBruce had been previously convicted "'of a felony involving the use of force or threat of use of force to a person.'" *Id*. at 32. The foregoing claims are insufficiently specific to satisfy federal pleadings requirements, and as such, they are due to be dismissed. Moreover, counsel was aware of Garner's status as a social worker and agreed that Garner should examine DeBruce. Additionally, the state court found that DeBruce failed to present any evidence in support of these claims during collateral proceedings. *DeBruce v. State*, 890 So. 2d at 1092. Therefore, these claims are also without merit.

The petitioner next asserts that counsel failed to object to imposition of the death penalty on the grounds that such a sentence is "disproportionate and discriminatory punishment under state and federal law[,]" that "Alabama's method of execution is cruel and unusual punishment on its face and as applied[,]" and that "Alabama's death penalty statute fails to "sufficiently narrow the class of people to whom the death penalty may apply." (Doc. 1, pp. 32-33). The state court found that DeBruce failed to present any evidence in support of these claims during collateral proceedings. *DeBruce v. State*, 890 So. 2d at 1092. Therefore, these claims are also without merit.

DeBruce's complaint that counsel failed to argue that the offense for which he was convicted was improperly used as an aggravating factor at the penalty stage of trial is also

without merit.  (Doc. 1, pp. 32-33).  It is well known that dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the sentencing phase is not unconstitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (citing *Lowenfeld v. Phelps*, 484 U.S. at 244-246, wherein the Supreme Court  stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase....  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)").

DeBruce also alleges that counsel did not argue about the cumulative impact of sentencing errors violated due process at the trial and the penalty phase.  (Doc. 1, pp. 32-33).  This claim too, is insufficiently pleaded, or the alternative, merits no habeas relief due to its vague, general and conclusory nature.

### B.    DeBruce's family was unlawfully excluded from the courtroom during the capital murder trial  (Doc. 1,  ¶¶ 109-12, pp. 38-39)

DeBruce alleges that his right to a public trial was violated when, at the prosecutor's request and over defense counsel's objection, the trial court utilized its discretionary authority under ALABAMA RULE OF CRIMINAL PROCEDURE 9.3(a)[55] to exclude his mother and father from the courtroom during the guilt phase of trial simply because his parents "were potential witnesses [at the penalty phase of the trial.]"  (Doc. 1, p. 38) (citing *Waller v. Georgia*, 467 U.S. 39 (1984)

---

[55]Alabama Rule of Criminal Procedure 9.3(a) reads:

**Exclusion of Witnesses and Spectators**
**(a) Witnesses.**  Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court.

and *In re Oliver*, 333 U.S. 257 (1948)).  He declares that such a "rigid application of a state

procedural rule...." violated his right to due process of law.  *Id*. (citing *Chambers v. Mississippi*,

410 U.S. 284 (1973)).[56]

DeBruce asserts "[t]here was no compelling state interest in or necessity for excluding

[his parents from the guilt phase of trial as] Mrs. DeBruce was the only defense witness at the

penalty phase and her testimony was limited to a plea for mercy."  (Doc. 1, p. 38).  As such, he

"was improperly forced to choose between two fundamental constitutional rights: his right to

have family members in attendance at a public trial and his right to present mitigating evidence

that might spare his life."  *Id*. at 39.

The respondent answers that this claim was properly denied by the Alabama Court of

Criminal Appeals on direct appeal, and DeBruce cannot show the state court's decision was

contrary to or an unreasonable application of clearly established federal law, or an unreasonable

determination of the facts in light of the evidence before it.  (Doc. 14, pp. 62-64 and Doc. 15, pp.

57-59).  The respondent additionally contends that DeBruce is not entitled to federal relief

because the claim "presents only a question of state law."  (Doc. 14, p. 64 and Doc. 15, pp. 58-

59).

On direct appeal, the Alabama Court of Criminal Appeals made the following findings of

fact and conclusions of law:

> The appellant filed a written motion to invoke "the rule" prior to the voir
> dire of the jury venire.  CR. 59-65, R. 54.  It was within the sound discretion of

---

[56]In his reply brief, DeBruce also argues *Perry v. Leeke*, 488 U.S. 272, 280-84 (1989) and
*Geders v. United States*, 425 U.S. 80 (1976) provide support for his position.  However, these cases
involve judicial interference with communications between defense counsel and the defendant during
trial and are therefore inapplicable to DeBruce's case.  (Doc. 20, p. 192).

> the trial court to sustain the prosecutor's objection and refuse to allow the appellant's mother and father, who might testify at the sentence phase of the trial, to be excused from "the rule" and to remain in the courtroom during the guilt phase of the trial.  Rule 9.3(a), A.R. Crim. P.  See also *Henderson v. State*, 583 So.2d 276, 291 (Ala. Cr. App. 1990), affirmed, 583 So. 2d 305 (Ala.1991), *cert. denied*, 503 U.S. 908, 112 S. Ct. 1268, 117 L. Ed. 2d 496 (1992).  The trial judge made it clear that "[i]f you [defense counsel] tell me one of them is not going to be a witness at any time in any part of the proceedings that might come forth, then I'll exclude them."  R. 292.  "[T]he decision to exclude or not to exclude witnesses from the courtroom remains a matter of discretion for the trial court." *Ex parte Lawhorn*, 581 So. 2d 1179, 1181 (Ala.), *cert. denied*, 502 U.S. 970, 112 S. Ct. 445, 116 L. Ed. 2d 463 (1991).

*DeBruce v. State*, 651 So. 2d at 604-05.

DeBruce's reliance on *Waller v. Georgia*, 467 U.S. 39 (1984) and *In re Oliver*, 333 U.S. 257 (1948), fails to persuade this court that he had a fundamental right to have family members in attendance at his public trial.  In *Waller*, the Supreme Court found the trial court erred when it refused to allow the public at large to attend a mid-trial suppression hearing lasting seven days, during which time only 2 ½ hours were spent playing wiretapped recordings that were purportedly the necessary reason for closure of the hearing.  In *Oliver*,

> the petitioner was called as a witness to testify in secret before a one-man grand jury conducting a grand jury investigation.  In the midst of petitioner's testimony the proceedings abruptly changed.  The investigation became a 'trial,' the grand jury became a judge, and the witness became an accused charged with contempt of court-all in secret.  Following a charge, conviction and sentence, the petitioner was led away to prison - still without any break in the secrecy.  Even in jail, according to undenied allegations, his lawyer was denied an opportunity to see and confer with him.  And that was not the end of secrecy.  His lawyer filed in the State Supreme Court this habeas corpus proceeding.  Even there, the mantle of secrecy enveloped the transaction and the State Supreme Court ordered him sent back to jail without ever having seen a record of his testimony, and without knowing all that took place in the secrecy of the judge's chambers.  In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be

> deprived of his liberty without due process of law means at least that an accused
> cannot be thus sentenced to prison.

*In re Oliver*, 333 U.S. at 272-273.

The Sixth Amendment jurisprudence offended in *Waller* and *Oliver* is clearly not present in DeBruce's case.  *Waller* and *Oliver* hold only that a defendant has a constitutional right to a public trial, not that a defendant has a fundamental right to have family members present at a public trial.  Nor can *Waller* and *Oliver* be interpreted to apply to DeBruce's case in the sense that his mother and father were simply members of the public desiring to attend the trial *because* his parents were to be witnesses at the penalty phase of trial.

As to the latter concern, DeBruce does not dispute the constitutionality of ALABAMA RULE OF CRIMINAL PROCEDURE 9.3(a) on its face.  He does argue, however, that the 'rigid' application of the Rule in his case resulted in a violation of his right to due process on the basis of *Chambers v. Mississippi*, 410 U.S. 284 (1973).  DeBruce is incorrect.

In *Chambers*, Mississippi's 'voucher' rule prevented a defendant being tried for the murder of a police officer from calling to the stand and questioning another individual who had given but later recanted a written confession that he (and not the defendant) had killed the police officer.  *Chambers*, 410 U.S. at 296.  Moreover, the State's hearsay rule prevented the defendant from calling three additional witnesses who would have testified that soon after the murder, the recanting individual also had separately made the same confession to them.  *Id.* at 298-99.  The Supreme Court held that, in Chambers's case, the application of each of these state procedural rules violated Chambers's right to due process of law because it prevented him from defending himself by cross-examining and confronting witnesses against him.  *Id.* at 302-03.

76

Additionally, *Chambers* and its progeny make it clear that *Chambers* was a "case-specific error correction." *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996).

> *Chambers* specifically confined its holding to the "facts and circumstances" presented in that case; we thus stressed that the ruling did not "signal any diminution in the respect traditionally accorded to" the States in the establishment and implementation of their own criminal trial rules and procedures." *See Chambers v. Mississippi*, 410 U. S., at 302, 93 S. Ct., at 1049. *Id.*, at 302-303, 93 S. Ct., at 1049. *Chambers* therefore does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence.

*United States v. Scheffer*, 523 U.S. 303, 316 (1998).

DeBruce presents no evidence to show that his parents removal during the guilt phase of trial pursuant to Alabama's witness exclusion rule violated his right to defend himself against the charges against him.  His assertion that he somehow was forced to choose between the presence of his parents at the guilt phase of trial and presentation of mitigating evidence at the penalty phase of trial rings hollow.  There was absolutely nothing to prevent DeBruce from presenting, through his parents, any mitigating evidence he desired at the penalty phase of trial.

The state court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence before it.[57]  This claim is due to be denied.

**C.    DeBruce's constitutional right to be present at his capital murder trial was violated because he was absent during a material stage of the proceedings. (Doc. 1,  ¶¶ 113-19, pp. 39-41)**

Next, DeBruce alleges he was deprived of the opportunity to be present at every critical stage of his trial because he

---

[57]DeBruce's claim therefore is reduced to a question of state law, one which is beyond this court's jurisdiction.

was absent for a pre-trial hearing at which more than 27 motions were decided governing a wide range of critical issues, including: whether Mr. DeBruce should be granted poor person's status; whether the jurors should be death qualified; whether to appoint a jury expert for the defense; whether to conduct a psychological evaluation; the scope of discovery, including cooperation agreements and aggravating circumstances; and jury instructions.

(Doc. 1, pp. 39-40).  DeBruce declares he was prejudiced because "[h]ad he been present and able to assist his counsel it would have greatly benefitted him and changed the outcome of trial." *Id.* at 40.  Moreover, since his absence from the hearing "plainly frustrated 'the fairness of the proceeding[,]'" the state court's rejection of the claim is contrary to and an unreasonable application of clearly established federal law.  *Id*. at 41 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934); *Faretta v. California*, 422 U.S. 806, 819, n.15 (1975) and Doc 20, p. 192 (citing *Kentucky v. Stincer*, 482 U.S. 730 (1987)).

With two exceptions that will be discussed further herein[58], the above allegations represent the entirety of DeBruce's claim.  Such allegations fail to meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c[ ]" and are due to be dismissed.  *McFarland v. Scott*, 512 U.S. at 856.  Alternatively, DeBruce's blanket assertion that his presence at the hearing would have been 'beneficial' or 'changed the outcome of the trial' is devoid of the substance necessary to convince this court that the Alabama Supreme Court's lengthy adjudication of the claim is contrary to or an unreasonable application of clearly established federal law.  *See Ex parte DeBruce*, 651 So. 2d at 625-35.  For the foregoing reasons, all but two aspects of the habeas claim are insufficiently pleaded, or alternatively, do not merit § 2254(d) relief.

---

[58]These involve DeBruce's allegations regarding the purported necessity of physical and mental health experts, and the discovery of a prior robbery conviction that would eventually be proffered as an aggravating factor at the penalty phase of his trial.  (Doc. 1, pp. 40-41).

Turning to the two exceptions, it must initially be noted that DeBruce's presentation of the *entire* claim at the state appellate and Supreme Court level consisted only of a declaration that he had a right to be present at every stage of the trial proceedings[59], along with a quote from trial counsel as proof DeBruce was indeed absent from the motion hearing.  (C.R. Vol. 8, Tab. 28, pp. 44-46 and C.R. Vol. 9, Tab. 33, pp. 61-63 (quoting R. Vol. 2, Tab. 4, p. 12).  Still, as reported earlier, the state court engaged in a lengthy examination of the motions addressed during the hearing and the effect of DeBruce's absence from the hearing.

Having identified the essence of the predecessor state claim, the exceptions meeting the specificity requirements of federal pleadings in the habeas claim involve: (1) the purported necessity of physical and mental health experts for DeBruce, and (2) the discovery of a prior robbery conviction that would eventually be proffered as an aggravating factor at the penalty phase of his trial.  (Doc. 1, pp. 40-41).  To that end, DeBruce declares that his

> mental health was discussed in his absence.  Counsel initially stated the issue could not be decided without Mr. DeBruce being present.  Yet, in Mr. DeBruce's absence, counsel acquiesced to the court's suggestion that it would suffice simply to appoint a state-employed social worker to prepare a report.
>
> At the same time, counsel decided not to pursue a request for funding for the appointment of experts.  Had Mr. DeBruce been present when this crucial issue was discussed, he could have alerted counsel about his repeated failures in school, his placement in special education class, the abuse to which he was exposed to as a child and the debilitating illness from which he . . . suffered later diagnosed as Crohn's disease.  Such information would have led counsel to seek funding for independent experts, including a forensic psychologist, a neuropsychologist and a gastroenterologist.  Instead of relying on experts, counsel relied on the state's ill-equipped and unqualified social worker.

---

[59]DeBruce also alleged that as a capital defendant, this right could not be waived under state law, but this question is not at issue in his habeas petition.

During the same hearing ... there was a discussion about potential aggravating circumstances for the penalty phase. The prosecutor stated that he thought [DeBruce] had a prior felony conviction, but claimed he was not sure. Counsel, demonstrating his complete unfamiliarity with his client's background, stated that [DeBruce] had no prior felony convictions and his robbery case in Jefferson County was pending. In fact, several months earlier Mr. DeBruce had pled guilty to the robbery in Jefferson County. This conviction became the only aggravating circumstance in the present case, other than Mr. DeBruce's participation in the offense.

Because Mr. DeBruce was not present in the courtroom during this critical discussion, he was unable to correct his attorney's mistake. As a result, counsel failed to investigate the Jefferson County conviction and was not prepared when the prosecutor introduced it into evidence at the penalty phase. This was extremely prejudicial since there were numerous grounds to oppose the use of the Jefferson County conviction. The Court in Jefferson County on the record had told DeBruce that a guilty plea in that case would have no effect on his capital murder case. Further, DeBruce's lawyer in Jefferson County, Anthony Falletta, had provided conflicted representation since he also represented Barbara Jean Spencer, who along with her son and L[u]Juan McCants, was cooperating against Mr. DeBruce in the capital murder case.

*Id.*

The respondent correctly answers (doc. 14, p. 65 and doc. 15, p. 15) that the above factual allegations are raised for the first time in the habeas petition. Had not the Alabama Supreme Court[60] engaged in an expansive merits review of the claim, this court would have been inclined to agree with the respondent that DeBruce's failure to first bring forth his new factual allegations in state court results in a procedural default in the habeas arena. However, since the state court did conduct a merits adjudication of the claim on direct appeal, the prudent course will be to conduct a habeas review on the merits as well.

---

[60]*See Ex parte DeBruce,* 651 So. 2d at 625-35. The Alabama Court of Criminal Appeals listed all 27 motions as well, but ultimately found that DeBruce was not prejudiced by his absence from the pre-trial hearing. *DeBruce v. State*, 651 So. 2d at 618-20.

Before setting out the relevant portions of the state court's opinion, the reader is reminded that this *entire* claim was presented to the state court as a simple declaration by DeBruce that he had a right to be present at every stage of the trial proceedings[61], along with a quote from counsel to prove he (DeBruce) was not at the pre-trial hearing, "'... I'm certainly not prepared to make such a showing without [DeBruce] being here....'"  (C.R. Vol. 8, Tab. 28, pp. 44-46 and C.R. Vol. 9, Tab. 33, pp. 61-63(quoting R. Vol. 2, Tab. 4, p. 12)).  Against this backdrop is the Alabama Supreme Court's opinion regarding the two excepted habeas claims, within the context of the entire appeal:

> We have reviewed the opinion of the Court of Criminal Appeals, which addresses each of the issues raised by DeBruce ... [and] [a]dditionally. . . searched the record ... for any plain error or defect that has or probably has affected DeBruce's substantive rights....

>                  . . . .

> We have examined the transcript of the pre-trial hearing that is the subject of th[e] claim of error [regarding DeBruce's absence from a motions hearing], to determine whether the defendant's presence was required by the  ... Constitution of the United States....

> The pertinent portions of the record show the following occurred when the several pre-trial motions were heard by the trial court....

>                  . . . .

> During the hearing, defendant's counsel stated that he might wish to file a motion, claiming indigency, although he had hired his counsel, if he needed to some experts to do some independent testing, and ask for the State to pay for those experts.[FN2]

> > FN2. There was some discussion about whether the defendant wanted to do some independent testing and the court noted that the

---

[61]Again, DeBruce also alleged that as a capital defendant, this right could not be waived under state law, but he has not made waiver an issue in his habeas petition.

> case had already been continued once at the defendant's request
> and was set for trial on a specific date.  Defendant's counsel stated
> that he did not want to delay the trial.
>
> . . . .
>
> The next motion was a "Motion for Aggravating and Mitigating
> Circumstances."  By this motion, defense counsel was "primarily looking forward
> to the penalty phase of this trial if there is one, and in trying to prepare for it as
> best we possibly can."  There was a colloquy between the trial judge, the district
> attorney, and defense counsel, which essentially culminated in the district
> attorney's stating that he thought the defendant had a prior robbery conviction,
> although he could be wrong about that, but that the indictment charged the
> aggravating circumstance of murder during the course of a robbery and that the
> only mitigating circumstance that he knew about would be the defendant's age.

*Ex parte DeBruce*, 651 So.2d 624, 626-27 (Ala. 1994).  Thereafter, the Alabama Supreme Court

held that

> DeBruce, of course, has a substantive right to be present, either in person
> or by counsel, or both, at several stages in a criminal proceeding.  The question
> presented here is whether he was entitled to be present at the pretrial hearing in
> this case.  We hold that DeBruce was not prejudiced by his absence from the
> pretrial hearing.

*Id.* at 639.

DeBruce does not take issue with the Alabama Supreme Court's factual findings or its

assertion that the entire record, including the transcript of the motions hearing, was taken into

consideration on direct appeal.  When the state court's expansive review of the record and its

opinion concerning this claim are compared to DeBruce's new allegations, it is clear the state

court's opinion is neither contrary to nor an unreasonable application of clearly established

federal law.

Although unmentioned by the Alabama Supreme Court, this court finds several other

facts, taken directly from the trial record, are pertinent to resolution of this claim.  DeBruce's

82

first attorney, Jon Adams, filed an application for youthful offender status on DeBruce's behalf on December 9, 1991.  (C.R. Vol. 1, p. 13).  On January 7, 1992, a youthful offender report was filed by the Talladega County probation office.  *Id.* at pp. 56-58.  The September, 14, 1991, Jefferson County, Alabama, second degree robbery conviction is clearly listed in the criminal history portion of the report.  *Id.* at p. 56.  Moreover, the investigating officer wrote: "DeBruce stated he has been in and out of the hospital, quite a while.  He stated that he has asthma and stomach problems.  He had an intestinal blockage, following a car wreck in 1990....  DeBruce claims to have attended high school at Ramsey, in the 'Gifted' program, in Jefferson County and graduated in 1988.  He attended UAB for one semester."  *Id.* at p. 57.  DeBruce's youthful offender application was denied the same day.  (C.R. Vol. 2, p. 207).  In his motion to withdraw, Jon Adams represented that Mr. Mathis had contacted him on January 7, 1992, about representing DeBruce as retained counsel, and informed Adams on January 13, 1992, the date the case was first set for trial, that he indeed had been retained by DeBruce.  (C.R. Vol. 1, pp. 199-200).

On January 16, 1992, Mathis filed a Notice of Appearance and numerous motions on DeBruce's behalf.  *Id.* at  pp. 23-55.  Mathis filed another set of motions on January 28, 1992.  *Id.* at pp. 59-170.  The motions hearing at issue took place on January 31, 1992.  (R. Vol. 2, Tab. 4, pp. 4-64).

Certainly, DeBruce's health and criminal history were discussed at the hearing, but DeBruce does not allege that Mathis never engaged in conversations with him regarding these topics either before and after the motions hearing took place.  Additionally, at the hearing, the District Attorney agreed to turn over his entire file to Mathis.  *Id.* at p. 6.  Even if the district

attorney's file did not contain the youthful offender report, the report was a part of the court

record.  DeBruce has never denied the validity of the information contained in the youthful

offender report.  During the colloquy between the parties at the hearing, Mathis and the

prosecutor expressed knowledge that DeBruce had pending robbery charges, and the prosecutor

twice stated to defense counsel that he believed DeBruce had a robbery conviction.  *Id*. at 26-27.

For the foregoing reasons, the state court's finding that DeBruce failed to establish prejudice as a

result of his absence from the hearing is neither contrary to nor an unreasonable application of

clearly established federal law.

      As for DeBruce's medical condition, there was no mention of it at the motions hearing,

nor was it ever an issue during the entire trial process.  In fact, DeBruce was not diagnosed with

Crohn's disease until after his conviction, and he has not shown that the record reveals any

evidence regarding his gastrointestinal condition that would have changed the outcome of the

trial and penalty phase of this action.[62]  Therefore, even with the benefit of hindsight (that Mathis

could not have possibly have had), DeBruce's absence from the motions hearing did not

prejudice him, and as such, the state court's adjudication to that effect withstands federal review.

      As for DeBruce's mental health, the following discussion was had at the motion hearing:

> **THE COURT:** The next motion in order in the Clerk's file would be
> Motion for Psychological Evaluation.
>
> **MR. MATHIS:** I filed that motion, Your Honor, based on some
> information I was given by this defendant's mother prior to having the opportunity
> to speak at length with him.  I have spoke with him many times.  My
> understanding is that in order to be able to go forward on such a motion, I'm
> going to have to affirmatively show that there is some reason for it.  I am not

---

    [62]For additional detail, *see infra,* Claim IV.H, for the Alabama Court of Criminal Appeals'
alternate finding that DeBruce was factually and legally competent to stand trial.

prepared to make such a showing without him being here and chances are we wouldn't be able to if he was here.

**MR. RUMSEY:** Chances what?

**MR. MATHIS:** Chances are we wouldn't be able to if he was here.  The motion pretty much speaks for itself when it uses the terms, may, may not and may as opposed to - -

**THE COURT:** We need to go forward with that.  We need to do that like Monday or Tuesday.

**MR. MATHIS:** I don't believe it is necessary.  If it is necessary at all, it would be for the purposes of the punishment phase of the trial as opposed to me thinking that there is any way on God's earth that he is going to be determined by some expert to be insane.

**THE COURT:** If you want me to have him at some point in time evaluated, we a have a local mental health.

**MR. MATHIS:** If I could get him evaluated for purposes of - - for what I just said, so that I might have that if it comes down to it at the punishment phase of the this trial, I would appreciate it.  That may have (sic) done.  There was a YO application.  I don't know if they do that as a matter of rote.  They don't?

**MR. RUMSEY:** We do on juveniles, but not on YO's.

**MR. MATHIS:** Of course, this kid - - my understanding is that he is only 19 years old.

**THE COURT:** I'll call Mr. Garner and see if he can't do something on it in the next week.

**MR. MATHIS:** Thank you, Judge.

**THE COURT:** You don't know of any reason why we need to have a hearing at this time on it?

**MR. MATHIS:** No, sir.

(R. Vol. 2, Tab. 4, pp. 11-13).

DeBruce's assertion that he could have informed his counsel of his difficulties in school had he been at the hearing is without merit.  DeBruce himself undisputedly informed the probation officer preparing his youthful offender report that he was in a gifted program in public school and had attended some college.  Interestingly, DeBruce does not deny that he made the same representation again to a probation officer during a March 1992, *pre-sentence* investigation as well.  (C.R. Vol. 2, Tab. 2, pp. 215-16).  Nor does he deny that he informed the probation officer that he had "a good relationship with both of his parents and his numerous siblings[,]" and that "[t]here were no significant problems noted during his formative years."  *Id*. at p. 215. Finally, DeBruce does not contend any private conversations between he and Mr. Mathis were misrepresented to the court at the January 31, 1992, hearing.

The court does not disregard the testimony later given by DeBruce's mother about DeBruce's mental health, nor does it disregard a statement DeBruce made to social worker Gary Garner after the January 31, 1992, motions hearing to the effect that he (DeBruce) had dropped out of school in the seventh grade.  (R. Vol. 7, Tab. 19, pp. 1138-52).  It also cannot disregard the fact that DeBruce himself testified during a mid-trial suppression hearing that he had graduated from high school, admitted that he had told the probation officer that he had attended college for two years while conceding, "I was suppose to went in for two, but I didn't go the whole two." (R. Vol. 5, pp. 766-67).

Ultimately, however, the issue is whether DeBruce's presence at the January 31, 1992, motions hearing would have would have contributed to the outcome of his case and the fairness of proceedings in the context of his mental health and criminal history.  Based upon the historical record, this court cannot find the state court's adjudication of the prejudice prong of this claim is

contrary to or an unreasonable application of clearly established federal law, or an unreasonable

determination of the facts in light of the evidence before it.

Finally, the trial court made it clear at the motions hearing that the issue of DeBruce's

mental health would not be decided at that time, and he in fact appointed social worker Gary

Garner to conduct an evaluation.  There was no testimony taken at DeBruce's motions hearing

regarding any issue and as such, there is no concern that DeBruce's right to confrontation and

cross-examination were thwarted by his absence.  This claim is due to be denied.

**D.   DeBruce was deprived of a fair and impartial jury  (Doc. 1, ¶¶ 120-136, pp.
        42-48)**

In the introductory paragraph of this four part claim, DeBruce alleges  "[e]very criminal

defendant has the right to a panel of "impartial ... jurors."  (Doc. 1, p. 42 (quoting *Irvin v. Dowd*,

366 U.S. 717, 722 (1961); *Turner v. Louisiana*, 379 U.S. 466 (1965)).  He further asserts the

jurors "conceal[ed] information, improperly consider[ed] extraneous information, [and]

engage[d] in premature deliberations...." in violation of his right to due process of law.  *Id*.

(citing *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 555 (1984); *Remmer v.

United States*, 347 U.S. 227 (1954); *Mattox v. United States*, 146 U.S. 140, 149 (1892)).

DeBruce also contends the trial court deprived him of a fair and impartial jury when it "failed to

excuse four venire members who knew the victims or their families."  *Id*. at 46.  An analysis of

each claim follows.

**1.   Jurors and the prosecution failed to disclose information during voir
          dire  (Doc. 1, ¶¶ 121-24, pp. 42-43)**

DeBruce declares that although "the trial judge admonished the prospective jurors to

listen carefully during voir dire and to answer questions truthfully, ... jurors [Lindsey, Jaffe and

87

Ford] failed to disclose material information[]" in violation of his "right to a fair trial, an impartial jury, to exercise his peremptory strikes, to challenge jurors for cause, equal protection and reliable sentencing." (Doc. 1, pp. 42-43).

DeBruce first contends juror Lindsey did not reveal "that she was the daughter of a law enforcement official and that her sister had been murdered." *Id*. at p. 42. In fact, "her father's career spanned many years, he was a friend of the prosecutor, whom he continued to work with on a professional basis, and he showed up at Mr. DeBruce's capital murder trial with a Valentine's Day present for Ms. Lindsey." *Id.*

DeBruce contends the Alabama Court of Criminal Appeals' decision to discount the prejudice he suffered from Ms. Lindsey's omissions by relying on the "self-serving hindsight recollections of Ms. Lindsey and a few other jurors, that [her] "law enforcement ties did not affect her decision[]" is contrary to and an unreasonable application of clearly established federal law because a juror's "[s]ubjective recollections about the deliberative process are improper and irrelevant...." *Id*. at 43 (citing *Remmer v. United States*, 347 U.S. 227 (1954)).

Next, DeBruce alleges juror Ford "failed to disclose her husband had been a deputy sheriff[,]" and juror Jaffe "failed to disclose that she was on a first name basis with a key witness, whom she referred to as 'poor Larry,' the store the manager who had extensive business dealings with [her] husband." *Id*. In the summation of this claim, DeBruce again declares the state court's rejection of these claims is contrary to and an unreasonable application of clearly established federal law. *Id*.

88

The respondent answers that DeBruce cannot show is he entitled to § 2254(d) relief with regard to any of the three venire persons about whom he complains.  (Doc. 14, pp. 67-69 and Doc. 15, pp. 63-76).

With regard to juror Lindsey, the Alabama Court of Criminal Appeals affirmed the findings of fact and conclusions of law made by the circuit court on collateral review, writing:

> DeBruce argues that juror P.L. failed to disclose that her father was in law enforcement.  Specifically, DeBruce contends that P.L., although asked if she had any relatives involved in law enforcement, failed to disclose that her father was a former police officer, a former chief of police, and, at the time of DeBruce's trial, an employee of the Alabama Department of Corrections in Montgomery.

> The circuit court held that this claim was procedurally barred because DeBruce failed to show that the evidence in support of the allegation was newly discovered.  The circuit court also addressed this issue on the merits and stated in its order denying postconviction relief:

> > "....  In *Tomlin v. State*, 695 So. 2d 157, 170 (Ala. Crim. App. 1996), the Court of Criminal Appeals applied five factors in reviewing claims of juror misconduct: (1) temporal remoteness of the matter inquired about; (2) the ambiguity of the question propounded; (3) the juror's inadvertence or willfulness in failing to answer; (4) the failure of the juror to recollect; and (5) the materiality of the matter inquired about.  The question of probable prejudice[63] is primarily within the trial court's sound discretion and will be reversed only upon a showing of an abuse of that discretion.  *Thomas v. State*, 622 So. 2d 415, 418 (Ala. Crim. App. 1992).  Where a trial court investigates the circumstances under which the claim arose and determines that the rights of the petitioner were not prejudiced, the trial court will generally not be held to have abused its discretion.  *Burell v. State*, 680 So. 2d 975 (Ala. Crim. App. 1996).  It is not simply any failure on the part of a juror to properly respond to any question that entitles a petitioner to a new trial, but rather whether that failure to answer resulted in

---

[63]The applicable prejudice standard pursuant to federal constitutional law requires a petitioner to show the type of actual bias that would support a challenge for cause, as opposed to the State of Alabama's arguably more lenient 'probable prejudice' requirement.

probable prejudice to the petitioner. *Washington v. State*, 539 So. 2d 1089, 1095 (Ala. Crim. App. 1988).

"1.  Juror [P.L.]

"[P.L.] did not answer the question regarding family in law enforcement.  At the evidentiary hearing, DeBruce presented [P.L.] as a witness, who testified that her father is [W.W.].  [W.W.] held various positions in the Talladega County Police Department in the mid-1970's, including acting police chief.  [W.W.][64] then became employed by the Alabama Department of Corrections, where he worked until 1995.

"The Court finds that the first *Tomlin* factor, temporal remoteness, is relevant because actual 'law enforcement' activities of [W.W.] occurred in the mid-1970's, approximately 20 years before the trial of this matter.  The second inquiry, the ambiguity of the question propounded, is also relevant.  The term 'law enforcement' usually denotes police officer or prison worker.  The fact that [W.W.] worked in Montgomery at the actual Department of Corrections does not easily lead one to consider that he was involved in a 'law enforcement' career.  Third, [P.L.] did not

---

[64]Although unmentioned by the court, W.W. also testified at the Rule 32 hearing.  (Rule 32 R. Vol. 17, pp. 144-65).  He testified that while he did remember his daughter being a juror, he did not recollect his daughter being a juror at DeBruce's trial, did not remember bringing a Valentine's Day present to his daughter on the last day of deliberation, and denied he ever would have brought such a present into the courtroom.  *Id.* at 153-55.  As police chief, he had much contact with the District Attorney and considered him a personal friend, but the two never socialized outside of work and did not discuss their families.  *Id.* at 151-52.  With regard to whether or not juror P.L. knew Rumsey, W.W. explained an affidavit he had signed and that was prepared by DeBruce's counsel as follows:

> You've got down here at the end of this last statement down here where I said, "I know Robert Rumsey very well from my law enforcement days.  We socialized together and have kept in touch, even when I moved to Montgomery to work the corrections department.  Pamela knew Rumsey as well."  Now Pamela knew Rumsey from after she started to work down here [P.L. became an employee of the county clerk's office several years after the DeBruce trial], but she didn't know him like I knew him back in the days.  Now I didn't mean that Pam knew him at the time I knew him... at the time of trial....

*Id.* at 156.

willfully or intentionally 'conceal' information.  She stated at the Rule 32 hearing that 'if [she] had heard that question, [she] would have jumped up if there was a way of getting out of being a juror for that case.'  She said that she 'evidently' did not hear the question.  She did not want to be on a sequestered jury, and did not want to serve on a murder case.  The fourth factor, the failure to recollect, is not at issue in this case.  [P.L.] fully recollected the issue in question.

"Finally is the materiality of the question at issue.  [Defense counsel] testified that he would have used a peremptory strike to remove her.  The statement from a biased defense attorney that he finds the question material is not dispositive.  While it may be material, any potential prejudice was rebutted by [P.L.'s] statement that she based her opinion on nothing other than the facts, the evidence, and the law as instructed by the trial court.  [P.L.] testified that she did not consider her father's service in law enforcement during deliberations."

*DeBruce v. State*, 890 So. 2d at 1075-76.

With regard to jurors Ford and Jaffe, the Alabama Court of Criminal Appeals made the

following findings of fact and conclusions of law on collateral review:

DeBruce argues that juror M.F. failed to disclose that her husband had been in law enforcement.  When addressing this issue the circuit court made the following findings:

"DeBruce alleges that juror [M.F.'s] husband was involved in law enforcement and that she improperly failed to answer that question during voir dire.  The question asked of [M.F.'s] panel was whether they or a family member 'is' in law enforcement.  The question did not ask whether anyone was or had been in law enforcement.  During the evidentiary hearing, [M.F.] testified that her husband worked as a volunteer, or a reserve county deputy, sometime around 1975.  He then worked full time as a county deputy in the Talladega County Sheriff's Department for one year from 1978-79.  He also served in the reserves for one year after being a full-time deputy.  [M.F.'s] husband was not in law enforcement in 1991 or 1992, which is the information sought to be elicited by the voir dire question.  He was not involved in law enforcement at all after 1980.

"The question itself was not asked in such a way as to elicit information regarding past law enforcement activities.  The activities were more than ten years previous to this trial.  [M.F.] did not intentionally withhold information."

The circuit court's findings are supported by the record.  The question that was asked of M.F.'s panel was "whether they or a family member 'is' in law enforcement."  As the juror stated during the Rule 32 hearing, her husband had not been in law enforcement for more than 10 years at the time of DeBruce's trial.  There was no showing that this juror failed to disclose any information during voir dire.

DeBruce also argues that juror S.J. failed to disclose that she knew the victim and had had business dealings with him.

The circuit court found that this issue was not sufficiently pleaded and that DeBruce failed to meet his burden of proof.  The record shows that juror S.J. had died before the postconviction evidentiary hearing.  DeBruce attempted to introduce the testimony of a legal aid attorney who had spoken with S.J. before her death.  The State moved that this evidence be excluded.  The circuit court excluded this evidence after finding that it was hearsay.  There was no legal evidence introduced to support this allegation.  We agree with the State's argument during the postconviction hearing that DeBruce's attorney could have obtained an affidavit from S.J. before her death to substantiate this claim.  The circuit court correctly found that DeBruce failed to meet his burden of proof concerning this claim.[65]

*DeBruce v. State*, 890 So. 2d at 1079.

In the landmark case of *McDonough Power Equipment Inc. v. Greenwood*, 464 U.S. 548,

556 (1984), the United States Supreme Court

h[e]ld that to obtain a new trial in [the event of juror non-disclosure], a party must first demonstrate that a juror failed to answer honestly a material question on *voir*

---

[65]The state court did not mention that Mr. Jaffe was present in court, but the trial court sustained the State's objection to Mr. Jaffe's testimony on hearsay grounds and that counsel would be impermissibly delving into Mrs. Jaffe's mental deliberations.  (Rule 32 R. Vol. 18, pp. 258-59). Rule 32 counsel stated that Mr. Jaffe was admissible to the extent that Mr. Jaffe could testify that he had extensive business dealings with Larry McCardle and that Mrs. Jaffe was aware of that fact. *Id.* at 259.  However, the court insisted that it had made its ruling and instructed counsel to move on. *Id.*

*dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

"Thus, the first prong of the *McDonough* test requires a determination of whether juror [Lindsey's] answers were honest, that is, whether [s]he was aware of the fact that h[er] answers were false."  *United States v. Perkins*, 748 F.2d 1519, 1531-33 (11th Cir. 1984).  Application of the second prong of the *McDonough* test requires a determination as to:

> whether a correct response [by juror Lindsey] would have provided a valid basis for a challenge for cause.  A party who seeks a new trial because of non-disclosure by a juror during *voir dire* must show actual bias.  *United States v. Tutt*, 704 F.2d 1567, 1569 (11th Cir.), *cert. denied*, 464 U.S. 855, 104 S. Ct. 174, 78 L. Ed. 2d 156 (1983).  Actual bias may be shown in two ways: "by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed."  *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (citations omitted).[FN14]
>
> > FN14.  The *Nell* court defines presumed bias as "situations in which the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause."  526 F.2d at 1229 n. 8.

*Id.* at 1532.

DeBruce does not dispute the validity of the state court's recitation of Ms. Lindsey's testimony in the post-conviction record.  Although DeBruce contends Ms. Lindsey failed to disclose information, he does not allege she was being dishonest when she testified that she did not hear the question pertaining to juror's with family in law enforcement.  Nor does he declare that the state court's implicit finding that she answered the material question honestly (through its application of the five *Tomlin* factors) during post-conviction proceedings was an unreasonable determination of the facts in light of the evidence before it.  Since a determination

93

as to whether she was honest is undoubtedly in line with, and thus neither contrary to nor an unreasonable application of clearly established federal law, this court's inquiry ends at this juncture, and the juror partiality claim regarding Ms. Lindsey is due to be denied.

Even if, for the sake of argument, the inquiry was continued to the second *McDonough* prong, DeBruce has not made any reasoned argument to support a finding that the state court's determination that Ms. Lindsey was not actually biased[66] is an unreasonable determination of the facts in light of the evidence before it.  Nor has he pointed to any Supreme Court precedent dictating that a juror must be dismissed for cause upon revelation of family members who are or have been members of law enforcement.  Thus, the claim would still be due to be denied.

Finally, DeBruce does not dispute the validity of the state court's factual findings with regard to jurors Jaffe and Ford, and as such, the findings are presumptively correct.  Since DeBruce provided no admissible evidence of juror Jaffe's purported misconduct and it is undisputed that juror Ford honestly answered the question that was asked of her during voir dire, the state court's rejection of the juror misconduct claims pertaining to Jaffe and Ford is neither contrary to or an unreasonable application of clearly established federal law.  This claim is due to be denied.

### 2. DeBruce's jury improperly and unconstitutionally considered extraneous information  (Doc. 1, ¶¶ 125-30, pp. 43-45)

DeBruce alleges juror "Lindsey and two other jurors overheard conversations other jurors were having prior to deliberations."  (Doc. 1, p. 44).  Moreover, according to DeBruce, the bailiff

---

[66]Even if it is assumed that Mr. Mathis would have exercised a peremptory strike against Ms. Lindsey had he known the nature and extent of her law enforcement connections, such a loss is  not dispositive of the federal constitutional question, and that question is whether Ms. Lindsey was *actually biased* against DeBruce.

informed the jury "that if they did not reach a verdict by Friday, they would be sequestered for the entire holiday[67] weekend."  *Id*.  DeBruce declares the bailiff's instructions deprived him of a fair and impartial jury and were "an unauthorized, improper, coercive, and prejudicial instruction."  *Id*. at 44-45 (citing *Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Allen v. United States*, 164 U.S. 492 (1896); *Jenkins v. United States*, 380 U.S. 445 (1965)).  He concludes the state court's denial of the claim is contrary to and an unreasonable application of clearly established federal law.  *Id*. at 45.

On collateral review, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> DeBruce further argues that he was deprived of an impartial jury because, he says, the jury's verdict was tainted by extraneous information and by unlawful juror contact with a bailiff.  Specifically, he argues that there is evidence indicating that members of the jury heard fellow jury members discussing the case before the case was submitted to the jury for its decision.  Also, he asserts that one of the bailiffs told the jury that if it did not reach a verdict before the weekend it would have to be sequestered for a three-day holiday weekend.

> The circuit court, when addressing this issue, made the following findings:

>> "DeBruce argues that his due process rights were violated because jurors considered extraneous information in forming their verdict.

>> "The first allegation is that jurors considered extraneous information in forming their verdict.  From [P.L.'s] testimony, it is clear that no extraneous information was considered by the jury.  This claim is alternatively denied on the merits.

>> "The second allegation involves inappropriate contact between the bailiff and the jury.  [L.D.,] the petitioner's own witness, clearly and unequivocally stated that no such

---

[67]Friday, February 14, 1992, was St. Valentine's Day, and Monday, February 17, 1992, was President's Day.

conversations occurred.  This Court denies relief on the merits of this claim, in addition to holding it procedurally defaulted.[FN2]

> FN2. DeBruce does not pursue this claim on appeal. Claims not raised in briefs to this Court are deemed abandoned.  *Brownlee v. State*, 666 So. 2d 91 (Ala. Crim. App. 1995).[68]

> "Third, and finally, is the allegation that prejudicial conversations about sequestration over the weekend occurred.  The record does not reflect any prejudicial conversations.  This claim, also, is denied on the merits."

(R. 584.)

Four of the jurors at DeBruce's trial testified at the postconviction hearing. Three said that there had been no discussions about the case outside the jury room.[69]  A fourth juror did indicate that while the jury was sequestered she heard comments being made about the case by someone in the hall outside her motel room.  However, she could not testify who made the comments and she could not identify the substance of the comments.[70]  Nor did any juror testify that the bailiff had had any conversation[71] with him or her concerning reaching a verdict. Clearly, DeBruce failed to meet his burden of proof, and relief was correctly denied on that basis.  There is no indication that erroneous information was considered, much less that DeBruce was prejudiced by it.

*DeBruce v. State*, 890 So. 2d at 1079-80.

DeBruce does not dispute the appellate court's historical factual findings.  Upon review

of the record, this court finds that the bulk of the appellate court's historical factual findings are

---

[68]This is incorrect.  DeBruce did pursue this claim on appeal.  *See* Rule 32 C.R. Vol. 27, Tab. 47, pp. 11-13.

[69]*See* Rule 32 R. Vol. 15, Tab. 45, pp. 29-56.

[70]The Rule 32 record bears this out.  *See* Rule 32 R. Vol. 16, pp. 241-45.

[71]To the extent this finding can be interpreted as a factual finding by the appellate court that the bailiff did not tell the jury which verdict to reach or how to reach that verdict, it is correct. However, as set out in the body of this memorandum opinion, there are some historical facts of concern that the factual findings made by the appellate court in its opinion do not necessarily clarify.

correct, but there is one aspect of Juror Lindsey's testimony the appellate court's opinion does

not  make clear that it took into account.  This aspect pertains to a comment made by the bailiff

to the jurors and one juror's purported reaction to the comment.  At the evidentiary hearing, juror

Lindsey testified:

> Q [Mr. Ives]  And is it true that [the bailiff] told you that if you did not reach a verdict on Friday, you would be sequestered until the following Monday?  Do you remember him saying that to you?
>
> A [Ms. Lindsey]  He didn't say it directly to me.  He said it to all of us.
>
> Q [Mr. Ives]  He said it to the whole group; right?  When was that?
>
> A [Ms. Lindsey]  I can't remember.  I don't know.
>
> Q [Mr. Ives]  Was it on the Friday when you got the case or was it before that?
>
> A [Ms. Lindsey]  I can't remember, but I remember him telling us that.
>
> Q [Mr. Ives]  And do you remember Friday being a holiday, being Valentine's Day?
>
> A [Ms. Lindsey]  Yes.
>
> Q [Mr. Ives]  And he told you that had you not reached a verdict that day, you would be held the entire weekend until Monday?
>
> A [Ms. Lindsey]  Yes.

(Rule 32 R. Vol. 16, pp. 241-49).  On *cross-examination* by the prosecution, Ms. Lindsey

testified:

> Q [Ms. Stephens]  . . . Do you remember when the attorney asked you if a bailiff had made a statement to you about whether you would have to be sequestered over the weekend?
>
> A [Ms. Lindsey]  Uh-huh.
>
> Q [Ms. Stephens]  Did that have anything to do with your deliberations in this case?

A [Ms. Lindsey]  No.

Q [Ms. Stephens]  Did anyone say we need to hurry up and decide this case so we won't be sequestered over the weekend?

A [Ms. Lindsey]  It was mentioned, but it didn't have anything to do with it how long it took us to deliberate or anything.

Q [Ms. Stephens]  It had no part in your deliberations?

A [Ms. Lindsey]  Huh-huh.

*Id.* at 254-55.  On *redirect*, the questioning was as follows:

Q [Mr. Ives]  Ms. Lindsey, you said it was mentioned.  Who mentioned it?

A [Ms. Lindsey]  I can't remember.  I don't even know the names.  If I saw them, I wouldn't even remember their faces.

Q [Mr. Ives]  But it was other jurors that you were serving with on this case?

A [Ms. Lindsey]  It was just one.

*Id.* at 255-56.  Further questioning by counsel revealed that the individual who made the

comment was male, but she could not remember if he was black or white.  *Id.* at 256.  She agreed

that on the Friday the jury began deliberating, the man mentioned what the bailiff had said to the

entire group and "made reference to the fact that he didn't want to stay from Friday till

Monday[.]"  *Id.*

Later, the trial judge asked Ms. Lindsey if she had "a fair and reasonable time to

deliberate the case[,]" and Ms. Lindsey answered, "Yes, we did."  *Id.* at 258.   The judge then

asked, "And reach your verdict?", to which Lindsey responded, "Yes, sir."  *Id.* at 259.   Ms.

Lindsey was then asked:

THE COURT: Was your verdict based solely on the evidence that came to you from the witness chair and according to the law as I gave it to you in my charge?

98

A [Ms. Lindsey]  Yes, sir.

THE COURT:  Was it based on that?

A [Ms. Lindsey]  Yes, sir.

THE COURT:  Was it a fair and impartial verdict, your verdict?

A [Ms. Lindsey]  Yes, sir.

*Id*. at 259.

DeBruce was entitled to a fair and impartial jury pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Nevertheless, it is only when the petitioner makes "a colorable showing of extrinsic influence that the court must investigate the asserted impropriety."  *United States of America v. Siegelman*, 467 F. Supp. 2d 1253, 1273 (M.D. Ala. 2006) (citing *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir. 1979)).

The jury in DeBruce's case was directed to abide by the trial court's instruction that the only evidence to be considered was the testimony heard from the witness stand, and those documents and tangible exhibits admitted into evidence.  Moreover, "[t]he 'trial by jury' portion of the Due Process clause necessarily means those jurors look only at the evidence presented to them from the witness stand."  *Parker v. Head*, 244 F.3d 821, 839 (11th Cir. 2001).  Therefore, extrinsic evidence is "any information other than the information that the jury received from the court's instructions on the law, the factual evidence presented in this case through witness testimony from the witness stand, and factual evidence presented in the case through exhibits

properly admitted at trial." *Siegelman*, 467 F. Supp. 2d at 1265.  Thus, in the most technical

sense, the bailiff's comment to the jurors could be considered extrinsic evidence.

Jury exposure to extrinsic evidence is presumed to be prejudicial.  *Parker v. Head*, 244

F.3d 821, 839 (11th Cir. 2001) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)).  "The

presumption is not conclusive, but the burden rests heavily upon the Government to establish,

after notice to and hearing of the defendant, that such contact with the juror was harmless to the

defendant." *Remmer,* 347 U.S. at 229 (citations omitted).

> To rebut the presumption of prejudice, the government must show that the
> jurors' consideration of extrinsic evidence was harmless to the defendant.
> *Remmer*, 347 U.S. at 229, 744 S. Ct. at 451; *McNair*, 416 F.3d at 1307-08;
> *Caporale*, 806 F.2d at 1503; *Perkins*, 748 F.2d at 1533-34.  To evaluate whether
> the government has rebutted that presumption, we consider the totality of the
> circumstances surrounding the introduction of the extrinsic evidence to the jury.
> *Remmer*, 347 U.S. at 229-230, 74 S. Ct. at 451; *McNair*, 416 F.3d at 1307-08;
> *Parker*, 244 F.3d at 839.  The factors we consider include: (1) the nature of the
> extrinsic evidence; (2) the manner in which the information reached the jury;
> (3) the factual findings in the district court and the manner of the court's inquiry
> into the juror issues; and (4) the strength of the government's case.  *See McNair*,
> 416 F.3d at 1307-08.

*United States v. Ronda*, 455 F.3d 1273, 1299-1300 (11th Cir. 2006).

Along this line, it is understood that "[n]ot every case in which a jury has been exposed to

extrinsic evidence results in findings that a new trial must be granted."  *Siegelman*, 467 F. Supp.

2d 1253, 1273 (citing *e.g., United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006); *United*

*States v. Bolinger*, 837 F.2d 436, 440-41 (11th Cir. 1988)).

The court now examines the Rule 32 transcript to determine whether there is persuasive

rebuttal evidence to what must be considered at this juncture: *i.e.* the *presumptive* prejudice

created by juror exposure to such information.  As stated earlier, while the bailiff's comment was,

in the most technical sense, an extrinsic influence, the bailiff did not insinuate or tell the jury that

they should find DeBruce guilty.  The evidence against DeBruce at the guilt phase of trial was

overwhelming and juror P.L. answered that the jurors had a fair and reasonable time to deliberate

the case.  When the court considers the totality of the circumstances surrounding the extrinsic

evidence conveyed by the bailiff, in this case, the court finds that the exposure did not create a

reasonable possibility of prejudice against DeBruce.  Based upon the foregoing, this court finds

DeBruce was not prejudiced by the bailiff's comment and he was not denied his Sixth

Amendment right to trial by a fair and impartial jury.

Since DeBruce's own evidence disproved the existence of the remainder of his

allegations (*e.g.*, that jurors discussed the case), no further in depth discussion of the

constitutional principles associated with juror misconduct is necessary because under no

circumstances could DeBruce show the state court's rejection of the claims are either contrary to

or an unreasonable application of clearly established federal law.  This claim is due to be denied.

### 3. The trial court failed to excuse four venire members who knew the victims and their families  (Doc. 1, ¶¶ 131-34, p. 46)

DeBruce alleges the trial court "failed to excuse four venire members who knew the

victims or the victims' families."  (Doc. 1, p. 46).  He also alleges that the trial court erred when

failed to excuse venire person William E. Kallenbach even though Kallenbach

> revealed [during voir dire] that he had "read articles about the case" in the
> Talladega newspaper.  When asked what he had recalled from the articles, Mr.
> Kallenbach replied, "The main thing I remember is, you know, about the person
> that was killed, not really the defendant."  Mr. Kallenbach explained, "I just
> remember he was traveling through town and stopped in a place to buy some parts
> and was killed there."  The juror also acknowledged that he had seen television
> coverage about the shooting and that he read additional articles about the arrests
> of suspects.

*Id*.  DeBruce asserts "[t]he record does not reveal that Mr. Kallenbach could be an impartial juror despite his familiarity with the case."  *Id*.  He then concludes his right to "due process, a fair trial, and a reliable sentencing determination..." were violated.  *Id*.

The respondent answers that DeBruce's allegations concerning the juror's knowledge of the victims and their families is due to be dismissed as insufficiently pleaded pursuant to the rules governing habeas corpus petitions.  (Doc. 14, pp. 71-72)  Moreover, the respondent contends the state court found the claim to be procedurally defaulted on collateral review because DeBruce could have, but did not raise the claim on direct appeal.  *Id*. at 73.  As to the remainder of this claim, the respondent asserts that DeBruce cannot show he is entitled to habeas relief from the following findings of fact and conclusions of law of the Alabama Court of Criminal Appeals on direct review:

> The trial court did not abuse its discretion in allowing William E. Kallenback to be seated on the trial jury in spite of his alleged "extensive exposure to media stories regarding the case."  Appellant's brief at 49.

> The record does not support the appellant's allegation of "extensive exposure." What the record does show is that during individual voir dire, Mr. Kallenback admitted that he had "read in the Talladega paper a couple of articles about the case."  R. 252.

> "The main thing I remember is, you know, about the person that was killed, not really the defendant....  I just remember he [the victim] was traveling through town and stopped in a place to buy some parts and was killed there. . . .  That's my main memory.  I saw it also on television.  That's my main memory.  I do remember some later articles about the arrests and that, but I really didn't pay any attention.  I didn't recognize any of the names or anything."  R. 252-253.

> Defense counsel did not object to or challenge this veniremember. R. 271. There is no "plain error" in this regard.  "It is not required . . . that jurors be totally

102

ignorant of the facts and issues involved." *Irvin v. Dowd*, 366 U.S. 717, 722, 81
S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961).

*DeBruce v. State*, 651 So. 2d at 620-21.

DeBruce's claim that the trial court erred by failing to remove for cause four unidentified

venirepersons who had connections to the victim or family members does not meet the

heightened pleading requirements for federal habeas corpus petitions.  Thus, it is due to be

dismissed.  Alternatively, the claim is procedurally defaulted because the state court dismissed it

on collateral review pursuant to a state procedural rule which required DeBruce to raise the claim

on direct appeal, and DeBruce does not dispute that he failed to comply with the procedural rule,

nor does he contest its adequate and independent nature.  Therefore, this aspect of DeBruce's

claim is due to be dismissed, or in the alternative, is procedurally defaulted.

The court begins its further, alternative substantive examination of the matter surrounding

juror Kallenbach by noting that DeBruce does not dispute the state appellate court's recitation of

Kallenbach's historical responses in the trial record.   The state appellate court also properly

identified and applied *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) to Kallenbach's responses.

 The "standard [to determine actual prejudice] is whether the juror's views would

'prevent or substantially impair the performance of his duties as a juror in accordance with his

instructions and his oath.'" *Wainwright v. Witt*, 469 U. S. 412, 424 (1985) (quoting *Adams v.

Texas*, 448 U. S. 38, 45 (1980)).

> "The decision to excuse a [prospective] juror for cause upon a suggestion
> of partiality is within the sound discretion of the trial judge." *United States v.
> Taylor*, 554 F.2d 200, 202 (5th Cir. 1977).  [footnote omitted].  The trial judge
> must consider whether the prospective juror has such a fixed opinion, based on his
> bias, that he "could not judge impartially the guilt of the defendant." *Patton v.
> Yount*, 467 U. S. 1025, 1035, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984).

103

> Whether an individual is so partial that he must be disqualified is "plainly [a question] of historical fact." *Id.* at 1036, 104 S. Ct. at 2891.  Thus, on federal habeas corpus review, a state court's determination as to the partiality of a particular juror is entitled to a presumption of correctness.  28 U.S.C. § 2254(d) (1988).  In reviewing such a finding, then, we will not set it aside "unless the error is manifest."  *Irvin v. Dowd*, 366 U. S. 717, 723, 81 S. Ct. 1639, 1643, 6 L. Ed. 2d 751 (1961) (*quoting Reynolds v. United States*, 98 U. S. 145, 156, 25 L.Ed. 244 (1878)).  In other words, "the question is whether there is fair support in the record for the state court['s] conclusion that the jurors here would be impartial." *Patton*, 467 U. S. at 1038, 104 S. Ct. at 2892-93.

*Depree v. Thomas*, 946 F.2d 784, 788 (11th Cir. 1991).

Viewing the historical facts in deference to the trial court, this court cannot find that the trial court's refusal to dismiss juror Kallenback for cause resulted in any manifest injustice to the petitioner.  There is fair support in the record for the state court's conclusion that Kallenbach could be an impartial juror, and DeBruce's bald assertion that "the record does not reveal that Mr. Kallenbach could be an impartial juror despite his familiarity with the case" does not overcome the presumption of correctness owed to the state court's factual findings regarding the matter.  (Doc. 1, p. 46).

This claim is due to be denied because DeBruce has not alleged nor shown that the state court's decision is contrary to or an unreasonable application of clearly established federal law.

### 4.    In violation of the court's explicit instructions, venire members discussed the case outside of the courtroom  (Doc. 1, ¶¶ 135-36, p. 47)

In spite of being instructed not to discuss the case outside of the courtroom, venire person Mooney "informed the court that prospective jurors 'were all talking about we kind of dreaded getting on the case because it was such a serious matter you know.'"  (Doc. 1, p. 47).  However, DeBruce contends the trial court abdicated its responsibility to ensure his right to "due process, a fair trial, and reliable sentencing" when it "made no attempt to investigate" the prejudicial,

104

"unauthorized discussion among venire members." *Id*. (citing *Irvin v. Dowd*, 366 U.S. 717

(1961); *Jordan v. Lippman*, 763 F.2d 1265 (11th Cir. 1985)).

When examining the claim on direct appeal, the Alabama Court of Criminal Appeals

held:

> The record does not support any finding that the veniremembers discussed the merits of the case in violation of the instructions of the trial court.

> Shortly after the voir dire of the venire had begun, the district attorney asked, "How many of you either read about, heard about it [the Auto Zone murder/robbery], somebody talking about or read it in the newspaper or whether it be on radio or TV?" R. 136-37. In response veniremember Terry Mooney stated: "Just heard about it today, people talking about it." R. 137-38.

> Then, on individual voir dire of Mooney, the following occurred.

> "MR. MATHIS [defense counsel]: Mr. Mooney, you indicated a little while ago that you heard some folks talking about this case and that you overheard some folks talking about it today.

> "JUROR MOONEY: It was today that I heard it.

> "MR. MATHIS: Okay. What did you hear?

> "JUROR MOONEY: Well I just heard them saying-we were all talking about we kind of dreaded getting on the case because it is such a serious matter, you know. That's just basically what it was and then what the Judge told us too.

> "MR. MATHIS: Is that the way you feel about it, that you dread getting on it because it is such a serious case?

> "JUROR MOONEY: Well, I feel like it is my civil duty to serve. To be honest with you, I don't mind doing it, but I realize the seriousness of it. It is a man's life was taken.

> "MR. MATHIS: I don't have any more questions."

> R. 171-72.

Mooney then indicated that he could make a decision based upon an application of the instructions of the trial court to the testimony presented at trial. Defense counsel made no objection and did not raise or pursue this issue at trial.

We reject the appellant's argument on appeal that Mooney's comments show that the veniremembers were discussing the facts of the case outside the courtroom and in violation of the instructions of the trial court. There is simply no evidence to support that inference from Mooney's comments indicating that "some folks" were concerned about the "seriousness" of the case. We interpret his comments to mean that some veniremembers were aware of the fact that this was a capital case involving the death of one man, the victim, and the possible death of another, the appellant.

*DeBruce v. State*, 651 So. 2d at 616-17.

DeBruce does not make any attempt to overcome the correctness of the trial court's factual findings. Therefore, his contention that the trial court failed to investigate the comments, their substance and potential prejudice is completely without merit. The state court did undertake an investigation by way of individual voir dire when the issue was raised, and determined the substance and possible prejudice of any conversations concerning extraneous matters were merely juror comment that the case was serious because it was capital. Additionally, juror Mooney responded that he would decide the case on the law and the facts as presented to him from the bench and witness stand. (R. Vol. 2, Tab. 5, pp. 172-73). The state court's adjudication of this claim is not an unreasonable determination of the facts in light of the evidence before it nor is it contrary to or an unreasonable application of clearly established federal law. This claim is due to be denied.

**E.    DeBruce's jury was unconstitutionally constituted as the prosecutor exercised his peremptory challenges to systematically exclude black jurors (Doc. 1, ¶¶ 137-39, pp. 48-49)**

106

DeBruce alleges that in spite of his defense counsel's protest, the trial court erroneously

refused to require the prosecutor to give race-neutral explanations for using his peremptory

challenges to remove "five qualified black prospective jurors."  (Doc. 1, p. 48 (citing *Batson v.*

*Kentucky*, 476 U.S. 79 (1986)).  He complains that the black individuals struck by the

prosecution "shared the characteristics of white jurors who were not challenged the prosecutor[,]

. . . [t]he prosecutor engaged in disparate questioning of black and white jurors[,] ... did not

question two of the black jurors he struck peremptorily, and he conducted only minimal inquiry

of the other three."  *Id*.

It bears repeating that since "habeas corpus review exists only to review errors of

constitutional dimension," a habeas corpus petition must meet the "heightened pleading

requirements [of] 28 U.S.C. § 2254 Rule 2(c)."  *McFarland v. Scott*, 512 U.S. at 856.  A

petitioner must specify all grounds for relief available to him, state the facts supporting each

ground, and state the relief requested.  28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules*

*Governing Section 2254 Cases*.  A "general reference to the transcripts, case records and briefs

on appeal patently fails to comply with Rule 2(c)."  *Phillips v. Dormire*,  2006 WL 744387 at *1

(citing *Adams v. Armontrout*, 897 F.2d at 333 ).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he

seeks.  *Hill v. Linahan*, 697 F.2d at 1034; *Corn v. Zant*, 708 F.2d 549.  That burden is to

demonstrate at least *prima facie* evidence establishing the alleged constitutional violation.  The

mere assertion of a ground for relief, without more factual detail, does not satisfy a petitioner's

burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing §*

*2254 Cases in the United States District Courts*.  DeBruce has failed to provide any specific facts

to support his conclusory allegations, and as such, this claim is due to be dismissed for failure to comply with federal pleading requirements.

Even if this claim were not due to be dismissed on that basis, it is certain that the substance of DeBruce's habeas claim fails to show the state court's rejection of his *Batson* claim entitles him to 2254(d) relief.  On direct appeal, the Alabama Court of Criminal Appeals wrote:

> We agree with the trial court in its finding that the appellant failed to prove a prima facie case of racial discrimination necessary to a claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L. Ed. 2d 69 (1986).
>
> The record shows that there were 16 black veniremembers; that the State removed five blacks; that the defense removed four blacks; that six blacks (50%) sat on the jury; that none of those six were alternates; and that blacks composed 28-30% of the population of Talladega county.
>
>> "[A] defendant cannot prove a prima facie case of purposeful discrimination solely from the fact that the prosecutor struck one or more blacks from his jury.  A defendant must offer some evidence in addition to the striking of blacks that would raise an inference of discrimination.  When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created.  Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing discriminatory impact then it should also be available to show the absence of a discriminatory purpose."
>
> *Harrell v. State*, 571 So. 2d 1270, 1271-72 (Ala. 1990) (emphasis and citations omitted), *cert. denied*, 499 U.S. 984, 111 S. Ct. 1641, 113 L. Ed. 2d 736 (1991). *See also Ex parte McWilliams*, 640 So. 2d 1015 (Ala. 1993).
>
> We note that with the single exception of *Walker v. State*, 611 So. 2d 1133 (Ala. Cr. App. 1992), this Court has found that the peremptory strikes against black veniremembers exercised by this particular district attorney or his assistants have been race neutral.[FN11]
>
>> FN11.  *See Davis v. State*, 593 So. 2d 145, 147-48 (Ala. Cr. App. 1991); *Henderson v. State*, 584 So. 2d 841, 845-47 (Ala. Cr. App. 1988) (death penalty case), 584 So. 2d 862 (Ala. 1991); *Gaston v.*

> *State*, 581 So. 2d 548, 549-50 (Ala. Cr. App. 1991); *Kuenzel v.*
> *State*, 577 So. 2d 474, 485-486 (Ala. Cr. App. 1990) (death penalty
> case), affirmed, 577 So. 2d 531 (Ala.), *cert. denied*, 502 U.S. 886,
> 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991); *Andujar v. State*, 572 So.
> 2d 1319, 1320-21 (Ala. Cr. App. 1990); *Beavers v. State*, 565 So.
> 2d 688, 690 (Ala. Cr. App. 1990); *Wilson v. State*, 571 So. 2d
> 1237, 1248-50 (Ala. Cr. App. 1989) (death penalty case), reversed
> on prosecutor's impermissible comment of defendant's right not to
> testify, 571 So. 2d 1251 (Ala. 1990); *Borden v. State*, 523 So. 2d
> 508, 510-11 (Ala. Cr. App. 1987).

*DeBruce v. State*, 651 So. 2d at 620.

In the face of this opinion, DeBruce's generic assertion that the five stricken black venire

persons shared the same characteristics of white venire persons, and that the prosecutor either did

not question or disproportionately questioned black and white veniremembers fails to show that

the state court's adjudication of the claim is contrary to or an unreasonable application of clearly

established federal law.  The jurors are not identified, the characteristics are not illustrated, and

the type and substance of questions that were not asked or disproportionately asked are not

revealed by DeBruce.  For the foregoing reasons, this claim is due to be dismissed, or the in

alternative, it is due to be denied.

> **F.     The State failed to correct false or misleading testimony and failed to disclose**
> **evidence that was favorable and material to the defense  (Doc. 1, ¶¶ 140-49,**
> **pp. 49-52)[72]**

DeBruce alleges the prosecution "insisted that it had a policy of 'open file' discovery and

counsel relied on that promise[,]" but the prosecutor failed to disclose exculpatory and

impeachment information in violation of his right to due process of law.  (Doc. 1, p. 49) (citing

---

[72]In his reply brief (doc. 20, p. 192), DeBruce withdrew one incident, that being that the prosecutor "affirmatively misled counsel by suggesting that Mr. McCants had been entirely consistent in his account to law enforcement."  *See* (Doc. 1, ¶ 141, pp. 49-50).  As such, it is not mentioned in the body of the Memorandum Opinion.

*Strickler v. Greene*, 527 U.S. 263, 278 (1999); *Kyles v. Whitley*, 514 U.S. 419 (1995);  *Green v. Georgia*, 442 U.S. 95 (1979); *Brady v. Maryland*, 373 U.S. 83 (1963)).  DeBruce also alleges the state relied upon and failed to correct false, misleading, and perjurious testimony.  *Giglio v. United States*, 405 U.S. 150 (1976).  *Id*.  DeBruce presents seven incidents (identified in the petition by paragraph number only) that he believes implicate *Brady*/*Giglio* violations.

The respondent answers that all but one[73] of the seven incidents are procedurally defaulted in that "the Alabama Court of Criminal Appeals correctly found that they were procedurally defaulted because they could have been but were not raised at trial and on appeal." (Doc. 14, p. 80).  Alternatively, the respondent asserts the claims were properly addressed on the merits by the Rule 32 court and that DeBruce cannot show he is entitled 2254(d) relief from that court's denial of the claims.  *Id*. at 81-82.

The pertinent portion of the Alabama Court of Criminal Appeals' opinion reads:

> DeBruce argues that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose certain alleged exculpatory evidence.  He presents a laundry list of items that he argues were not disclosed to DeBruce before trial.

> . . . .

> [T]he State did argue that the *Brady* claims were procedurally barred because they could have been raised at trial or on appeal but were not.  Rule 32.2(a)(3) and 32.3(a)(5), Ala. R. Crim. P.  We agree.  We have often stated that *Brady* claims are subject to the procedural bars of Rule 32.2(a)(3) and 32.2(a)(5), Ala. R. Crim. P.  See *Williams v. State*, 782 So.2d 811 (Ala. Crim. App. 2000), cert. denied, 782 So. 2d 842 (Ala. 2000); *Holladay v. State*, 629 So. 2d 673 (Ala. Crim. App. 1992), cert. denied, 510 U.S. 1171, 114 S. Ct. 1208, 127 L. Ed. 2d 555 (1994);

---

[73]Designated as "F.6." in this memorandum opinion, this *Brady* claim pertains to evidence purportedly seized as the result of a search warrant obtained in violation of the Fourth Amendment, an allegation that the respondent declares is outside this court's authority pursuant to *Stone v. Powell,* 428 U.S.465 (1976).  (Doc. 14, pp. 78).

and *Gibson v. State*, 580 So. 2d 38 (Ala. Crim. App. 1990).  DeBruce does not
argue that these claims were based on newly discovered evidence.

*DeBruce v. State*, 890 So. 2d 1068, 1094 (Ala. Crim. App. 2003).

DeBruce filed no reply to this claim.  However, this court's independent examination of

the record shows the state court's finding regarding the position held by the State throughout

collateral review is erroneous.  DeBruce's *Brady* claims first appeared in his second amended

Rule 32 petition.  (Rule 32 C.R. Vol. 13, pp. 432-36).  The State responded to the *Brady* claims

by answering, "The averments made in support of this claim are denied."  (Rule 32, C.R. Vol. 13,

Tab. 42, p. 487).

After the circuit court held an evidentiary hearing on the Rule 32 petition, the parties were

allowed to submit post-hearing briefs.  In the record is DeBruce's brief[74] and reply brief[75] to the

State's post-hearing brief.  The *Brady* portion of the State's post-hearing brief[76] reads:

> Debruce has failed to present an argument for any of his 15 assignments of
> error regarding *Brady v. Maryland* as to exactly how each item meets the criteria
> for establishing a violation of the State's obligations.  Debruce has the burden of
> pleading and proof in post-conviction proceedings.  Ala. R. Crim. P. 32.3.  While
> the Court could and indeed should, deny relief on all of these claims for failure to
> meet the burden of proof, the nature of the allegations is such that this Court
> should also enter a ruling denying each claim on the merits.

(Rule 32 C.R. Vol. 19., pp. 47-48).  Thereafter, the State argued that each individual *Brady* claim

was due to be denied on the merits, and concluded with the following:

---

[74] DeBruce's post-hearing brief is a repeat of petition.  (Rule 32 C.R. Vol. 14, pp. 708-717).

[75]*Id.* at 631-35.  This court is unaware if DeBruce's reply to the post-hearing brief was even
considered because it was filed on the same day the circuit court had entered its order denying
postconviction relief.

[76](Rule 32 C.R. Vol. 19, pp. 46-57).

111

In sum, Debruce has failed to plead and prove a violation of *Brady v. Maryland*, regarding any of the above issues. In addition to failing to argue the issue sufficiently enough to preserve it, the claims fail on the merits. This Court should deny relief on all of Debruce's *Brady* claims.

*Id.* at 82-83.

Thereafter, the trial court entered a written order that began with an acknowledgment that there were three (3) claims for which testimony had been taken: ineffective assistance of counsel, *Brady* and juror misconduct. *Id*. at Vol. 13, pp. 576-77. Further, the decisions within that portion of the opinion dedicated to the *Brady* claims are clearly adjudications on the merits of DeBruce's claims - with no hint that preclusion was ever a consideration in the matter. *Id*. at Vol. 14, pp. 597-603. Finally, nowhere in the State's brief on collateral appeal is it argued that DeBruce's *Brady* claims were due to be dismissed pursuant to Rule 32 (a)(3) and (a)(5). *Id*. at Vol. 27, Tab. 48, pp. 34-40.

For the foregoing reasons, the Alabama Court of Criminal Appeals factual finding regarding the State's position is clearly erroneous and an unreasonable determination of the facts in light of the record before it. The *Brady* claims are not procedurally defaulted. Since the State never alleged DeBruce's *Brady* claims were precluded under the auspices of Alabama Rule of Criminal Procedure 32.2(a)(3) and (a)(5), as was its burden pursuant to Rule 32.3 of the same rules, and the trial court explicitly heard evidence pertaining to the merits of the *Brady* claims before denying the claims on the merits, this court will conduct a 28 U.S.C. § 2254(d) review of the same.

The substantive examination should begin with the circuit court's expressed understanding of *Brady*, followed by an individual analysis of each *Brady* incident alleged by

112

DeBruce, along with the circuit court's specific findings.  As a preliminary matter, the state

circuit court generally acknowledged *Brady* and its application in the following manner:

> In order to establish a violation of *Brady*, Debruce must demonstrate: (1) that the State possessed evidence favorable to Debruce (including impeachment evidence); (2) that Debruce does not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the State suppressed the favorable evidence; and, (4) that had the evidence been disclosed to the defense at trial, a reasonable probability exists that the outcome of the proceedings would have been different.  *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989).  For the purposes of a *Brady* analysis, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Stewart*, 820 F.2d 370, 374 (11th Cir. 1987).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

(Rule 32 C.R. Vol. 13, pp. 587-98).

The state court's identification of the *Brady v. Maryland* standard is correct[77] and

attention is now turned to DeBruce's individual claims to determine whether the *Brady* standard

was unreasonably applied.[78]

> **1.     The State represented that McCants would receive a life sentence for
> his involvement in the crime, but in fact McCants only received a
> twenty-five year sentence.  (Doc. 1, p. 50)**

DeBruce alleges the State represented that in exchange for testifying against DeBruce, co-

defendant McCants would receive a life sentence for his involvement in the AutoZone crime, but

---

[77]*See Banks v. Dretke*, 540 U.S. 668, 670-72 (2004), wherein the United States Supreme
Court explained the three essential elements of a *Brady* claim.

> A *Brady* prosecutorial misconduct claim has three essential elements.  *Strickler v.
> Greene*, 527 U.S. 263, 281-282, 119 S. Ct. 1936, 144 L. Ed. 2d 286....  [T]he
> evidence at issue [must] be favorable to the accused as exculpatory or impeaching....
> [T]he State suppressed the evidence at issue[,] [and the] suppressed evidence is
> "material" for *Brady* purposes.  *Ibid.*

*Banks v. Dretke*, 540 U.S. at 671.  To be

> "material for *Brady* purposes, [its] suppression [does] not give rise to sufficient
> prejudice to overcome [a] procedural default."  *Strickler*, 527 U.S., at 282, 119 S.Ct.
> 1936 (internal quotation marks omitted).  Our touchstone on materiality is *Kyles v.
> Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  *Kyles* instructed
> that the materiality standard for *Brady* claims is met when "the favorable evidence
> could reasonably be taken to put the whole case in such a different light as to
> undermine confidence in the verdict."  514 U.S., at 435, 115 S. Ct. 1555.  See also
> *id.*, at 434-435, 115 S. Ct. 1555 ("A defendant need not demonstrate that after
> discounting the inculpatory evidence in light of the undisclosed evidence, there
> would not have been enough left to convict."); accord *Strickler*, 527 U.S., at 290, 119
> S. Ct. 1936.  In short, Banks must show a "reasonable probability of a different
> result."  *Kyles*, 514 U.S., at 434, 115 S. Ct. 1555 (internal quotation marks omitted)
> (citing *Bagley*, 473 U.S., at 678, 105 S. Ct. 3375).

*Id.* at 698-99.

[78]DeBruce does not dispute or attempt to overcome the presumption of correctness afforded
the state court's factual findings.  (Doc. 1, p. 52).

in actuality, McCants received a 25 year sentence.  (Doc. 1, p. 50).  The respondent presents the

following alternate answers to DeBruce's claim: (1) the Rule 32 court properly denied this claim

on the merits, (2) the factual findings made by the Rule 32 court are presumptively correct,

(3) DeBruce is not entitled to an evidentiary hearing to the extent he failed to develop a factual

basis for the claim in state court, and (4) a general denial of the factual averments.  (Doc. 14, pp.

81-82).  The Rule 32 court held:

> []*Benefits conferred upon McCants*
>
> The Court finds that Erskine Mathis knew that McCants would receive a
> life sentence for his testimony prior to trial.[79]  He also knew about the parole
> eligibility that McCants would receive.  Relief is denied on the merits of this
> claim.

(Rule 32 C.R Vol. 13, p. 600).

------

[79]Although the Alabama Court of Criminal Appeals found this claim to be procedurally
defaulted on collateral review, its recitation of the crime's factual background acknowledges
McCants received a life sentence.  It reads:

> The evidence at DeBruce's trial showed that on August 6, 1991, six
> men-Willie Brantley, Charles Lee Burton, Andre Lee Jones, Deon D. Long, Lujuan
> McCants, and DeBruce-robbed the occupants of the Auto Zone store in Talladega.
> [footnote omitted].  Five of the six men entered the store armed with guns.  McCants
> testified that DeBruce was armed with a .380 caliber handgun and that he was the last
> of the five men to leave the store.  McCants said that after the robbery when the six
> were in the car leaving the scene DeBruce said that he had killed the man inside the
> store to protect McCants.  Battle was shot in the back as he was lying face-down on
> the floor.
>
> The presentence report contained in the transcript of DeBruce's direct appeal
> shows that Jones, Brantley, McCants, and Long were all charged with murder made
> capital because it was committed during the course of a robbery.  McCants agreed to
> testify against DeBruce in exchange for pleading guilty to robbery and being
> sentenced to life in the penitentiary.  The presentence report does not show the final
> disposition of the other codefendants' cases.

*DeBruce v. State*,  890 So. 2d at 1074.

In his Rule 32 petition, DeBruce specifically alleged that McCants received a 25 year sentence instead of the life sentence as represented by the prosecutor.  (Rule 32. C.R. Vol. 13, p. 434).  A review of the Rule 32 evidentiary hearing shows that petitioner's counsel introduced McCants's pre-sentence report[80] while examining DeBruce's trial attorney, Erskine Mathis. (Rule 32 R. Vol. 15, Tab. 45, pp. 113-14).  However, counsel only utilized the report to question Mathis about information regarding McCants's background.  *Id*.  He did question Mathis about the McCants's plea agreement, but only to point out that at trial, when cross-examining McCants, Mathis did not ask questions that made it clear to the jury that McCants would receive a life sentence as opposed to a sentence of *life without parole* for his cooperation.  *Id*. at 122-23. Counsel asked Mathis no questions about the 25 year sentence McCants actually received.

Moreover, there was no other testimony taken at the Rule 32 hearing concerning the McCants's plea agreement and the question of his ultimate 25 year sentence.  Even though counsel had an opportunity to cross-examine former prosecutor Robert Rumsey, he refused to do so on the grounds that he was not prepared, arguing that the State had not informed them Rumsey may be called as a rebuttal witness.  (Rule 32 R. Vol. 17, pp. 215).  Post-conviction counsel maintained this position even though the Attorney General's office had just completed its direct questioning of Rumsey, wherein Rumsey had been asked:

> Q [Ms. Stephens]  Did you feel that the jury might come back with a felony murder conviction?
>
> A [Mr. Rumsey]  Yes.

---

[80]According to a February 17, 1993, pre-sentence report prepared by McCants's probation officer, McCants did plead guilty to first degree robbery, but on May 28, 1992, only received a sentence of 25 years.  (Rule 32 C.R. Vol. 21, p. 477).  This exhibit was not admitted into evidence.

Q [Ms. Stephens]  Can you think of any other specific examples [concerning Mathis's effectiveness] without having reviewed your file?

A [Mr. Rumsey]  Well, of course you know there was nothing magic about it, but he did a good job on the state making the trade with McCants or entering into the agreement, but there was nothing - - everyone tends to do a good job with that really because, you, know, juries don't like people that you make deals with, particularly in capital cases.

(Rule 32 R. Vol. 17, pp. 214-15).

Finally, during discussions at the close of the evidentiary hearing as to which exhibits were admitted into evidence, the following colloquy took place:

MR. FINKELMAN:  There was the document from Parole and Pardons. This is Exhibit 15 explaining that LuJuan McCants told the interviewer that he was dismissed from school in Detroit for disciplinary problems.  Again, that was impeachment material that Mathis should have used.  McCants basically at the trial was portrayed as someone had it not been for the influence of Burton and allegedly according to the DA Mr. DeBruce, that he would have been just fine, and an attorney who had done an investigation in the case would have found out that this kid, I guess he was a kid at the time, had been having problems and creating problems right from the start.

THE COURT:  What's your response?

MS. STEPHENS:  First of all, double hearsay McCants telling someone else who in turn wrote in a report.  In addition, this is a statement from a juvenile. I don't think that that would be admissible anyway.

THE COURT:  Sustained.  Let's move on.  We're not admitting it at trial.

MR. FINKELMAN:  It's a document the lawyer would use to question the witness.

THE COURT:  Move on.

MR. FINKELMAN: It's in evidence to the point that he [Mathis] discussed it on the record?

THE COURT: Anything that went in over there (indicating [presumably the witness stand]), I let in.

117

FINKELMAN:  Okay, everything he testified to. . . . .

*Id*. at Vol. 18, pp. 305-06. [bracketed portions added by this court].

After review of the circuit court's opinion, the entire record and applicable law, DeBruce

has failed to show that the state court made an unreasonable determination of the facts in light of

the evidence before it.  DeBruce made no attempt to argue or provide evidence of the 25 year

sentence at the evidentiary hearing, and the one document containing any information concerning

the sentence was not admitted into evidence.  He has not demonstrated that at the time of

McCants's testimony, the agreement was for anything but a life sentence.  Accordingly, he

cannot show the state court's decision is contrary to or an unreasonable application of clearly

established law.  This claim is due to be denied.

> **2.      The State failed to disclose that Mr. DeBruce was seriously ill, that he
> had received inadequate medical care, that the FBI investigated abuse
> by the Talladega police officers, and that at least one officer
> responsible for Mr. DeBruce's safety was disciplined for excessive
> force.  (Doc. 1, p. 50)**

The title to this sub-claim represents the totality of its substance.  The claim  fails to meet

the heightened pleading requirements for habeas petitions, and as such is due to be dismissed.

Alternately, the claim is without merit.  The circuit court held:

> [ ]      *Petitioner Required Extensive Medical Treatment before trial*
>
> This fact does not qualify as *Brady* material.  First, it was not suppressed.
> Obviously, Debruce himself could have informed counsel about this.  Second, it is
> not exculpatory.  This in no way reduced Debruce's culpability for the murder of
> Doug Battle.  Nor is it impeachment information.  No individual could have been
> impeached with the knowledge that Debruce required medical attention.  There is
> no theory under which this information could be deemed *Brady* material.  This
> claim is denied on the merits.

(Rule 32 C.R. Vol. 14, p. 602).

DeBruce provides no factual or legal support from which this court could conclude that the state court's decision was an unreasonable application of *Brady*. Accordingly, this claim is due to be denied.

> **3.     The State failed to disclose that attorney Anthony Falletta was simultaneously representing DeBruce and Barbara Jean Spencer. (Doc. 1, p. 50)**

DeBruce alleges the state failed to disclose that Anthony Falletta represented him on the Jefferson County, Alabama, robbery case that was later used as an aggravating factor against DeBruce while simultaneously representing and negotiating a favorable plea agreement for Barbara Jean Spencer for her testimony against DeBruce before the Talladega County jury that indicted him for capital murder. (Doc. 1, p. 50).

On collateral review, the circuit court made the following findings of fact and conclusions of law:

> [ ]     *Jefferson County Attorney Had Conflict of Interest*
>
> Debruce has failed to establish a *Brady* violation. First, there is no evidence that information regarding Anthony Falletta was suppressed. Robert Rumsey testified, yet Debruce did not ask any questions regarding whether Rumsey knew that Falletta had previously represented Debruce, and at what point he gained any such knowledge, if indeed he had it. Second, this is not exculpatory or impeachment information. This does not bear on Debruce's participation in the crime. No one could have been impeached with this information. Third, the result of the trial would not have been different. This claim is denied on the merits.

(Rule 32 C.R Vol. 14, pp. 602-603).

Like the previous claim, DeBruce provides no factual or legal support from which this court could conclude that the state court's decision was an unreasonable application of *Brady*. Accordingly, this claim is due to be denied.

      **4.**      **The State failed to disclose that Mr. Garner, DeBruce's pre-trial mental health evaluator, was not a certified forensic examiner and that he had not performed appropriate testing.  (Doc. 1, p. 51)**

This claim is without merit as Mr. Mathis was well aware at the time that the court

appointed Mr. Garner that Garner was only a social worker, as evidenced by the circuit court's

findings:

    [ ]    *Gary Garner was not a Certified Forensic Examiner*

    Erskine Mathis testified that he requested a mental health examination, and that a "cursory" examination was performed.  (Rule 32 vol. I, R. 174)  He also testified that the report was prepared by a social worker, Gary Garner.  (Rule 32. vol. I R. 184)  Mr. Mathis acknowledged that Gary Garner was not a psychologist or psychiatrist.  (*Id.*)  Because this does not meet the threshold of *Brady*, this Court denies relief on the merits of this claim.

(Rule 32 C.R. Vol. 14, p. 603).  Nothing before this court challenges the factual determinations

of the circuit court.  The petitioner is entitled to no relief.

      **5.**      **The State failed to disclose an oral statement by DeBruce in which DeBruce stated McCants shot the victim and Burton set up the robbery.  (Doc. 1, p. 51)**

DeBruce contends an additional statement made by him was revealed mid-trial by the

prosecutor during a suppression hearing held outside the presence of the jury.  Rumsey himself

claimed surprise at the discovery of the statement, a disingenuous technique that DeBruce asserts

Rumsey had employed in two other trials.  *Id.* at p. 51 (citing *Stewart v. State*, 659 So. 2d 120

(Ala. Crim. App. 1992); *Self v. State,* 564 So. 2d 1023 (Ala. Crim. App.  1989).[81]

---

[81]An examination of both of these cases shows that such a technique was not at issue or developed in a manner that is in any way related to conclusion DeBruce tries to draw.

This claim was dismissed by the circuit court pursuant to Alabama Rule of Criminal

Procedure 32.2(a)(2) and (a)(4)[82] because it claim was raised and addressed at trial and on direct

appeal.[83]  (Rule 32 C.R. Vol. 12, p. 301).  Thus, contrary to the respondent's argument and the

_____

[82]The respondent answered that the claim was procedurally defaulted pursuant to these rules. (Rule 32 C.R. Vol. 11, Tab. 38, pp. 9-10).

[83]The opinion of the Court of Criminal Appeals reveals the following:

The appellant's conviction is not due to be overturned because of the district attorney's tardy disclosure of a statement made by the appellant to Officer Shawn Smith of the Montgomery Police Department.

The record shows that the appellant made an oral statement to Officer Smith after signing a written waiver of rights form. In that brief statement, the appellant told Smith that McCants was the shooter in the robbery, that Burton set it up, and that McCants was "about I guess 17, 15.  Something like that."  R. 766.  At the hearing on the motion to suppress, the appellant testified that this "wasn't a statement.  We was just talking."  R. 766.  He testified further that "[i]t wasn't a statement, but I talked to him. . . .  That wasn't a statement, but I told him."  R. 768.

The substance of the statement to Officer Smith was included in a statement the appellant gave to Detective Bowerman "within an hour."  R. 771, 944.  In his brief, the appellant acknowledges that "[t]he substance of the undisclosed recorded statement was included in a later statement given by Mr. DeBruce to other law enforcement officers.  (R. 771)."  Appellant's brief at 51.

During the course of the trial, a hearing was held outside the presence of the jury on the appellant's motion to suppress the recorded statement given to Detective Bowerman.  During that hearing, the district attorney used the appellant's written waiver and oral statement to Officer Smith to impeach the appellant's testimony on direct examination.  When defense counsel complained that the existence of that oral statement had not been disclosed to him, the prosecutor maintained that he had just been provided that information himself.  FN12

FN12. Exactly how the district attorney learned of the appellant's oral statement is not disclosed in the record.  During the course of his cross-examination of the appellant at the suppression hearing, the district attorney represented to the court that he had not talked to anyone from the Montgomery Police Department and that he had been unaware that the appellant had given a statement to officer

Smith "until just a few minutes ago."  R. 769.  The district attorney further stated:

> "I had no knowledge that even a statement existed to Shawn Smith.  There were no notes in Montgomery's file that Shawn Smith had even talked to him.  There w[ere] no notes in Tallageda P.D.'s file.  We gave him a copy of the *Miranda*.  We told Montgomery to provide us with everything they had. They gave it to us and we gave it to them [the defense], everything that is in our file."  R. 946.

. . . .

It is undisputed that the district attorney had an "open file policy" in this case, *see generally Ex parte Monk*, 557 So. 2d 832 (Ala. 1989), and that he did provide defense counsel with a copy of everything in his files.  R. 774.  Defense counsel readily acknowledged that he had received a copy of the signed  written waiver form given to Officer Smith.  R. 770, 774.

After the State had rested its case, the trial court assured defense counsel:

> "If the only reason you are not going to call the [appellant] is because of his testifying relative to this statement and maybe getting into some inconsistencies, I'll see to it that nothing will come out if he is put on the stand relative to this by way of cross examination by the state. . . .  I want to tell you that if that's the only reason you've got for not putting your client on, then please understand that this Court will insulate him from any difficulty that may arise out of his testimony relative to the statement by way of appropriate instructions of limitations to the state, unless you were to go into it and open it up."  R. 947-48.

. . . .

Here, there is no probability that the jury would have resolved the appellant's case differently had the State disclosed the oral statement on a timely basis.  Here, as in Coral, "[t]he untimely disclosure could not have had any effect whatsoever on the outcome of the case."

Furthermore, in this case the trial court took corrective action in order to ensure that the appellant would not be prejudiced by the delayed disclosure.  See

opinion of the Alabama Court of Criminal Appeals, it is ripe for 28 U.S.C. § 2254(d) review.

Even though DeBruce's counsel was not informed of the statement until mid-trial, this court finds that, under the circumstances, DeBruce was not prejudiced. "Delayed disclosure may be grounds for reversal, 'but only if the defendant can show prejudice, *e.g.*, the material came so late that it could not be effectively used.' " *United States v. Cleckler*, 265 Fed. Appx. 850, 852, 2008 WL 426257, *1 (11th Cir. 2008) (unpublished) (citing *United States v. Bueno-Sierra*, 99 F.3d 375, 379 (11th Cir. 1996) (quoting *United States v. Beale*, 921 F.2d 1412, 1426 (11th Cir.) *cert. denied*, 502 U.S. 829 (1991)).

During the suppression hearing outside the presence of the jury, defense counsel had ample opportunity to question the law enforcement officer responsible for taking the statement, as well his client's recollection of the circumstances surrounding the statement. *DeBruce v. State*, 651 So. 2d at 621-22. Moreover, DeBruce repeated what he said in a later statement to law enforcement officials approximately one hour later. *Id*. After the suppression hearing, the trial court assured defense counsel that he would not allow DeBruce to be cross-examined about the statement if he decided to testify. *Id*. Therefore, this court finds that although disclosure of the statement to defense counsel was improperly delayed, DeBruce was not prejudiced thereby. This claim is without merit and is due to be denied.

6. **The State relied upon a search warrant based on false testimony, resulting in unlawfully obtained evidence. (Doc. 1, p. 51-52)**

---

Rule 16.5, A. R. Crim. P.; *Blackmon v. State*, 574 So. 2d 1037, 1040 (Ala. Cr. App. 1990); *McLemore v. State*, 562 So. 2d 639, 645-46 (Ala. Cr. App. 1989).

*DeBruce v. State*, 651 So. 2d at 621.

DeBruce alleges that a law enforcement officer used false testimony to obtain a search warrant for his vehicle, from which evidence was confiscated and admitted against him at trial. (Doc. 1, pp. 51-52). This claim was dismissed by the circuit court pursuant to Alabama Rules of Criminal Procedure 32.2(a)(2) and (a)(4)[84] because the claim had been raised and addressed at trial and on direct appeal. (Rule 32 C.R. Vol. 12, p. 301).

The respondent begins its answer to DeBruce's allegations by contending that under the doctrine of *Stone v. Powell*, 428 U.S.465 (1976), "a federal court cannot entertain a Fourth Amendment claim by a habeas petitioner attacking his state court conviction if the petitioner had an opportunity for full and fair consideration of that claim in the state trial and appellate courts." (Doc. 14, p. 78) (also referring to *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989)). Alternatively, the respondent declares that DeBruce cannot show the state court's adjudication of the claim on direct appeal is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. *Id.* at 78-79.

The Eleventh Circuit has quoted the United States Supreme Court as instructing that:

> where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

[*Stone v. Powell*,] 428 U.S. [465,] 494-95 [(1976)] (footnotes omitted).

_____

[84]The respondent answered that the claim was procedurally defaulted pursuant to these rules. (Rule 32 C.R. Vol. 11, Tab. 38, pp. 16-17).

124

*Mincey v. Head*  206 F.3d 1106, 1125 -26 (11th Cir. 2000).

DeBruce's trial counsel cross-examined Officer Sisk concerning his allegedly false

attestations.  (R. Vol. 5, pp. 687-408).  The matter was also thoroughly examined by the Alabama

Court of Criminal Appeals on direct appeal.  *DeBruce v. State*, 651 So. 2d at 613-15.  DeBruce

was afforded a full and fair opportunity to adjudicate his Fourth Amendment claim in the state

court during the direct review process.  As such, pursuant to *Stone v. Powell*, this court will

afford no further discussion to this claim.

> **7.     The State failed to disclose the plea minutes of DeBruce's prior
> Jefferson County robbery conviction, in which "DeBruce was
> wrongly assured by the Jefferson County judge that his guilty
> plea in that case had 'nothing to do'" with the pending capital
> murder case.  (Doc. 1, p. 52)**

The title of the above sub-claim represents the claim in its entirety.   After examining it

on collateral review, the circuit court held:

> []     *Plea Minutes from Jefferson County Conviction*
>
> This evidence was a matter of public record in Jefferson County.  *Brady*
> does not require production by the Talladega District Attorney's Office of
> information from Jefferson County that was readily available.  This claim is
> denied on the merits.

(Rule 32 C.R. Vol 14, p. 602).

DeBruce provides no factual or legal support from which this court could conclude that

the state court's decision was an unreasonable application of *Brady*.  Accordingly, this claim is

due to be denied.

> **8.     Cumulative error (Doc. 1, p. 52)**

DeBruce alleges his *Brady* claims individually and cumulatively violated his "rights to due process, a fair trial and a reliable sentencing proceeding...." (Doc. 1, p. 52). However, for the foregoing reasons, this court agrees with the circuit court's conclusion, which reads:

> []      *Conclusion*
>
> The Court is mindful that a *Brady* issue must be analyzed individually and collectively. Having analyzed each instance individually, the Court further finds that, collectively, no violation of *Brady* occurred. This Court denies post-conviction relief on these claims.

(Rule 32 C.R. Vol. 14, p. 603).

For all of the foregoing reasons, DeBruce's *Brady* claims are denied. DeBruce has not established any entitlement to relief under § 2254(d).

**G.     The prosecution engaged in unconstitutional misconduct throughout DeBruce's trial. (Doc. 1, pp. 52-62)**

**1.     The prosecution's misleading arguments impermissibly shifted the burden of proof on the issue of intent. (Doc. 1, ¶¶ 151-59, pp. 53-55)**

This claim, as set out in the habeas petition, is substantially the same as its state predecessor on direct appeal. (Doc. 1, pp. 53-55 and C.R. Vol. 8, Tab 28, pp. 1-5). The respondent answers that the claim was properly denied by the Alabama Court of Criminal Appeals, and DeBruce cannot show the state court's decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it. (Doc. 14, pp. 83-84 and Doc. 15, pp. 89-92).

The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law with regard to this claim:

The appellant argues that the district attorney impermissibly shifted the burden of proof on the element of intent through his misleading comments to the jury.

The prosecutor's comments and the objections of defense counsel, where made, are as follows.  During the course of his guilt phase opening remarks, the district attorney commented:

> "[District Attorney] Of course, we expect the evidence to be when you point a gun at somebody and aim at somebody and pull the trigger, those are intentional acts.  The pointing of the gun, the pulling of the trigger, those are all intentional acts.  Of course, the act which follows then of course would be intentional.

> "MR. DELGROSSO [defense counsel]:  We object to that if it please the Court.

> "THE COURT: Overruled.

> ". . . .

> "[District Attorney] . . . I'll submit this to you, that in law and in common sense, if you take a gun with a man laying on the floor and you point it at him and you pull the hammer back and you pull the trigger and you shoot a bullet, that is an intentional act of killing."  R. 327-28.

In his guilt phase closing argument to the jury, the assistant district attorney argued:

> "And that is for you to decide.  That when you take guns in there and you are going to rob the store, some of the natural consequences that can flow from that type of activity, that someone could end up getting killed.

> ". . . .

> "So all those things, in a chain related back to what someone intended.  In other words, did you intend the consequences of those acts?  Those acts.  That being, having the loaded gun, pointing the loaded gun at somebody, and pulling the trigger."  R. 985-86.

During his guilt phase closing argument, the district attorney stated:

> "The accomplice is criminally responsible for his acts that are [the] direct natural result of a conspiracy, or foreseeable consequences of the conspiracy. In other words, what is the foreseeable consequences of six people, armed with weapons, going into a store to rob it, and look at the people in there. There are consequences that can arise from that, somebody could get killed. And that is exactly what happened in this case. Somebody got killed." R. 999.

———————

> "But that man over there shot Doug Battle. And when you aim a gun, and you point it, and you pull that trigger, that is just as intentional an act as you can get. You cannot get more intentional than that." R. 1041.

Although the appellant complains of these six instances of allegedly improper argument, objection was raised at trial to only one instance. That objection was a general objection and no specific grounds were stated.

> " 'While this failure to object does not preclude review in a capital case, *it does weigh against any claim of prejudice.*' *Ex parte Kennedy*, 472 So.2d [1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S. Ct. 340, 88 L. Ed. 2d 325 (1985) ] (emphasis in original). 'This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' *Johnson v. Wainwright*, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987). 'Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' *United States v. Butler*, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S. Ct. 407, 93 L. Ed. 2d 359 (1986). See also *Biddie v. State*, 516 So. 2d 837, 843 (Ala. Cr. App. 1986), reversed on other grounds, 516 So. 2d 846 (Ala. 1987)."

*Kuenzel v. State*, 577 So.2d 474, 489 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L. Ed. 2d 197 (1991). See

128

also *Ex parte McWilliams*, 640 So. 2d 1015, 1019 (Ala. 1993). These principles are applicable throughout this opinion.

We do not consider the prosecutors' remarks to constitute "plain error."

The appellant's argument that the above comments created a "mandatory presumption" that the appellant had the intent to kill is based on an erroneous factual contention. Contrary to the appellant's argument, there was evidence supporting the rational and reasonable inference that the appellant intentionally shot the victim. At trial, the State presented evidence that six men participated in the robbery. Five of those men actually entered the Auto Zone store. Each of those five was armed with a firearm. Lujuan McCants, one of the robbers, testified to the effect that the appellant went inside the store armed with a .380 handgun, that McCants heard a gun shot and saw the appellant running out of the store, that the appellant was the last one out of the store, and that once the appellant was in the get-away car, the appellant twice admitted to shooting Battle because "he was trying to protect [McCants]." R. 916, 922-23. According to McCants, Battle refused to get on the floor as directed and called the appellant a "young punk." R. 921. McCants testified that the appellant "took care of the man and hit him down to the ground." R. 920. Other witnesses positively identified the appellant as one of the robbers.

Within the context in which the arguments were made, the above-quoted comments by the prosecutor did not constitute impermissible error.

> "This court, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. *See Duncan v. Stynchcombe*, 704 F.2d 1213, 1216 (11th Cir. 1983). Such prosecutorial misconduct, if 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' requires reversal. *United States v. Alanis*, 611 F.2d 123, 126 (5th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1607, 63 L. Ed. 2d 791 (1980) (quoting *United States v. Blevins*, 555 F.2d 1236 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S. Ct. 733, 54 L. Ed. 2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. *See [In*

re] *Winship*, 397 U.S. [358,] at 364, 90 S. Ct. [1068,] at 1072[, 25
L. Ed. 2d 368 (1970) ].  We reaffirm the former Fifth Circuit's
position that 'the limits of proper argument find their source in
notions of fairness, the same source from which flows the right to
due process of law.'  *Houston*, 569 F.2d at 380."

*United States v. Simon,* 964 F.2d 1082, 1086 (11th Cir. 1992).

Here, the prosecutors did not argue or imply that the appellant had any
obligation to produce evidence.  The evidence supports the prosecutor's theory
that the appellant intentionally shot the victim.  The reasonableness of this
hypothesis is best demonstrated by the fact that in his closing argument to the
jury, defense counsel argued that "[w]hoever killed him stood up behind him, or
over him, while he was laying on the ground and put a bullet in his back.  That's
why that bullet didn't fall out of his chest.  The floor kept it from falling out."  R.
1026.  The prosecutors's comments simply do not create any impermissible
"mandatory presumption" or shift any burden of proof.

*DeBruce v. State*, 651 So. 2d at 602-04.

DeBruce does not dispute the correctness of the appellate court's factual findings

regarding the evidence.  DeBruce has failed to show the state court's decision to find that

prosecutor's comments were reasonable inferences from that evidence[85] is contrary to or an

unreasonable application of clearly established federal law.  This claim is due to be denied.

### 2.     The prosecutor improperly commented on DeBruce's decision not to testify.  (Doc. 1, ¶¶ 160-61, pp. 55-56)

This claim, as set out in the habeas petition, is substantially the same as its state

predecessor on direct appeal.  *See* (Doc. 1, pp. 55-56 and C.R. Vol. 8, Tab 28, pp. 23-25).  The

respondent answers that DeBruce cannot show the state court's denial of the claim on direct

appeal was contrary to or an unreasonable application of clearly established federal law, or an

---

[85]As opposed to DeBruce's suggestion of impermissible burden shifting in the following
Supreme Court cases: *Francis v. Franklin*, 471 U.S. 307, 316-18 (1984), *Sandstrom v. Montana*, 442
U.S. 510 (1979) and *Yates v. Evatt*, 500 U.S. 391 (1991).  (Doc. 1, pp. 54-55).

unreasonable determination of the facts in light of the evidence before it.  (Doc. 14, pp. 85-86

and Doc. 15, pp. 92-95).

The pertinent portion of the Alabama Court of Criminal Appeals' opinion reads:

.... [T]he appellant ... argues that the district attorney commented on the appellant's decision not to testify in his own defense.

The appellant did not testify at either the guilt or the sentence phase of his trial.  After all the evidence had been presented at the sentence phase of the trial, the trial court, at the request of defense counsel, announced that it would permit the appellant to make a statement "in closing argument....  It will still be the same thing as an argument to the jury, whether he make[s] it in closing, opening or middle....  So really it is an argument to the jury."  R. 1146.  In instructing the jury immediately before those closing arguments, the trial court stated:

"I want to tell you that it is my understanding that the defendant may decide to make a statement to you at closing argument.  He has a right to do this just like his lawyers do in the opening and closing.  However, I do want to instruct you that the statement of the defendant, like his lawyers', is not evidence in this case.  You are not to consider it as evidence because the evidence comes to you from the witness stand, this place right here.

"Satisfied with these instructions?

"MR. MATHIS [defense counsel]: Yes, sir."  R. 1153-54.

In his statement to the jury during closing argument, the appellant said:

"MR. DeBRUCE: I have a son who is one year old and my mother.  I love my mother.  I love my son.  I just want you to please don't kill me.  I would like to also say to the mother over here, I'm sorry and-

"....[86]

---

[86]At this juncture, there was an emotional outburst from the audience because the jury was cleared from the courtroom, and the trial judge stated that if anyone else could not control their emotions, they should leave.  The jury was then brought back into the courtroom and DeBruce completed his closing argument.

> "As I was saying, ladies and gentlemen of the jury, that I
> was sorry and that I beg forgiveness and also for y'all to forgive me
> and think about letting me live.  Let me live.  I'm still a young
> man.  I won't be able to be free any more, but I want to be able to
> see my child and see him grow up.  I really do, ladies and
> gentlemen, want to live.  Please, please don't kill me.  Let me live.
> Thank you."  R. 1169-70.

Defense counsel then presented his closing argument.

In his closing rebuttal argument, the district attorney responded:

> "He gets up here and he talks to you, but the only evidence
> that you could consider is what comes from here under oath.  The
> only evidence that you can consider is what comes under oath."  R.
> 1176.

Defense counsel made no objection to this argument.

The district attorney's statement was not a comment on the appellant's
exercise of his right against self-incrimination.  The district attorney merely
commented on the appellant's statement to the jury and repeated the trial court's
previous instructions, to which defense counsel had indicated his satisfaction.
The trial court made it clear that any comment made by the appellant in closing
argument would be treated as merely a part of the argument.  When the appellant
assumed the role of his own defense counsel in making a closing argument to the
jury, his comments were subject to the same criticism available as if the
comments had been made by defense counsel.  "It is the right of counsel under the
guidance of the court, to discuss the rules of law applicable to the different phases
of the testimony."  *Davis v. State*, 213 Ala. 541, 543, 105 So. 677, 678 (1925).
"Statements of counsel to the court are not evidence."  *Evans v. State*, 341 So. 2d
749, 750 (Ala. Cr. App. 1976), cert. denied, 341 So. 2d 750 (Ala.1977).

*DeBruce v. State*, 651 So. 2d at 607-08.

DeBruce argues that the prosecutor "highlight[ed]" his decision not testify in violation of

a fundamental constitutional principle.  (Doc. 1, p. 56 (citing *Doyle v. Ohio*, 426 U.S. 610

(1975)).  This court questions whether *Doyle* is even applicable to DeBruce's circumstances

because, as the United States Supreme Court has held:

> [i]n *Doyle*, the defendants, after being arrested for selling marijuana, received their *Miranda* warnings and chose to remain silent.  At their trials, both took the stand and claimed that they had not sold marijuana, but had been "framed."  426 U.S., at 613, 96 S.Ct. 2240.  To impeach the defendants, the prosecutors asked each why he had not related this version of events at the time he was arrested.  We held that this violated the defendants' rights to due process because the *Miranda* warnings contained an implicit "assurance that silence will carry no penalty."  *Id.*, at 618, 96 S. Ct. 2240.
>
> ....  "[W]e have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."  *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (per curiam)....

*Portuondo v. Agard*, 529 U.S. 61, 74 (2000).

There is no indication whatsoever that the prosecutor's comment was meant to impugn DeBruce's right to remain silent.  It was not even a comment on DeBruce's credibility.  Quite clearly, the prosecutor simply and properly reiterated to the jury that DeBruce's closing argument was just that - an argument - not evidence.  DeBruce does not take umbrage with Alabama's evidentiary rule that his presentation of a closing argument under these circumstances is not evidence.  Thus, DeBruce effectively concedes that the prosecutor's comment was in fact proper.  This claim is due to be denied.

### 3.    The prosecutor's pervasive leading questions made him an unsworn witness.  (Doc. 1, ¶¶ 162-63, pp. 56-57)

This claim, as set out in the habeas petition, is substantially the same as its state predecessor on direct appeal.  (Doc. 1, pp. 56-57 and C.R. Vol. 8, Tab 28, pp. 13-16).  The respondent answers that DeBruce cannot show the Alabama Court of Criminal Appeals' denial of the claim on direct appeal was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  (Doc.

14, pp. 86-88 and Doc. 15, pp. 95-97).  The respondent additionally contends that DeBruce is not

entitled to relief because the claim "presents only a question of state law."  (Doc. 15, pp. 96-97).

On direct appeal, the Alabama Court of Criminal Appeals held:

> Quite obviously the district attorney was guilty of leading certain witnesses.  Most of this occurred in establishing proper chains of custody and in laying predicates for the admission of other evidence.  "Whether to allow or disallow leading questions is discretionary with the trial court and [only] for a flagrant violation will there be reversible error."  *Jones v. State*, 292 Ala. 126, 128, 290 So. 2d 165, 166 (1974) ("[t]here was no error in overruling objections to leading questions propounded by the State to its witness in laying the predicate to establish the voluntariness of the confession").

> The record does not support a finding that the prosecutor's manner of questioning witnesses in this case prejudiced this appellant.  We find no abuse of discretion by the trial court in its ruling on this matter.[FN4]  We reject the appellant's contention that "[t]his continual leading placed Mr. Rumsey [the district attorney] in the role of the State's star witness."  Appellant's brief at 14.

> > FN4. There was no significant objection raising this issue before the trial court.  See R. 628, 803, 804.  However, on one occasion in response to defense counsel's objection, the trial judge instructed the district attorney: "Don't lead the witness."  R. 803.

*DeBruce v. State*, 651 So.2d at 606-07.

DeBruce is really arguing that the prosecutor's actions constituted a violation of the

advocate witness rule.  (Doc. 1, pp. 56-57).  However, he points to no United States Supreme

Court cases holding that pervasive leading questions by the prosecutor transform the prosecutor

into witness.  The Eleventh Circuit and State of Alabama cases cited by DeBruce involve

situations where the prosecuting attorney actually took the witness stand himself and testified

during the trial, and then resumed his prosecutorial role for the remainder of the trial.[87]

_____

[87]In *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988), the prosecuting attorney, Mr. Hendrix, took the stand to dispute that he had made a plea agreement with the defendant regarding the case, and then proceeded to continue acting as the prosecuting attorney.  In *Waldrop v. State,* 424

Contrary to DeBruce's assertion, he was not sentenced to death "'on information he did not have the opportunity to deny or explain[]'"[88] because the prosecutor in DeBruce's case did not testify as a witness nor were DeBruce's right to confrontation and cross-examination[89] violated under the same circumstances.  This claim is due to be denied.

<strong>4.      The prosecutor improperly appealed to the jurors' emotions.  (Doc. 1, ¶ 164, p. 57)</strong>

DeBruce's *entire* claim reads:

> The victim's sister, Denise Battle, testified during the guilt-innocence stage.  Under the pretext of seeking to prove that the victim had died, the prosecutor showed Ms. Battle a photograph of her brother's body.  Other prosecution witnesses had already established that the victim was killed.  Thus, the only purpose of showing Ms. Battle the picture was to inflame the passions and prejudices of the jury.  The prosecutor's tactic was deliberately designed to deprive Mr. DeBruce of due process, a fair trial, and a reliable sentencing determination.

(Doc. 1, p. 57).

---

So. 2d 1345 (Ala. Cr. App. 1982), the prosecuting attorney, referred to as Mr. Galanos, took the stand to testify that the defendant's confession to him was voluntary, and then proceeded to continue to prosecute the case.  Curiously, DeBruce infers that Rumsey was the prosecuting attorney in the *Waldrop* case.  (Doc. 1 at p. 56 ("Prosecutor Rumsey was quite experienced and his merging of the roles of advocate and witness have previously caused appellate courts to overturn criminal convictions," citing *Waldrop*.).   However, nothing in the record supports this inference.  Additionally, even if correct, it would not impact the court's decision on this issue in the instant case.

[88](Doc. 1, p. 57 (citing *Skipper v. South Carolina*, 476 U.S. 1, 7, n.1 (1986) *quoting Gardner v. Florida*, 430 U.S. 349, 363 (1977)).

[89]*Id*. (citing *Pointer v. Texas*, 380 U.S. 400, 405 (1965); *Douglas v. Alabama*, 380 U.S. 415 (1965); *Cruz v. New York*, 481 U.S. 186 (1987); *United States v. Avery*, 760 F.2d 1219 (11th Cir. 1985)).

135

The respondent declares that DeBruce has failed to show he is entitled to habeas relief pursuant to 28 U.S.C. § 2254(d).  (Doc. 14, pp. 88-90 and Doc. 15, pp. 97-99).  On direct appeal, the Alabama Court of Criminal Appeals held:

> We also reject the appellant's contention that the district attorney improperly appealed to the emotions of the members of the jury.  The appellant complains because, during the guilt phase of the trial, the district attorney called the victim's sister, Carolyn Denise Battle, as a witness and had her identify a photograph as being a photograph of the victim.  There was no objection to this identification at the time it occurred.  R. 941.

> The only indication that Ms. Battle became upset or displayed any emotion is found in the guilt phase closing argument, when the assistant district attorney stated:

> > "I apologize to you for being required to put someone on to identify Doug Battle.  Don't hold that against anybody.  The lady became upset [about] that.  I understand that.  But please don't hold it against us that we put someone on, because it is our burden to identify Doug Battle by someone that knew him during his lifetime.  And it is uncontroverted naturally that the person taken to the autopsy, who Dr. Embry told you, died as a result of a gunshot wound, is in fact Doug Battle.  And that was the person who proved that particular matter."

> R. 989.

> The photograph identified by Ms. Battle depicted the head and shoulders of her deceased brother, apparently lying on an autopsy table. The photograph did not depict any wounds, was not emotion-stirring in and of itself, and did not distort the facts or mislead the jury in any way.

> > "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered....

> > " . . . .

136

> ".... Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury...."

*Ex parte Bankhead*, 585 So. 2d 112, 118 (Ala. 1991).

> "[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors."  *Ex parte Siebert*, 555 So. 2d 780, 784 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S. Ct. 3297, 111 L. Ed. 2d 806 (1990).  See generally C. Gamble, McElroy's Alabama Evidence § 207.01(2) (4th ed. 1991).  "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, . . . or gruesome. . . ."  *Williams v. State*, 506 So. 2d 368, 371 (Ala. Cr. App. 1986), cert. denied, 506 So. 2d 372 (Ala. 1987).

*DeBruce v. State*, 651 So. 2d at 607.

DeBruce's conclusory habeas claim is devoid of any factual or legal argument showing that the state court's decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  DeBruce simply alleges that it had already been established that the victim had been killed, but he does not assert or provide legal or factual evidence to dispute that the testimony of the victim's sister was material to the question of the identity of the deceased nor does he allege or dispute that the photograph was not gruesome.  This claim is due to be denied.

### 5.     The prosecutor relied on "facts" not in evidence.  (Doc. 1, ¶ 165, pp. 57-58)

This *entire* claim reads:

> Besides repeatedly arguing that Mr. DeBruce pointed a gun, took aim, cocked the hammer, and pulled the trigger – "facts" that were not in evidence, see Claim G (I), *supra*[90] – the prosecutor also argued that the gun found near Mr. DeBruce when he was arrested was unloaded.  This, too, was a fact not in

---

[90]There is no Claim G(I) in DeBruce's petition.  Presumably, he is referring to Claim G.1 in the petition.

evidence.  Based upon this invented fact, the prosecutor then invited the jurors to
conclude that, because the gun nearest to Mr. DeBruce was unloaded, Mr.
DeBruce must have used another weapon, found closer to Barbara Jean Spencer
and LuJuan  McCants, to commit the murder.  The prosecution's reliance upon
facts not in evidence violated Mr. DeBruce's constitutional rights to confront the
evidence against him, to a fair trial, and to a reliable sentencing.

(Doc. 1, pp. 57-58).

The respondent declares that DeBruce has failed to show he is entitled to habeas relief

pursuant to 28 U.S.C. § 2254(d).  (Doc. 14, pp. 88-90 and Doc. 15, pp. 99-100).  The Alabama

Court of Criminal Appeals' opinion regarding this matter on direct appeal reads:

The district attorney's arguments during the guilt phase of the trial did not
deny the appellant a fair trial.

1.  The prosecutor's argument that the appellant intentionally shot Mr.
Battle because the appellant aimed the pistol, cocked the hammer, and pulled the
trigger of the pistol was a reasonable inference from the evidence, as this Court
has already determined.  See Part I.[91]  The comments of which the appellant
complains were made in the district attorney's opening remarks and were
preceded by the statement, "Of course, we expect the evidence to be...."  R. 327.

2. The prosecutor's comment that the pistol found in the appellant's car
was unloaded and his theory that the unloaded pistol was an indication of a
conspiracy (R. 1032-33) were within the realm of legitimate argument.  Those
comments were also a reply to defense counsel's "gun swapping" argument.[92]  R.

_____

[91]The information found in Part I of the Alabama Court of Criminal Appeals' opinion may
be found in this court's quote from that opinion in subsection 1 of Claim G (IV.G.1.), *supra*.

[92]At this juncture, the court placed footnote 5, which reads:

FN5. There was evidence that as the police approached the appellant, the appellant
placed a blue steel .380 semi-automatic pistol underneath the hood of a car.  That
pistol was not the murder weapon, which was positively identified as a silver or
chrome .380 semi-automatic pistol. In his closing argument to the jury, defense
counsel argued: "It seems logical to me that we ought to be able to assume that [the
empty pistol found under the hood of the car was] what [the appellant] was toting
when he was down there a few days later, and that's probably what he had in his
hands when he was up here at the Auto Zone, as the evidence will recall."  R. 1014.

1014, 1019-20.  A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel.  See *Ex parte Rutledge*, 482 So. 2d 1262, 1264 (Ala. 1984).

> "[T]he rule is that counsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury."  *Espey v. State*, 270 Ala. 669, 674, 120 So. 2d 904, 907 (1960).  "Counsel is allowed, within limits, to draw their own conclusions and to express their arguments in their own way, provided, of course, they do not travel out of the record or make use of unfair means to create prejudice in the minds of the jury." *Garrett v. State*, 268 Ala. 299, 303, 105 So. 2d 541, 544 (1958).

> "In Alabama, liberal rules are allowed counsel in drawing inferences from the evidence in their arguments to the jury.... Counsel has a right to argue any reasonable inference from the evidence or lack of evidence, ... and to draw conclusions from the evidence based on their own reasoning....

> ". . . .

> "Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though far-fetched....  So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled."

*Roberts v. State*, 346 So. 2d 473, 476-77 (Ala. Cr. App.), cert. denied, 346 So. 2d 478 (Ala. 1977).  "Counsel in making argument to the jury have a right to state their conception of what the evidence is."  *Hope v. State*, 21 Ala. App. 491, 492, 109 So. 521, 522 (1926).  "Certainly, the State has as much right as the defendant to argue to the jury every matter of legitimate inference from the evidence, and . . . 'the evidence may be examined, collated, sifted, and treated in [the solicitor's] own way.' "  *White v. State*, 41 Ala. App. 54, 58, 123 So. 2d 179, 181-82, cert. denied, 271 Ala. 702, 123 So. 2d 186 (1960).  "Whether an inference is reasonable is generally within the sound discretion of the trial judge."  *Hayes v. State*, 588 So. 2d 502, 505-06 (Ala. Cr. App. 1991).  See also *Kuenzel*, 577 So. 2d at 493-94.

*DeBruce v. State*, 651 So.2d at 609 -10.

---

DeBruce does not dispute the state court's historical factual findings.  Again, in the face

of the state court's reasoned opinion, DeBruce's conclusory habeas claim is devoid of any factual

or legal argument to persuade this court that the state court's decision was contrary to or an

unreasonable application of clearly established federal law.  The prosecutor was indeed arguing a

reasonable converse inference to counteract defense counsel's suggestions regarding possession

of the murder weapon.  This claim is due to be denied.

### 6. The prosecutor improperly vouched for his witnesses.  (Doc. 1,  ¶¶ 166-69, p. 58)

DeBruce alleges that the prosecutor improperly vouched for LuJuan McCants when he

stated: "Now either you are going to believe LuJuan McCants or you are not going to believe

LuJuan McCants.  But I'll submit to you, LuJuan McCants is telling you the truth."  (Doc. 1, p.

58).[93]  The prosecutor also told the jury to blame him if they did not like the plea agreement the

District Attorney's office made with McCants in order to secure his testimony against DeBruce.

*Id*.  Finally, the prosecutor lambasted DeBruce's defense witness by arguing, "But I'll submit to

you, that the little girl, she is not telling the truth.  That is just - I don't know how to put it in

words.  It is just a bald faced lie.  She is not telling the truth."  *Id*.  DeBruce concludes that "it

was particularly improper for the district attorney to vouch for a prosecution witness while

personally attacking a defense witness."  *Id*. (citing *Berger v. United States*, 295 U.S. 78, 88

(1935); *United States v. Young*, 470 U.S. 1 (1985)).

The respondent answers that this claim was properly denied by the Alabama Court of

Criminal Appeals on direct appeal, and DeBruce cannot show the state court's decision was

---

[93]DeBruce fails to cite the record for any of the prosecutor's purported comments in this
claim.

contrary to or an unreasonable application of clearly established federal law, or an unreasonable

determination of the facts in light of the evidence before it.  (Doc. 14, pp. 92-94 and Doc. 15, pp.

100-04).

The Alabama Court of Criminal Appeals made the following findings of fact and

conclusions of law with regard to this claim:

The appellant argues that the district attorney improperly bolstered the
testimony of the State's main witness, the accomplice Lujuan McCants.

In his closing argument to the jury, the district attorney stated:

"Now, Lujuan McCants.  You know, it always amazes me,
that what the State did relative to Lujuan McCants.  I made that
decision.  That's my decision.  If you don't like it.

"MR. MATHIS [defense counsel]: We object to that.
That's improper.

"THE COURT: Overruled.

"MR. RUMSEY [district attorney]: (Continuing) If you
don't like that decision, then you can hold it against the State of
Alabama, because I made that decision.  But, you have heard all
the evidence in this case.  And I'll submit to you, you observed
Lujuan McCants on that witness stand.  You saw him testify.  And
you saw his demeanor, and you know everything about him.  He
was cross-examined by the lawyers.

"Now, either you are going to believe Lujuan McCants or
you are not going to believe Lujuan McCants.  But I'll submit to
you, Lujuan McCants is telling you the truth. . . .

". . . .

". . .  And I'll submit to you, it [how the robbery/murder
occurred] is just like Lujuan McCants said.

". . . .

> "And I'll submit to you, that is the evidence.  And then you weigh that.  Because I told you at the first of the case that there would be conflicting testimony.  There is conflicting testimony in every case.  You have got to use the factors that the judge gives you, and decide who is telling the truth.

> "And it is a two-part process.  You recollect the evidence and then you evaluate it.  He will tell you you can consider interest, bias, kinship, friendship, or the lack of it.  That you can use your common sense and everyday understanding.  And you decide what really happened the night of August the 16th, 1991.  And you decide it, not based upon what I say, or what Mr. King, or any other lawyers say, but what comes to you from there.  But I'll submit to you, that the little girl, she is not telling the truth.  That is just-I don't know how to put it in words.  It is just a baldfaced lie.  She just is not telling the truth."

R. 1035, 1040-42.

A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial.  "[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses."  *Ex parte Parker*, 610 So. 2d 1181 (Ala. 1992).  See *Ex parte Waldrop*, 459 So. 2d 959, 961 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S. Ct. 2050, 85 L. Ed. 2d 323 (1985).

> " 'Attempts to bolster a witness by vouching for his credibility are normally improper and error.' ...  The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility....  This test may be satisfied in two ways.  First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity....  Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony."

*United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S. Ct. 1304, 79 L. Ed. 2d 703 (1984).

Here, the district attorney did not give any personal assurance of McCant's veracity and did not imply that he had information that had not been presented to

142

the jury that supported McCant's testimony.  "The credibility of a witness is a legitimate subject of criticism and discussion."  *Flint v. State*, 370 So. 2d 332, 335 (Ala. Cr. App. 1979).  Here, as in *Smith v. State*, 344 So. 2d 1239, 1242 (Ala. Cr. App.), cert. denied, 344 So. 2d 1243 (Ala. 1977), "[t]he prosecutor's remarks were grounded on some testimony given by the witness himself."  See also *Watson v. State*, 398 So. 2d 320, 328 (Ala. Cr. App. 1980), cert. denied, 398 So. 2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S. Ct. 3085, 69 L. Ed. 2d 955 (1981) (reference in closing argument to defendant as a "bald face liar" was "a hard blow but it was not foul").

We note that in his closing argument to the jury, defense counsel argued that "what the little girl said today is true" (R. 1016), and that McCants had "a tremendous reason to put this on somebody else"  (R. 1023).

*DeBruce v. State*, 651 So.2d at 610-11.

DeBruce does not dispute the state court's historical factual findings, which properly examined the prosecutorial comments in context.  The appellate court's determination that the prosecutor's comments were related to the level of credibility the jury should give each witness, based on evidence they observed from the stand - as opposed to impermissible voucher or attack - is neither contrary to nor an unreasonable application of clearly established federal law.  This claim is due to be denied.

> **7.** **The prosecutor improperly told the jurors that it was their "duty" to sentence DeBruce to death.  (Doc. 1, ¶¶ 170-73, pp. 58-60)**
>
> **8.** **The prosecutor improperly minimized the jury's role and sought a death sentence based on future dangerousness.  (Doc. 1, ¶¶ 174-75, pp. 60-61)**

These claims are substantially the same as their state predecessors on direct appeal.  (Doc. 1, pp. 58-61 and C.R. Vol. 8, Tab. 28, pp. 27-32), respectively.  The respondent answers that the claims were properly denied by the Alabama Court of Criminal Appeals on direct appeal, and DeBruce cannot show the state court's decisions were contrary to or an unreasonable application

of clearly established federal law, or an unreasonable determination of the facts in light of the

evidence before it.  (Doc. 14, pp. 94-97 and Doc. 15, pp. 104-09).

The Alabama Court of Criminal Appeals made the following findings of fact and

conclusions of law with regard to these claims:

We reject the appellant's allegation that the district attorney "engaged in a series of highly improper inflammatory arguments" during the sentence phase of the trial.  Appellant's brief at 27.

1.  In his sentence phase closing argument, the district attorney argued that the jurors had a "duty" to serve as jurors, and that they were selected "to do an obligation, to do a duty that you think is right."  R. 1174.  The prosecutor also told the jury: "I know without question that you will do what you think is right and just under the law" (R. 1176); "You render a verdict that you can live with based upon this evidence and based upon this law"  (R. 1177); "It's your decision in this case. You do what you think is right.  You do what you think is just and you do it in your heart, as he [defense counsel] said, and in your mind under the evidence and under the law, and then nobody can complain.  You do what you think is right." R. 1179.  Defense counsel did not object to these comments.

A review of the argument shows that the district attorney did not argue that the jury could fulfill its duty only by recommending a sentence of death.  Here, the district attorney did not violate the principle that a "prosecutor is in error, in exhorting the jury to 'do its job,' to imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law."  *Arthur v. State*, 575 So. 2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So. 2d 1191 (Ala.1991).

2. The district attorney did not commit error in stating, "I'll tell you this, if we can ask the young people of this country to die in defense of this country, then we also have the right to ask killers, merciless killers to die."  R. 1175.  Defense counsel made no objection to this particular statement.  In *Kuenzel*, 577 So. 2d at 504, this Court held that "[t]he prosecutor's argument that 'if surely we have the right to ask young people to defend this country and our way of life, then we have the right to execute the worst of its criminals' did not go beyond the bounds of legitimate argument."

3. The district attorney did not commit error in his comment, "Folks, if there is one person in this courtroom that really and truly believes in capital punishment, it's that fellow seated right there."  R. 1176.  Defense counsel made

144

no objection to this comment.  In *Haney v. State*, 603 So. 2d 368, 395 (Ala. Cr. App. 1991), affirmed, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993), this Court found that "this line of argument is within the latitude allowed prosecutors in their exhortations to the jury to discharge its duties in such a manner as to punish crime, protect the public, and deter others from committing like offenses."

4. In his closing argument, the district attorney urged the jury to "do what you think is right and just under the law....  That's all anybody has got a right to ask.  But it is not right to come up here and put a guilt trip on you like that's just been done.  [Defense counsel] says- ... [i]f anything tugs at your heart, just do it.  In effect, just disregard the law.  Just disregard your oath to this Court."  R. 1176-77.  The district attorney's argument was a proper and legitimate response to defense counsel's previous statement:

> "When you g[e]t back there and make your decision, if there's anything in this case that really tugs on your heart, then go with it.  Go with it.  Because that's what this is all about.  If you've got something that is really bothering you on the inside about killing him, then go with that.  You are entitled to your own opinion.  You don't do it if you don't want to.  If you don't feel like he needs to die, then don't kill him."  R. 1172-73.

"[I]n *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987), the Supreme Court decided that 'an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' 479 U.S. at 539, 107 S. Ct. at 838 (emphasis added)."  *Kuenzel*, 577 So. 2d at 496.  A prosecutor's argument "in telling the jury not to let sympathy, emotions, or compassion affect its decision ... did not result in any error."  *Stewart v. State*, 601 So. 2d 491, 506 (Ala. Cr. App. 1992).

5. In his closing argument, the district attorney stated:

> "But if you believe and we believe that a person has a right to kill a person for coming into their home to protect their children and family, and that's the law in the State of Alabama, then you must believe that society has that same right.  Society has the right of self defense against people like Derrick DeBruce."   R. 1177.

145

This argument was proper for the same reasons this Court upheld a similar argument in *Kuenzel*, 577 So. 2d at 503.  It does not imply that the appellant would commit illegal or dangerous acts in the future.

*DeBruce v. State*, 651 So. 2d  at 612-13.

In *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985), the Eleventh Circuit wrote, "[P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements.  First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations.  *Brooks* [*v. Kemp*, 762 F.1383, 1403 (11th Cir. 1985)].  Second, they must have been so prejudicial, when viewed in the context of the entire sentencing, as to have rendered that proceeding 'fundamentally unfair.'"  *Id*. at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed. 2d 431 (1974)).

DeBruce does not dispute the validity of the appellate court's historical factual findings.  As such, he cannot rely on *United States v. Young*[94] to prove that the appellate court's ruling in his case was contrary to or an unreasonable application of clearly established federal law.  In *Young*, the prosecutor expressed his personal opinion that the defendant was guilty and then asked the jury to "'do its job.'" *Id*., 470 U.S. at 1.  The Supreme Court did find that  "[t]he prosecutor . . . was in error to try to exhort the jury to 'do its job'; that kind of pressure . . . has no place in the administration of criminal justice[.]" *Id*., 470 U.S. at 18 (additional citation omitted).  However, the prosecutor in DeBruce's case explained 'duty' as the jury's obligation to determine the facts and apply the law as instructed.  He did not inform the jury that its duty was to sentence

---

[94]*United States v. Young*, 470 U.S. 1, 11-12 (1985), involved an income tax evasion case, wherein during closing argument, defense counsel accused prosecution witnesses of perjury and engaged in a personal attack on the prosecutor.  The prosecutor then launched into an equally improper response to the attack.  Although the court was unimpressed with the behavior of both sides, it found that the defendant had invited the response.  *Id.* at 11-12.

DeBruce to death.  Even if the court were to assume, for the sake of argument, that it was

unreasonable for the state court to refuse to apply the rationale underlying *Young's* improper

argument determination in a manner which required it find that the comment in DeBruce's case

was improper, *Young* still affords DeBruce no relief.  That is because

> [i]mproper arguments [only] render [a trial] fundamentally unfair and require
> reversal when there is a reasonable probability that they changed the outcome of
> the case.  *See id*. at 1402.  "'A reasonable probability is a probability sufficient to
> undermine confidence in the outcome.'"  *Id*. at 1401 *(quoting Strickland v.*
> *Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

*Spivey v. Head*,  207 F.3d 1263, 1275-76 (11th Cir 2000).  There is no reasonable probability that

the jury would have recommended life without parole had the remark not been made.  "The

comment [did not] 'so infect[] the trial with unfairness as to make the resulting conviction a

denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637 (1974).

This court is not persuaded that the prosecutor's patriotic comment, when viewed in

context[95], deprived DeBruce of individualized consideration before the jury.  *Davis v. Kemp*, 829

F.2d 1522, 1527 (11th Cir. 1987).

> It "is not enough that the prosecutors' remarks were undesirable or even
> universally condemned." *Darden v. Wainwright*, 699 F.2d, at 1036.  The relevant
> question is whether the prosecutors' comments "so infected the trial with
> unfairness as to make the resulting conviction a denial of due process." *Donnelly*
> *v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

---

[95]Although unmentioned by DeBruce or the state appellate court, immediately before the
prosecutor made the patriotic comment, he acknowledged that the jury had an "awesome
responsibility" in such a civic obligation and stated, "I didn't tell you up here on Monday that it
would an easy decision or a simple decision and its not." (R. Vol. 7, Tab. 22, p. 1175).  Immediately
after the comment, the prosecutor stated, "My God, don't you think Doug Battle wanted to live."
*Id*.

*Darden v. Wainwright*, 477 U.S. at 181.

The court is also unpersuaded with DeBruce's assertion that the prosecutor's argument that DeBruce himself believed in the death penalty was improper.  The prosecutor was equating justice with the death penalty by arguing that DeBruce knew what justice was and did not want it.  In other words, the evidence showed that the death penalty was appropriate punishment.  Since "retribution and deterrence ..." represent proper societal purposes of the death penalty, the prosecutor's argument was not improper.  *Gregg v. Georgia*, 428 U.S.153, 183 (1976).

Next, after carefully examining the pertinent portions of *California v. Brown,* and the prosecutor's rebuttal in DeBruce's case, this court is convinced the state appellate court properly identified and applied federal law to the facts before it.  There is a clear constitutional distinction between "mere sympathy" and sympathy as it is derived from evidence of mitigating circumstances.  "Mere sympathy" is not an appropriate consideration in the sentencing process.  On the other hand, sympathy derived from evidence of a defendant's background and character and any other mitigating fact must be considered.  Although this issue arose in *Brown* in the context of a jury instruction, the Supreme Court's holding with regard to sympathy remains the same.  *Brown* explained the distinction as follows:

> By concentrating on the noun "sympathy," respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on mere sympathy.  Even a juror who insisted on focusing on this one phrase in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase.  While strained in the abstract, respondent's interpretation is simply untenable when viewed in light of the surrounding circumstances.  This instruction was given at the end of the penalty phase, only after respondent had produced 13 witnesses in his favor.  Yet respondent's interpretation would have these two words transform three days of favorable testimony into a virtual charade.  We think a reasonable juror would reject that interpretation, and instead

148

> understand the instruction not to rely on "mere sympathy" as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase.

*California v. Brown*, 479 U.S. 538, 542 (1987).

The prosecutor's comment, when read in conjunction with the argument surrounding it and the prosecutor's rebuttal argument as whole, is not improper. Rumsey did inform the jury not to decide DeBruce's fate based on sympathy and personal feelings alone. He also asked the jury to determine the existence of aggravating and mitigating circumstances based on the evidence. Thus, he directed the jury away from the type of sympathy that is not appropriate and in the direction of appropriate concerns.

Finally, the prosecutor's comments regarding DeBruce's future dangerousness were not improper. The prosecutor's comment regarding the death penalty as societal self-defense was not improper. The United States Supreme Court has allowed prosecutorial comment on future dangerousness and has never explicitly ruled that the societal self-defense argument is *per se* improper. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system.").

For the foregoing reasons, all aspects of this claim are due to be denied.

### 9. Individually and cumulatively, the prosecutor's conduct requires a new trial and sentencing. (Doc. 1, ¶ 176, p. 61)

This claim was not presented at trial, on direct appeal or at any time during collateral review. DeBruce does not dispute the respondent's assertion (doc. 14, p. 98) that the claim is

procedurally defaulted.  As such, it is procedurally defaulted and due to be dismissed.

Alternatively, for reasons already discussed in the foregoing sub-sections, the court rejects the

rejects the claim and it is due to be denied.

> **H.**   **DeBruce was not competent to stand trial and the State failed to conduct a necessary hearing to determine whether DeBruce was able to assist in his own defense.  (Doc. 1, ¶¶ 177-80, pp. 62-63)**

This claim was not raised at trial or on direct appeal.  It was presented for the first time in

DeBruce's Rule 32 petition, and found by the trial court to be procedurally barred pursuant to

Rule 32.2(a)(3) & (5).[96]  The Alabama Court of Criminal Appeals affirmed the trial court's

decision during collateral proceedings.  *See DeBruce v. State,* 890 So. 2d at 1100.  The appellate

court wrote:

> The circuit court also found that DeBruce's argument concerning his competency to stand trial was procedurally barred because it could have been raised at trial or on appeal but was not.  DeBruce specifically argued in his postconviction petition that he was mentally and/or physically incompetent to stand trial and the trial court erred in not holding a competency hearing.  The United States Supreme Court held in *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), that a mentally incompetent individual could not be tried and convicted.  Section 15-16-21, Ala.Code 1975, provides that if the trial court has reason to doubt an individual's sanity then the court must suspend the trial proceedings and inquire into the "fact of his sanity."  In *Nicks v. State*, 783 So. 2d 895 (Ala. Crim. App. 1999), cert. quashed, 783 So. 2d 926 (Ala. 2000), we recognized that a claim that a defendant was tried while mentally incompetent could not be subject to waiver in a collateral proceeding.
>
> DeBruce's argument relates to his physical competency-and not his mental competency-to stand trial.  Physical incompetence and mental incompetence are not analogous terms when a court reviews whether a defendant will be legally required to proceed with his or her trial.  A defendant can be found physically incompetent based on a severe medical condition and still proceed with trial.  See *United States v. Landsman*, 366 F. Supp. 1027 (S.D.N.Y. 1973) (medical

---

[96]*See* (Rule 32 C.R. Vol. 13, pp. 444-45), and the trial court's order regarding same.  *Id.* at 579.

testimony that defendant suffered from aneurysm near optical nerve in brain did not render defendant physically and mentally incompetent to stand trial); *United States v. DePalma*, 466 F. Supp. 920 (S.D.N.Y. 1979) (heart condition did not render defendant unable to stand trial).

      We can find no case where this Court or any other appellate court has held that a claim of physical incompetence to stand trial is not subject to waiver in a collateral proceeding.  We hold that the issue of physical incompetence is waived in a collateral proceeding because it could have been raised at trial or on appeal. Rule 32.2(a)(3) and 32.2(a)(5), Ala. R. Crim. P.

      Moreover, we have reviewed the record of DeBruce's trial proceedings and find no indication that DeBruce was so physically incapacitated that he was not able to participate in the proceedings.  Indeed, Mathis testified at the postconviction hearing that he never got the impression that DeBruce was sick or in pain.  DeBruce also made a statement to the jury before he was sentenced and pleaded with the jurors to spare his life.  Last, the circuit court was present during the trial and had the opportunity, unlike this Court, to view DeBruce's demeanor.

*DeBruce v. State,* 890 So.2d at 1100.

DeBruce does not dispute that the state court found this claim to be procedurally defaulted pursuant to adequate and independent state procedural rules.  After a careful examination of the record and applicable law, this court finds it is precluded from further review of the claim.  Even if the state appellate court's final comment could be in some way construed as a merits decision,  DeBruce has not alleged that the factual findings made by the state appellate court within that comment as to the state of DeBruce's physical condition are unreasonable in light of the evidence before it, and this court's independent examination of the entire record satisfies it that DeBruce could not possibly make such a showing.[97]  Under these circumstances, DeBruce could not show he is entitled to § 2254(d) pursuant to the constitutional

_____

[97] *See* Claim IV.X, *infra.*,  for additional detail regarding DeBruce's physical condition.

theory he has proposed. For the foregoing reasons, this claim is procedurally defaulted and due to be dismissed. Alternatively, it is due to be denied.

**I.      DeBruce is mentally retarded. (Doc. 1, ¶¶ 181-85, pp. 63-64)**

DeBruce contends he "is mentally retarded and his execution would be cruel and unusual punishment prohibited by the Eighth Amendment." (Doc. 1, p. 63 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002)). *Atkins* created a new rule of substantive constitutional law, made retroactive to cases on collateral review. As such, DeBruce was not required to raise such a claim before June 24, 2002, in order to preserve it for review.

On June 24, 2002, DeBruce's case was undergoing collateral review before the Alabama Court of Criminal Appeals. However, after *Atkins*, DeBruce did not attempt to file a second Rule 32 petition in the Circuit Court of Talladega, County, Alabama[98], nor did he amend any briefs or pleadings during the collateral appeal process.[99] Instead, it was raised for the first time when this habeas petition was filed on September 7, 2004.

DeBruce does not dispute the respondent's assertion (doc. 14, p. 99) that the claim is procedurally defaulted. This claim is procedurally defaulted and due to be dismissed.[100]

**J.      The State used unreliable and unconstitutionally obtained evidence. (Doc. 1, ¶¶ 186-89, pp. 65-66)**

---

[98]Assuming the state court would have found DeBruce's *Atkins* claim met the requirements for filing a second or successive Rule 32 petition pursuant to Rule 32.2 of the Alabama Rule of Criminal Procedure.

[99]The court can conceive of no state procedural rule that could have prevented DeBruce from raising this claim during the appellate process.

[100]The court also notes that, premised on the extensive record before it, this claim is without substantive merit.

This claim was not raised on direct appeal.  When it was presented in DeBruce's Rule 32 petition, the trial court found it to be procedurally barred pursuant to Rule 32.2(a)(5).[101]  The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings.  *See DeBruce v. State*, 890 So. 2d at 1099.  For the foregoing reasons, this claim is procedurally defaulted and due to be dismissed.

### K.    The trial court improperly admitted evidence concerning DeBruce and his co-defendants, who were tried separately.  (Doc. 1, ¶¶ 190-93, pp. 66-67)

DeBruce alleges "'mug shot' photographs of [him] and his co-defendants. . ." from which two eyewitnesses made identifications were unlawfully admitted into evidence

> because the state failed to establish any need to introduce such evidence.  The photographs impermissibly suggested to the jury that Mr. DeBruce and his co-defendants had criminal records.  Furthermore, there was no probative value in eliciting evidence that witnesses had identified non-testifying co-defendants from mug shots.  If there was any marginal probative value in such evidence it was far outweighed by the prejudice to Mr. DeBruce.

(Doc. 1, pp. 66-67).

DeBruce contends that he was "'entitled to have his guilt or innocence determined solely on the basis of evidence introduced at trial, and not on grounds of official suspicion ... or other circumstances not adduced as proof at trial.'"  *Id*. at p. 66 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986)).  From this premise, DeBruce asserts that "it is a violation of due process and the presumption of innocence for the jury to see the accused in shackles or prison garb."  *Id*.  Finally, he argues "certain evidence of a non-testifying co-defendant[ ] is so prejudicial ... that it cannot be cured by a limiting instruction.  *Id*. (citing *Bruton v. United States*, 391 U.S. 123

---

[101]*See* Rule 32 C.R. Vol. 12, Tab. 41, pp. 390-92, and the trial court's order regarding same. *Id*. at Vol. 13, p. 577.

(1968) (non-testifying co-defendant's confession is inadmissible); *Cruz v. New York*, 481 U.S. 186 (1987)).  For the foregoing reasons, DeBruce declares he was deprived of his constitutional right to due process, a fair trial, and a reliable sentencing determination.  *Id*.

The respondent answers that DeBruce is not entitled to relief because this claim only presents a question of state law.  (Doc. 14, pp. 100-02 and Doc. 15, pp. 117-20).  The respondent additionally argues the claim was properly denied by the Alabama Court of Criminal Appeals on direct appeal, and DeBruce cannot show the state court's decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  *Id*.

The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law with regard to this claim:

> The appellant argues that the prosecutor improperly introduced into evidence "mug shot" photographs of the appellant and his five codefendants. Each photograph consisted of a frontal view of the head and shoulder area of the depicted individual with "height" lines, either numbered or unnumbered, in the background.  There were no juxtaposed frontal and profile views of any person. No date, identification number, police markings, or other information appeared on any photograph.

> When the prosecutor stated that "there is nothing that you can look at the photograph and make a determination for a person viewing it that it is from [the] Talladega Police Department," the trial court responded, "I think that is a correct statement."  R. 403.  In addition, the trial court found that the photographs were "not suggestive."  R. 419.

> "The presence of lines in a photograph do not mean that the person in the photograph is a criminal, has a criminal record, or has committed a crime involving moral turpitude."  *Lockett v. State*, 518 So. 2d 877, 880 (Ala. Cr. App. 1987).  "In *Williamson v. State*, 384 So. 2d 1224, 1231 (Ala. Cr. App. 1980), this Court found that a photograph depicting a frontal view of the subject with a height chart in the background was not objectionable as a 'mug shot.'"  *Parker v. State*, 587 So. 2d 1072, 1093 (Ala. Cr. App. 1991) (death case).

To the extent that the photographs could be considered "mug shots,"[FN2] those photographs were properly admitted into evidence.

FN2. The trial court stated that there was "no question" that these photographs were "mug shots."  R. 404.

"Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history....  However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error.

"....  The three requirements [that should be met before a mug shot is admissible are] set out in [*United States v.*] *Harrington* [490 F.2d 487 (2d Cir. 1973):]

"'1. The Government must have a demonstrable need to introduce the photographs; and

" '2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

" '3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.'

"*Harrington*, 490 F.2d at 494.  We conclude that these three inquiries are appropriate criteria to consider when determining the admissibility of a mug shot; however, the failure to meet one or more of these criteria would not necessarily result in reversible error.  We shall still apply Rule 45, Ala. R. App. P., when deciding whether to reverse or set aside a judgment for error."

*Ex parte Long*, 600 So. 2d 982, 989 (Ala. 1992).

Here, the photographs were employed to connect the appellant with the codefendants.  The photographs themselves do not imply the existence of any criminal record and the prosecutor did not draw any attention to the source of the photographs when referring to the photographs during the trial.

Contrary to the appellant's argument made in connection with this issue, the testimony is that none of the five witnesses[FN3] who viewed the photographic

lineups made any identification of the photographs after having seen the codefendants on television.  Only Larry McCardle indicated that he had made such an identification after having seen the appellant's photograph in the newspaper.  However, that witness testified that "[t]here was no question in [his] mind whatsoever" about his identification of the appellant.  R. 553.  See Part XI of this opinion.

> FN3.  These witnesses were: Willie Davis, Roy Highfield, Larry McCardle, David Walton, and James Wilson.  R. 404.

*DeBruce v. State*, 651 So. 2d at 605-06.

DeBruce does not contend that the *Harrington* inquiry is constitutionally unsound on its face or as applied in his case, and since Alabama has adopted that test as the standard for determining the admissibility of mug shots at trial, the respondent is correct that this claim is reduced to a matter of state law, an issue beyond the jurisdiction of this court.  Alternatively, DeBruce's conclusory allegations in no way overcome the state court's historical factual findings concerning this matter, and he fails to make any reasoned legal connection to convince this court that the circumstances surrounding the introduction of the mug shots in his case rise to the level of the fundamental constitutional principles discussed in *Holbrook*, *Bruton* and *Cruz*.[102]  This claim is due to be dismissed, or, in the alternative, denied on the merits.

**L.    The State introduced unreliable and tainted identification evidence.  (Doc. 1, ¶¶ 194-200, pp. 67-69)**

DeBruce alleges witness Larry McCardle's in-court identification of him as one of the robbery participants was irreparably tainted because McCardle was exposed to a newspaper

___

[102]In *Holbrook*, the Supreme Court found a legitimate state interest in the presence of a reasonable number of law enforcement personnel in the courtroom as opposed to the prejudice inherent in making a defendant wear prison garb, with shackles and gags throughout the trial.  475 U.S. at 568-71.  In both *Bruton* and *Cruz*, the defendant's constitutional right to confrontation and cross-examination was violated when a non-testifying co-defendant's confession implicating the defendant was admitted into evidence.

photograph of DeBruce containing a notice that DeBruce had been arrested for the AutoZone

crime.  (Doc. 1, p. 67).  DeBruce infers that this out of court identification is particularly suspect

because McCardle had previously been unable to identify DeBruce as a robber despite "repeated

viewings" of photographic line-ups (mug shots).  *Id*.  He also for the first time expresses

consternation that  "immediately prior to Mr. McCardle's in-court identification of DeBruce, the

prosecution surreptitiously arranged for McCardle to view Mr. DeBruce through a window in the

courtroom door," but does not and has never before alleged that this was yet another suggestive

out of court identification in the context of this particular claim.  *Id*.

Since DeBruce believes that the state failed to satisfy its burden to "show ... an

independent or reliable basis for an identification [by clear and convincing evidence], [he argues]

the in-court identification" should have been suppressed as unconstitutional.  *Id*. at 67-68 (citing

*Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Simmons v. United States*, 390 U.S. 377, 383-

84 [(1968)]; *Gilbert v. California*, 388 U.S. 263 (1967)).[103]

The respondent answers that DeBruce cannot show the state appellate court's

adjudication of this claim is contrary to or an unreasonable application of clearly established

federal law, or an unreasonable determination of the facts in light of the evidence before it.  (Doc.

14, pp. 102-03 and Doc. 15, pp. 120-22).  The pertinent portions of that opinion read:

> The appellant maintains that Larry McCardle's in-court identification of
> the appellant was "tainted and rendered unreliable by Mr. McCardle's exposure to
> newspaper photographs identifying Derrick DeBruce as one of the men arrested in
> connection with the robbery."  Appellant's brief at 56.  Defense counsel did not

---

[103]To the extent DeBruce claims the trial court failed to give proper instructions regarding various issues pertaining to witness identification, and "the prosecutor's argument regarding identification" (*id.,* at 68-69),  these are due to dismissed as conclusory for failure to comply with the heightened specificity requirements for federal pleadings.

move to suppress Mr. McCardle's in-court identification of the appellant and we find no "plain error" in this regard.

McCardle was the manager of the Auto Zone. He testified that he had not identified the appellant in two photographic lineups conducted by the police. He testified that he had seen only one photograph of the appellant in a newspaper article "[i]dentifying him as someone who had been arrested," and that he did not keep or refer back to that photograph. R. 552-53. When asked, "Is your identification of him based upon your opportunity to observe him back on August 16, 1991 at the Auto Zone?" McCardle replied, "There is no question in my mind whatsoever." R. 553.

"The fact that the witness was unable to make an identification of the defendant from the photographic line-up ... does not require the exclusion of his in-court identification, but rather goes to the weight and credibility of his testimony." *Carter v. State*, 406 So. 2d 1076, 1077 (Ala. Cr. App. 1981). " '[A] witness's prior inability to identify a defendant goes to the credibility of the in-court identification and not to its admissibility, and thus raises a proper question of fact for the jury to determine.'" *Johnson v. State*, 453 So. 2d 1323, 1328 (Ala. Cr. App. 1984).

*DeBruce v. State*, 651 So. 2d at 622-23.

The court digresses a moment to assess DeBruce's allegation that McCardle had been unable to identify him as a robbery even though McCardle had repeatedly reviewed photo lineups. In doing so, it must also assess the same inference made by the state appellate court. Both contentions are factually misleading. The state appellate court was correct when it found that McCardle testified[104] before the jury that he had looked at two photographic lineups and did

---

[104]The testimony reads:

> Q [Mathis]   You identified the defendant as having been seen in the store a few moments ago. Isn't that correct?
>
> A[McCardle]   Yes, sir.
>
> Q [Mathis]   You have looked at several photo spread or photo lineups since the time of this robbery. Isn't that correct?

not identify DeBruce in the line-ups.  However, what is not mentioned is the testimony of

Detective Ken Sisk given during a hearing on defense counsel's motion to suppress the lineups,

held outside the presence of the jury and before McCardle took the stand.  Detective Sisk

testified that he only showed two photo lineups to McCardle, and each was shown on two

separate days.  (R. Vol. 3, Tab. 8, pp. 387-88 and R. Vol. 4, pp. 406-07).  McCardle identified

co-defendant Charles Burton in the first photo lineup[105] and Deon Long in the second photo

lineup.  *Id*.  The jury was not made privy to Detective Sisk's testimony.  Nevertheless, when

questioned by the prosecutor and defense counsel, McCardle testified before the jury that he was

shown two photo packs.  (R. Vol. 4, pp. 552-53).  Only the prosecution asked McCardle about a

particular photo pack, the one containing the photograph of Charles Burton.  (R. Vol. 4, pp. 532-

36).  Thus, the truth of the matter is McCardle did not identify DeBruce from the photo lineups

because McCardle was never shown a photo lineup with DeBruce's picture in it.  Even though

the court is tempted to determine that the state court's factual finding with regard to the two

photo lineups is unreasonable in light of the evidence before it, because the jury was not

informed of McCardle's identification of Long the point was not made clear.  And it cannot be

---

A[McCardle]   Two.

Q [Mathis]       You have not identified him in either one of those.  Is that
                      correct?

A[McCardle]   That's correct.

(R. Vol. 4, p. 552).

[105]Law enforcement created a separate photo lineup for each alleged co-defendant.  (R. Vol. 3, Tab. 8, pp. 371-400) and (R. Vol. 4, pp. 401-414).  Therefore, no more than one co-defendant appeared among the potential suspects in any one photo lineup.  *See also* (Rule 32 C.R. Vol. 21, pp. 474-75).

said that the state appellate court was incorrect when it found that McCardle did testify that he

had looked at two photo packs and did not identify DeBruce.

Moving on to the purportedly suggestive out-of-court identification of DeBruce by

newspaper photograph and its effect on the constitutionality of McCardle's in-court-

identification, the United States Supreme Court has

> conclude[d] that reliability is the linchpin in determining the admissibility of
> identification testimony....   The factors to be considered are set out in [*Neil*] *v.*
> *Biggers*, 409 U.S., [188], at 199-200 409 U.S. 188, 199-200 ... (1972).  These
> include the opportunity of the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy of his prior description of the
> criminal, the level of certainty demonstrated at the confrontation, and the time
> between the crime and the confrontation.  Against these factors is to be weighed
> the corrupting effect of the suggestive identification itself.

*Manson v. Braithwaite*, 432 U.S. at 114.  Stated differently,

> [t]he "central question," ... [is] "whether under the 'totality of the circumstances'
> the identification was reliable even though the confrontation procedure was
> suggestive." [*Biggers*, 409 U.S.] 199, 93 S. Ct., at 382.  Applying that test, "the
> Court [must determine whether there was a] ... "substantial likelihood of
> misidentification.  [If not,] the evidence was properly allowed to go to the jury."
> *Id.,* at 201, 93 S. Ct., at 383.

*Id*. at 106.

Assuming *arguendo,* that the out-of-court identification was unduly suggestive, it still

cannot be said that McCardle's in-court identification violated the *Biggers* standard because,

under the totality of the circumstances, McCardle's identification of Burton was not tainted.  The

historical trial record shows that McCardle testified he was checking out customer Roy Highfield

at the AutoZone register when DeBruce, who had been standing directly behind Highfield,

"pulled a handgun and started shouting obscenities that this was a robbery- -" (R. Vol. 4, p. 536).

On cross-examination, McCardle admitted that he saw DeBruce's photo in the paper, but did not

160

keep it or refer back to it. *Id.* at 553. He also admitted that DeBruce was the only black man seated at the defense table, but insisted on redirect that there was "no question in [his] mind whatsoever" DeBruce was one of the robbers. *Id.* The prosecutor got McCardle to reiterate that he had only seen two photo lineups before observing DeBruce's photograph in the paper, and thereafter he had a conversation with law enforcement relative to the newspaper photograph, but was not shown anymore photo packs. *Id.* at 553-54.

Therefore, the record shows that McCardle had an opportunity to view DeBruce face-to-face at the time of the crime, and his level of certainty that DeBruce was a robber was absolute. When these facts are weighed against a purportedly suggestive newspaper article and McCardle's view of DeBruce immediately prior to the commencement of trial, it is clear that McCardle's in-court- identification was not tainted and as such, its admissibility was constitutionally sound pursuant to *Biggers*. This claim is due to be denied.

**M.    The trial court's instructions were unconstitutional.  (Doc. 1, ¶¶ 201-04, pp. 69-70)**

DeBruce next alleges that "the trial court's reasonable doubt instruction, taken as a whole," was so flawed that there is a reasonable likelihood the jury to whom the instruction was read improperly interpreted the instruction in such a manner that the prosecution's burden of proof was impermissibly diluted and shifted to him in violation of his right to due process of law. (Doc. 1, pp. 69-70 (citing *In Re Winship*, 397 U.S. 358, 364 (1970), *Cage v. Louisiana*, 498 U.S. 39 (1990) and *Victor v. Nebraska*, 511 U.S.1 (1994)). The particular deficiencies with the reasonable doubt instruction given in his case are described by DeBruce as follows:

> Here, as in *Cage*, the trial court equated reasonable doubt with "an actual doubt" and equated reasonable doubt with proof to "moral certainty." The trial

161

court also told the jury that a reasonable doubt is "a doubt for which a reason can be assigned." This articulation requirement unconstitutionally imposes a "higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Cage v. Louisiana*, 498 U.S. at 41. The Constitution and Supreme Court precedent do not impose an obligation upon a juror to explain the reasons for having doubt.

Equating a reasonable doubt for "a doubt for which reason can be assigned" shifts and dilutes the burden of proof. It improperly suggests that even if the state's proof has not persuaded the juror, the resulting doubt is not "reasonable" unless the juror is able to express it in words. If there is an honest doubt, it is the juror's obligation to vote for acquittal even if the juror cannot explain the thought process that resulted in such doubt.

*Id*.

The respondent declares that DeBruce's allegations fail to show the Alabama Court of Criminal Appeals' adjudication of this claim on direct appeal is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. (Doc. 14, pp. 104-06 and Doc. 15, pp. 122-27). The Alabama Court of Criminal Appeals' opinion on the matter reads:

The trial court's instruction on reasonable doubt did not violate the principles of *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990).

The trial court gave the following instructions to the jury in the guilt phase of the appellant's trial:

"A reasonable doubt means an actual doubt. It could arise out of the testimony in the case, or it could arise from a lack of testimony in the case.

"It is a doubt for which a reason can be assigned, and the expression to a moral certainty means practically the same thing as beyond a reasonable doubt, because if you are convinced to the point where you no longer have a reasonable doubt, then you are convinced to a moral certainty."

R. 1068-69.

Defense counsel announced "[s]atisfied" at the conclusion of these instructions.  R. 1073.  At the sentence phase of the trial, the trial court instructed the jury that "[t]he same definitions that I gave to you yesterday in the guilt stage concerning reasonable doubt apply to this matter also."  R. 1187.  Defense counsel made no objection to either instruction, and in fact, in his closing argument to the jury in the guilt phase, used terminology identical in all practical respects to that employed by the trial court.[FN6]

> FN6. In his argument, defense counsel stated:
>
> > "Of course, the burden of proof and reasonable doubt are all wadded up together.  Because the burden of proof is on the State of Alabama . . . to prove my client guilty beyond a reasonable doubt and to a moral certainty.  And Robert [the district attorney] said that was likely so, in his opening the other day.  That beyond a reasonable doubt and to a moral certainty are really the same thing. If you feel morally certain, inside your heart, that you are right, you ought to go ahead.  If you don't, then you shouldn't.  The same thing goes, if you have got a doubt to which you can attach a reason, then you have a reasonable doubt, then you should not find him guilty."  R. 1021-23.

A similar issue was recently addressed by the Alabama Supreme Court in *Ex parte McWilliams*, 640 So. 2d 1015, 1024 (Ala. 1993):

> "We first note that 'beyond a reasonable doubt' and 'to a moral certainty' are not exactly synonymous.  In *Ex parte Beavers*, 598 So. 2d 1320, 1321 (Ala. 1992), this Court approved a jury instruction that included the following:
>
> > "''And the expression 'to a moral certainty' means practically the same thing as beyond a reasonable doubt.  Because if you are convinced to a point where you no longer have a reasonable doubt, then you are convinced to a moral certainty.'''
>
> "(Emphasis added.)  In other words, 'moral certainty' is the state a jury reaches when it is convinced of the defendant's guilt beyond a reasonable doubt.  We further note, however, that the trial court equated the two phrases only once, at the beginning of his introductory charge to the jury.  Moreover, as set out below, the

trial court's instruction, taken as a whole, does not suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.  Accordingly, we hold that this error in the trial court's instruction [that a reasonable doubt and to a moral certainty are 'synonymous] is harmless. Rule 45, A.R. App. P.

"....

"In *Cage v. Louisiana,* 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990), the United States Supreme Court reversed a criminal conviction, holding that the trial's instruction on reasonable doubt violated the defendant's due process rights.  The trial court in that case had equated reasonable doubt with 'actual substantial doubt' and had instructed the jury that a reasonable doubt 'must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.'  *Cage v. Louisiana*, 498 U.S. at 40, 111 S. Ct. at 329, 112 L. Ed. 2d at 342 (quoting *State v. Cage*, 554 So. 2d 39, 41 (La. 1989)).  The trial court in *Cage* further instructed the jury that 'What is required is not an absolute or mathematical certainty, but a moral certainty.'  *Id.*  The United States Supreme Court concluded that 'the words "substantial" and "grave" ... suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.'  *Cage v. Louisiana*, 498 U.S. at [41], 111 S. Ct. at 329, 112 L. Ed. 2d at 342.  It then held that, considering the use of those words in conjunction with 'moral certainty,' a reasonable juror could have understood the instruction as allowing 'a finding of guilt based on a degree of proof below that required by the Due Process Clause.'  *Id.* (footnote omitted.)

"'In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole.' *Id.* (citing *Francis v. Franklin*, 471 U.S. 307, 316, 105 S. Ct. 1965, 1972, 85 L. Ed. 2d 344 (1985)).  Having compared the instructions at question in *Cage* and those in the present case, we find that the instruction given here does not contain the same infirmity as that in *Cage*. Specifically, the instruction in the present case does not require 'a grave uncertainty' for acquittal."

See also *Ex parte Adkins*, 600 So. 2d 1067, 1069-71 (Ala. 1992); *Ex parte Beavers*, 598 So. 2d 1320, 1324 (Ala. 1992); *Ex parte White*, 587 So. 2d 1236, 1237 (Ala. 1991).

*DeBruce v. State*, 651 So. 2d at 617-18.

DeBruce does not argue that the appellate court's recitation of the trial court's reasonable doubt instruction in his case is inaccurate, and as such, the state court's factual findings are presumed correct. The appellate court's comparative legal study of the reasonable doubt instruction given in *Cage* to the reasonable doubt instruction in DeBruce's case is accurate. There is no reasonable likelihood that the jury interpreted the instruction to dilute or shift the prosecution's burden of proof to the defense in any constitutionally offensive manner. DeBruce has proffered no legal or factual argument to convince this court that the state court's adjudication of the claim is contrary to or an unreasonable application of clearly established federal law. This claim is due to be denied.

### N. Debruce's death sentence is unreliable and unconstitutional because the State relied upon improper aggravating circumstances and the jury was unaware of mitigating factors. (Doc. 1, ¶¶ 205-11, pp. 70-72)

The various allegations underlying this claim either were not raised at trial or direct appeal, or both. When presented in DeBruce's Rule 32 petition, the trial court found them to be procedurally barred pursuant to Alabama Rule of Criminal Procedure 32.2(a)(3) and/or (a)(5).[106] The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings. *See DeBruce v. State,* 890 So. 2d at 1099. For these reasons, and after a

---

[106]*See* (Rule 32 C.R. Vol. 13, pp. 411-18), and the trial court's order regarding same. *Id.* at 578.

careful examination of the record and applicable law, this court finds it is precluded from further review of the claim. This claim is procedurally defaulted and due to be dismissed.

O.    **DeBruce's death sentence is unconstitutional because it is disproportionate in light of the offense and DeBruce's background. (Doc. 1, ¶¶ 212-13, pp. 72-73)**

DeBruce asserts that he is retarded, brain damaged, indigent and black. He also alleges that "[a]t the time of his trial, 12 of 123 people on Alabama's death row were convicted in Talladega, which has a population of 74,000 people." (Doc. 1, p. 73). *Id.* However, more populated counties have a lesser percentage of inmates on death row. DeBruce argues that his death sentence was handed down as a result of "economic, racial and gender prejudice in Talladega county, .... [and] [n]o defendant with a similar background, convicted of a similar crime, has been punished capitally in Alabama." *Id.* Lastly, DeBruce alleges the "State's proportionality review failed to compare [his] case with similar homicide cases in Alabama where the death penalty was not imposed[,]" and any review that may have been conducted was based on an "incomplete and inaccurate record." (Doc. 1, p. 73).

The respondent correctly contends that DeBruce did not allege retardation or brain damage as factual support for this claim until the habeas petition before this court. (Doc. 14, p. 110 and Doc. 15, pp. 127-28). Accordingly, this aspect of the claim is procedurally defaulted. As for the remainder of the claim, the respondent answers that DeBruce cannot show the state appellate court's adjudication is contrary to or an unreasonable application of clearly established federal law. *Id.* at 110-12. The pertinent portion of that opinion reads:

> As required by Rule 45A, A.R. App. P., this Court has searched the record for "any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court." We have found no plain error in either

166

the guilt or sentence phases of the appellant's trial.  We have addressed all the issues raised on appeal and have found no reversible error.

In addition, we have found no error in the sentence proceedings adversely affecting the rights of the appellant.  We find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and that death is the proper sentence in this case. Ala. Code 1975, § 13A-5-53(a).

In determining that death is the proper sentence, we make the following specific findings pursuant to Ala. Code 1975, § 13A-5-53(b)(1), (2), and (3): 1) There is no indication or inference in this record that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. 2) Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence.[FN13]  3) The appellant's sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.  As this Court stated in *Kuenzel*, 577 So. 2d at 530: "As was noted in *Beck v. State*, 396 So. 2d 645, 654 n. 5 (Ala. 1980), two-thirds of Alabama death sentences are for robbery-murder. Although we have reviewed 'worse' crimes of robbery-murder, the apparent cold-blooded, senseless, and unmerciful manner in which the defendant executed this crime impresses this Court as it did the trial judge.  Other than the general arguments for not imposing a punishment of death in any case, we find no reason to spare the defendant's life."

> FN13. The trial court found the existence of two aggravating circumstances: 1) a previous conviction "of a felony involving the use or threat of violence to the person, namely Robbery, 2nd Degree"; and 2) "[t]he capital offense was committed while the defendant was engaged in the commission of . . . a robbery."  CR. 250-51. Ala. Code 1975, § 13A-5-49(2) and (4).  The trial court found the existence of only one statutory mitigating circumstance: "the age of the defendant."  CR. 252.  Ala. Code 1975, § 13A-5-51(7).  The trial court specifically stated that, after "a diligent search," it found "no other, statutory or non-statutory" mitigating circumstance.  CR. 252.

Therefore, upon finding that the appellant received a fair trial, the judgment of the circuit court, as to both conviction and sentence, is affirmed.

*DeBruce v. State*, 651 So. 2d at 623.

DeBruce's complaints regarding this claim fall woefully short of showing that the state court's decision was either contrary to or involved an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it. DeBruce does not attempt to offer any legal support for his position, much less the type of United States Supreme Court precedent required to afford him 28 U.S.C. § 2254(d) relief. This claim is due to be denied.

> **P.    Newly discovered evidence that was not known to the defense at trial shows that DeBruce is innocent of the crime for which he was convicted and sentenced.  (Doc. 1, ¶ 214, p. 73)**

This entire claim reads:

> Newly discovered evidence that was not known to the defense at the time of trial shows that Mr. DeBruce's physical and mental faculties were impaired at the time of the offense and that he did not shoot the victim, Douglas Battle. *Enmund v. Florida*, 458 U.S. 782 (1982). This newly discovered evidence established that Mr. DeBruce is innocent of the crime for which he was convicted and that he should not have been sentenced to death. If this evidence had been known at the time of trial, Mr. DeBruce would not have been sentenced to death.

(Doc. 1, p. 73).

This claim fails to meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. at 856. DeBruce has not specified all grounds for relief available to him nor has he stated the facts supporting each ground. 28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*. The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan*, 697 F.2d 1032 at 1034; *Corn v. Zant*, 708 F.2d 549. Consequently, DeBruce is required to provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded. *Douglas v. Wainwright*, 714 F.2d 1532. A part of that burden is to demonstrate at least

*prima facie* evidence establishing the alleged constitutional violation.  The mere assertion of a

ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the

requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the*

*United States District Courts*.  For the foregoing reasons, this claim is due to be dismissed.

> **Q.     DeBruce's conviction and sentence is unreliable and unconstitutional because**
> **it was based upon uncorroborated testimony of an accomplice whom the**
> **State coerced to testify.  (Doc. 1, ¶¶ 215-16, p. 74)**

This claim was not raised at trial or on direct appeal.  It was presented for the first time in

DeBruce's Rule 32 petition, and found by the trial court to be procedurally barred pursuant to

Rule 32.2(a)(3) & (5).[107]  The Alabama Court of Criminal Appeals summarily affirmed the trial

court's decision during collateral proceedings.  *See DeBruce v. State*, 890 So. 2d at 1099.  This

claim is procedurally defaulted and due to be dismissed.

> **R.     Race, gender, and economic discrimination in the formation and composition**
> **of the grand and petit juries, and the selection of respective forepersons,**
> **deprived DeBruce of a fair and reliable trial.  (Doc. 1, ¶ 217)**.

DeBruce alleges that he "was deprived of his right to a grand jury and a petit jury formed

without discriminatory animus."  (Doc. 1, ¶ 217).  He further alleges that he "was entitled under

state and federal law to consideration by grand and petit juries chosen from pool[s] that

represented a fair cross section of the community."  *Id*.  This claim was not raised at trial or on

direct appeal.  It was presented for the first time in DeBruce's Rule 32 petition, and found by the

trial court to be procedurally barred pursuant to Rule 32.2(a)(3) & (5).[108]  The Alabama Court of

Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings.

---

[107]*See* (Rule 32 C.R. Vol. 13, p. 427), and the trial court's order regarding same.  *Id.* at 578.

[108]*See* (Rule 32 C.R. Vol. 13, p. 430), and the trial court's order regarding same.  *Id.* at 579.

*See DeBruce v. State*, 890 So. 2d at 1099.  This claim is procedurally defaulted and due to be dismissed.

> S.    **The evidence was insufficient to support DeBruce's capital murder conviction and sentence of death as a matter of law, because there was insufficient evidence to establish an intentional murder during the commission of a robbery.  (Doc. 1, ¶¶ 218-19, pp. 75-76)**

This claim was not raised on direct appeal.  When it was presented in DeBruce's Rule 32 petition, the trial court found it to be procedurally barred pursuant to Rule 32.2(a)(5).[109]  The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings.  *See DeBruce v. State*, 890 So. 2d at 1099.  For these reasons, and after a careful examination of the record and applicable law, this court finds it is precluded from further review of the claim.  This claim is procedurally defaulted and due to be dismissed.

> T.    **DeBruce was sentenced to death pursuant to an unconstitutional sentencing procedure.  (Doc. 1, ¶¶ 220-25, pp. 76-77)**

DeBruce does not dispute the respondent's assertion (doc. 15, p. 9) that the above claim is being raised for the first time in this habeas petition.  The failure of DeBruce to raise the claim until now "means that [he] deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'"  *Bailey v. Nagle*, 172 F.3d at 1305 (citing *Picard v. Connor*, 404 U.S. at 276).  Further, it is "procedurally defaulted, even absent a state court determination to that effect, [because] it is clear from state law that any future attempts at exhaustion would be futile."  *Id.* (citing *Snowden v. Singletary*, 135 F.3d at 737).

_____

[109]*See* (Rule 32 C.R. Vol. 13, pp. 436-37), and the trial court's order regarding same.  *Id.* at 579.

If DeBruce were to attempt to raise this portion of his claim in another Rule 32 petition, it would be defaulted on numerous grounds: namely, it would an impermissible successive petition, filed outside the statute of limitations applicable to postconviction petitions, and a claim which he was required to, but did not raise during collateral proceedings. Rule 32.2 (b)(c) & (d), Ala. R. Crim. P. For the foregoing reasons, this claim is procedurally defaulted.

## U.    The State deprived DeBruce of a reasonable adjournment, proper discovery, and a complete transcript. (Doc. 1, ¶¶ 226-28, p. 78)

These claims were not raised at trial or on direct appeal. When presented for the first time in DeBruce's Rule 32 petition they were found by the trial court to be procedurally barred pursuant to Rule 32.2(a)(3) & (5).[110] The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings. *See DeBruce v. State*, 890 So. 2d at 1099. For these reasons, and after a careful examination of the record and applicable law, this court finds it is precluded from further review of the claims as they are procedurally defaulted. Even if they were not precluded, DeBruce's conclusory claims are insufficient to warrant any relief.

## V.    It was unreliable and unconstitutional for the court to conduct the trial and sentencing of DeBruce in Talladega County. (Doc. 1, ¶ 229, pp. 78-79)

This claim was not raised at trial or on direct appeal. It was presented for the first time in DeBruce's Rule 32 petition, and found by the trial court to be procedurally barred pursuant to Rule 32.2(a)(3) & (5).[111] The Alabama Court of Criminal Appeals' summarily affirmed the trial

---

[110]*See* Rule 32 C.R. Vol. 13, pp. 431,440, 442-43, and the trial court's order regarding same. *Id.* at 578-79.

[111]*See* (Rule 32 C.R. Vol. 13, pp. 440-42), and the trial court's order regarding same. *Id.* at 579.

court's decision during collateral proceedings.  *DeBruce v. State,* 890 So.2d 1068, 1099 (Ala. Crim. App. 2003).  For these reasons, this court is precluded from further review of the claim as it is procedurally defaulted and due to be dismissed.

> **W.    Alabama's method of execution is unconstitutional on its face and as applied to DeBruce.  (Doc. 1, ¶ 230, p. 79)**

Interpreted in the most generous light, DeBruce's three sentence claim only alleges that his execution would be cruel and unusual punishment because electrocution or lethal injection is inconsistent with evolving standards of decency and "international law."  (Doc. 1, p. 79).  This claim was not raised in any form on direct appeal.  It first appeared in the context of electrocution in DeBruce's Rule 32 petition, and the trial court found it to be procedurally barred pursuant to Rule 32.2(a)(3).[112]  The state appellate courts affirmed the trial court's decision.[113]

Admittedly, Alabama adopted lethal injection as an alternative form of execution effective July 1, 2002[114], but it was more than one year later (December 15, 2003) when DeBruce included lethal injection as a part of this claim in an application for rehearing[115] from the Alabama Court of Criminal Appeals' affirmation[116] on December 2, 2003, of the trial court's procedural default determination as to electrocution.

---

[112]*See* Rule 32 C.R. Vol. 13, pp. 445-46, and the trial court's order regarding same.  *Id.* at 579.

[113]*DeBruce v. State*, 890 So. 2d at 1099.

[114]*See* Code of Alabama 1975, § 15-18-82(c).

[115]*See* Rule 32 C.R. Vol. 28, Tab 50, p. 49.  The court also notes that Petitioner filed his initial brief with the Court of Criminal Appeals on or about August 30, 2000.  *See* R. 32 C. R. Vol. 27, Tab 47, pp. 100 & 105.

[116]*DeBruce v. State*, 890 So. 2d at 1099.

172

The respondent declares the lethal injection portion of this claim was not raised in the Rule 32 petition, and he generally asserts that it is "procedurally defaulted ... because it was never properly raised in the state courts."  (Doc. 14, p. 123).  After examining a decision by the United States District Court for the Southern District of Alabama regarding an Eight Amendment lethal injection claim in a similar posture, this court finds that DeBruce's lethal injection claim is also procedurally defaulted.  The pertinent portion of that decision reads:

> [O]n July 1, 2002, the Alabama legislature amended Ala. Code § 15-18-82(a), to make lethal injection the standard method of execution in Alabama.  At the time of the amendment, petitioner's appeal of the denial of his Rule 32 petition was pending in the Alabama Court of Criminal Appeals.  (Doc. 10, Vol. 25 at 4866; *McGahee v. State*, 885 So. 2d 191, 228 (Ala. Crim. App. 2003)).  In his previous Rule 32 petition, petitioner had challenged only the constitutionality of electrocution as a method of execution.  However, after the amendment, lethal injection became the prescribed method of execution for petitioner; yet, petitioner did not file a second Rule 32 petition in the state court to challenge its constitutionality.  *See Ala. R. Crim. P.* 32.1(e) (petition based on newly discovered material facts).  Any attempt by petitioner to do so now would be barred.  *See Ala. R. Crim.  P.* 32.2(c) (one-year, or in some instances six months, limitations period for filing a successive petition on the basis of newly discovered material facts).

*McGahee v. Campbell*, 2007 WL 3025192, *11, n.6 (S.D. Ala. 2007) (unpublished).

Regardless, to the extent this claim pertains to Alabama's use of electrocution as a method of punishment, it is moot, as electrocution is no longer Alabama's primary method of capital punishment.  To the extent the claim pertains to lethal injection, the habeas petition (a virtually identical copy of the claim as it appeared in the application for rehearing and petition for writ of certiorari) is devoid of any legal or factual support for DeBruce's conclusion that such a method of punishment violates the Eighth Amendment.  As such, the lethal injection claim is due to be  dismissed for failure to comply with specificity requirements governing federal pleadings,

or in the alternative, it is due to be denied on the merits for failure to state a claim upon which relief may be granted.

### X. The State post-conviction hearing was unreliable and unconstitutional. (Doc. 1, ¶¶ 231-241, pp. 79-83)

DeBruce alleges the "state courts deprived [him] of a full and fair post-conviction hearing by finding that a number of [his] claims were procedurally barred." (Doc. 1, p. 80). He also contends "the state courts overlooked evidence to support many of his claims [that] was not previously available, either due to trial counsel's ineffectiveness or prosecutorial misconduct." He described this evidence as follows:

> the full extent of the prosecution's discriminatory pattern of challenges to jurors, the extent of pre-trial publicity, proof that the aggravating circumstances used at sentencing were invalid, proof that physical evidence and statements were unlawfully obtained, evidence of [his] physical condition, and proof that Mr. Mathis had inadequate funding and time.

*Id*. The respondent correctly answers that these claims are procedurally defaulted because they were not raised on collateral appeal. (Doc. 15, p. 130, n.14). Regardless, DeBruce never identifies the procedurally defaulted claims to which he refers, and he does not allege or explain why the procedural default findings are erroneous. *Id*. The laundry list of what DeBruce loosely describes above as evidence is also insufficiently pleaded. For the foregoing reasons, this claim is due to be dismissed because it fails to meet the heightened specificity requirement for pleadings in habeas petitions.

Next, DeBruce alleges the "circuit court ... improperly denied [him] adequate time and resources to prepare for a post-conviction hearing..." and that his indigence, incarceration, Crohn's disease and brain dysfunction prevented him from "conduct[ing] an adequate

investigation, interview[ing] witnesses, or pay[ing] for appropriate testing."  (Doc. 1, ¶ 232, p. 80).  "Among the issues" DeBruce contends he "was not given adequate time and resources to investigate were the conditions of his pre-trial confinement."  *Id*.  In particular, DeBruce alleges the trial court rescinded an order in which it had previously granted DeBruce discovery of jail records thought to contain the "names of inmates, jail and employees and visitors."  *Id*., ¶ 233. The court also refused to "sign a subpoena for [FBI] records [allegedly chronicling treatment of DeBruce and his co-defendants at the jail], or even review them *in camera*," in violation of his right to due process.  *Id*. at pp. 80-81.  He declares the "documents and testimony from former inmates and other witnesses to [his] condition while awaiting trial were relevant on the issues of competence and voluntariness; and were also relevant to sentencing."  *Id*. at p. 81 (citing *Skipper v. South Carolina*, 471 U.S. 1 (1986)).

DeBruce also claims the trial court refused to allow him discovery of the work product of the district attorney's office concerning his case, arguing that D.A. Robert Rumsey's open file discovery policy in capital cases effectively waived any privilege the district attorney's office held regard that work product.  *Id*. at p. 81.  He simultaneously argues that the circuit court "deprived him of his right to show that the State's invocation of the work product doctrine was too broad" when it denied DeBruce's request that the district attorney "identify the work product by name of author, date and subject matter."  *Id*.  DeBruce asserts that if a document contained privileged and unprivileged information, then the privileged information could have been redacted and the remainder of the document turned over to post-conviction counsel.  *Id*.

DeBruce additionally complains that the circuit court denied a request to discover files for co-defendant McCants, and that this refusal was improper because McCants' "credibility, bias,

motive to lie, and propensity to commit the crime" were issues at trial and during post-conviction proceedings. *Id*. Finally, DeBruce contends the circuit court erred during post-conviction proceedings when it failed to appoint a special prosecutor, precluded two (2) witnesses from testifying to statements made to them by a deceased former juror that indicated juror misconduct, excluded post-conviction testimony from a sociologist named Dr. Fitzpatrick, allowed the state to present surprise witnesses, and signing the State's "proposed order in entirety." *Id*. at pp. 82-83.

The respondent contends that these claims[117] are due to be dismissed because they present only questions of state law, or alternatively, they are due to be denied because DeBruce cannot show that the state court's adjudication of the claims entitle him to relief under 28 U.S. § 2254(d).   (Doc. 14, pp. 123-139).   After examination, it is apparent that the bulk of DeBruce's claims involve evidentiary decisions entrusted to the state court, and DeBruce's general assertion that his due process rights were violated cannot bootstrap the evidentiary decisions into a constitutional realm.   Accordingly, the claims are due to be dismissed.

Additionally, the court further finds that he is not entitled to substantive relief under § 2254 due to the fact that it only provides for habeas review "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254.   Because this claim is not an attack on DeBruce's conviction but rather on the Rule 32 process, this claim does not state a basis for federal habeas relief.   *Quince v. Crosby*, 360 F.3d 1259,1262 (11th Cir. 2004); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987).

---

[117]The court is referring only to the sub-claims it has not already dismissed.

Even if the claims were due to be examined on the merits, DeBruce has not shown that the state court's adjudication of the claims is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  The pertinent portions of the Alabama Court of Criminal Appeals opinion reads:

DeBruce argues that the circuit court denied him a full and fair postconviction hearing.  He lists several different grounds in support of this contention.

DeBruce first argues that the circuit court denied him a fair hearing when the court denied him funds to hire experts to testify at the postconviction hearing.  The circuit court stated the following in regard to this issue:

"The Due Process Clause does not require a trial court to approve funds to hire experts to testify at a [post-conviction] hearing.  *Holladay v. State*, 629 So. 2d 673, 688 (Ala. Crim. App. 1992), citing *Hubbard v. State*, 584 So. 2d 895, 900-01 (Ala. Crim. App. 1991), cert. denied, 502 U.S. 1041, 112 S. Ct. 896, 116 L. Ed. 2d 798 (1992).  Clearly this Court properly followed the law in denying DeBruce's motion for funds.

"DeBruce is represented by six attorneys.  Additionally, local counsel was appointed.  As the Court is well aware, various lawyers and/or assistants to lawyers shuffled in and out of the courtroom during the Rule 32 proceedings.  DeBruce had the assistance of many individuals, who were capable of presenting several witnesses and documents in support of their myriad claims.[118]  This claim is denied on the merits."

(C.R. 603-04).

The circuit court's findings are correct.  As this Court noted in *Hubbard v. State*, 584 So. 2d 895 (Ala. Crim. App. 1991), cert. denied, 502 U.S. 1041, 112 S. Ct. 896, 116 L. Ed. 2d 798 (1992):

"The appellant next contends that the trial court erred in denying his request for State funds to hire experts to testify at the Rule 20 [now Rule 32] hearing.  The appellant sought to hire a

---

[118]This case was also pending for four years in the state circuit court.

psychiatrist, toxicologists and experts in police procedure.  We find
that the appellant received a full and fair hearing.  The evidence the
appellant sought to introduce through these experts was either
already before the court in another form or was not necessary to the
court's determination.  Furthermore, the fundamental fairness
mandated by the Due Process Clause does not require the trial
court to approve such funds.  See generally, *Murray v. Giarratano*,
492 U.S. 1, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989) (no
requirement that indigent defendants be appointed counsel in
post-conviction proceedings); *Pennsylvania v. Finley*, 481 U.S.
551, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) (same); *Ex parte
Cox*, 451 So. 2d 235 (Ala. 1983) (same); *Hobson v. State*, 425 So.
2d 511 (Ala. Crim. App. 1982) (same).  The appellant has failed to
show how the denial of the request prejudiced his case in any
way."

584 So. 2d at 900-01.

DeBruce presented the testimony of four experts at the postconviction
hearing.  DeBruce called Dr. Jackson Kuan, a gastroenterologist; Dr. David
Williamson, a neuropsychologist; Dr. Kevin Fitzpatrick, a sociologist; and Dr.
Catherine L. Boyer, a clinical and forensic psychologist.  DeBruce has failed to
show how the denial of funds for more experts prejudiced him.  The circuit court
committed no error in denying DeBruce's motion for funds for an expert to testify
at the postconviction proceeding.

DeBruce also argues that the circuit court erred in not ordering the district
attorney's office to turn over numerous items in its files that the State claimed
were work product and therefore privileged.  The circuit court stated the following
concerning this contention:

"DeBruce argues that the Court erred by not providing him
with privileged work product material from the District Attorney's
files.  The Court reviewed the work product material in camera and
made a finding that there was nothing exculpatory contained within
the material, and that it consisted of trial preparation, trial strategy,
and trial organization notes.  This ruling was correct, and the Court
denies relief on the merits of this claim."

There is very little in the record addressing this issue; therefore, we must
give deference to the circuit court's ruling.  There is absolutely no evidence in the
record indicating that the circuit court erred in the above ruling.

178

DeBruce argues that the circuit court erred in not appointing a special prosecutor in the case because the Talladega County District Attorney, Jonathan Adams, had initially been appointed to represent DeBruce in the preliminary stages of his case.[FN10]

> FN10. Adams served as district attorney from February 1998, when he was appointed, until January 1999, when a newly elected district attorney took office after defeating Adams in the November election.

The record reflects that in December 1999 DeBruce filed a motion for appointment of a special prosecutor because of the alleged conflict of interest.  He asserted that the district attorney had been appointed to represent him during the preliminary stage of his capital prosecution and because of that representation he obtained confidential and privileged information that could be used against DeBruce during the postconviction proceedings.

The attorney general's office represented the State in the postconviction proceedings.  The record shows that in response to this motion, the circuit court informed the assistant attorney general handling the case that she was to have no contact with the district attorney and that she should detail any previous discussions that she had had with the district attorney.  In response to that order, the assistant attorney general stated that the only contact her office had had with Adams was to obtain the files of the district attorney office related to the case.

The record shows that little action was taken in the case from the time the motion for appointment of a special prosecutor was filed until after District Attorney Adams left office.  The supplemental record contains a copy of a letter from the assistant attorney general to Judge Fielding.  The letter states in part, "When we met for the last status conference in the above case, I believe that we were waiting to proceed until Mr. Adams was no longer in office.  It is my understanding that Mr. Adams has now left the District Attorney's office."

The record contains no evidence indicating that DeBruce was prejudiced by the circuit court's failure to appoint a special prosecutor in this case.

DeBruce also argues that he was denied a fair postconviction hearing because the circuit court excluded the testimony of S.J., the husband of a juror; Adrienne Holder, a legal-aid attorney; and Dr. Kevin Fitzpatrick, a sociologist.

The circuit court stated the following regarding this issue:

"[S.J.] is the husband of Susie [J.], a sworn juror in DeBruce's case. Ms. [J.] is deceased. DeBruce sought to introduce Mr. [J.'s] and Ms. Holder's testimony, based entirely on hearsay from Susie [J.], in an attempt to support a claim of juror misconduct. The Court properly denied this request. The proffered testimony does not fit into a hearsay exception under Rule 804 of the Alabama Rules of Evidence. To have a statement admitted under Rule 804, a proponent of a hearsay statement must do more than simply show that the declarant is unavailable; he must additionally meet one of the requirements of Rule 804(b). Ala. R. Evid. 804(b). DeBruce has failed to even assert a basis for admissibility of Ms. [J.'s] hearsay statements in his brief. He merely argues error, with no supporting authority. He has failed to properly present this claim to the Court. It further fails on the merits, based on the record of the hearing. This claim is denied.

"DeBruce also argues that exclusion of Dr. Kevin Fitzpatrick was error. Dr. Fitzpatrick would have testified about the nature of the neighborhoods in which DeBruce lived as a child. DeBruce presented family members who testified about violence that they, including DeBruce, witnessed in the neighborhood. The Court received a clear picture of the environment in which DeBruce was reared. Further, Fitzpatrick never interviewed DeBruce. He would have spoken in hypotheticals. DeBruce relies on the United States Supreme Court case of *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), as support for the proposition that the Court relied upon evidence from sociologists, thus, this Court was in error to decline to hear such testimony. The Court finds *Eddings* easily distinguishable and unsupportive of his position. This claim is denied."

We agree with the circuit court's findings and adopt them as our own.

Clearly, the evidence of what the now-deceased juror told someone else is a classic example of hearsay. The substance of the deceased juror's statement was offered to prove the truth of the matter asserted. The circuit court correctly ruled that this evidence was inadmissible hearsay. See Rule 804, Ala. R. Evid.

DeBruce also attempted to introduce the testimony of a sociologist concerning what affect living in a high crime area has on an individual. DeBruce argued that the sociologist's testimony would have established a nonstatutory mitigating circumstance that, he argues, his attorney failed to present.

180

Alabama has never specifically addressed whether a sociologist may properly testify to establish mitigating evidence.  Section 13A-5-52, Ala.Code 1975, addresses nonstatutory mitigating evidence and states:

> "In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."

> "The Eighth Amendment requires an individualized sentencing determination in a death penalty case."  *Sneed v. State*, 783 So. 2d 841, 853 (Ala. Crim. App. 1999), rev'd on other grounds, 783 So. 2d 863 (2000), citing *Stringer v. Black*, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992), and *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). Allowing a sociologist to testify concerning the general affect of environmental conditions violates the right to an individualized sentencing determination.

The North Carolina Supreme Court in *State v. Taylor*, 354 N.C. 28, 550 S.E.2d 141 (2001), cert. denied, 535 U.S. 934, 122 S. Ct. 1312, 152 L. Ed. 2d 221 (2002), had occasion to address whether the circuit court properly excluded a sociologist's testimony when that testimony was offered to prove mitigation.  The *Taylor* court stated:

> "While [the sociologist] was clearly qualified to give his opinion as to the possible cultural affects living in a drug-infested environment would have had on defendant, he was not qualified to give what is in essence a medical opinion as to any possible mental defect, as his training and experience were insufficient to allow the court to admit this portion of his testimony.  The trial judge properly exercised his discretion in excluding testimony that was unreliable for its intended purpose.  Although the courts have often properly allowed the testimony of psychiatrists and psychologists to address mitigating circumstances focused on a particular defendant's mental state, we do not believe it proper to allow a sociologist who studies the functions and patterns of groups to give this type of testimony.  Indeed, the above portions of testimony could have applied to any family member or associate of defendant

181

> who grew up in the same environment.  The primary purpose of
> mitigating circumstances is, as defendant notes, to treat the capital
> defendant with 'that degree of respect due the uniqueness of the
> individual.'  *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954,
> 2965, 57 L. Ed. 2d 973, 990 (1978).  The witness' testimony
> lacked the requisite uniqueness regarding this defendant, and the
> trial court did not err in excluding the testimony."

354 N.C. at 43, 550 S.E.2d at 152. See also *State v. Rose*, 120 N.J. 61, 65, 576
A.2d 235 (1990).

The circuit court correctly excluded the sociologist's testimony-it was not
relevant to the issue at hand.

DeBruce argues that he was denied a fair hearing because the State was
allowed to call two surprise witnesses who were not listed on the State's witness
list.

The circuit court found that these witnesses were called as rebuttal
witnesses.  The State indicated in its witness list that it would call rebuttal
witnesses.  We have stated:

> " 'The admission of rebuttal evidence is within the
> discretion of the trial judge.  *Crow v. State*, 365 So. 2d 1254 (Ala.
> Cr. App. 1978), cert. denied, 365 So. 2d 1256 (Ala. 1979).  "The
> State may, in the discretion of the trial court, introduce in rebuttal
> any competent evidence which explains or is a direct reply to or a
> contradiction of material evidence by the defendant."  *Sprinkle v.
> State*, 368 So. 2d 554 (Ala. Cr. App. 1978), writ quashed, 368 So.
> 2d 565 (Ala.1979) (emphasis added).' "

*Bishop v. State*, 656 So. 2d 394, 397 (Ala. Crim. App. 1994), quoting *Norris v.
State*, 429 So. 2d 649, 650 (Ala. Crim. App. 1982).

The circuit court committed no error in allowing the State to call two
rebuttal witnesses.

DeBruce argues that the circuit court erred in adopting in toto the State's
proposed order denying relief.  DeBruce's entire argument on this issue consists
of the following:

> "The Rule 32 court also erred by signing the state's
> proposed order in its entirety....  Mr. DeBruce was entitled to a full

and fair hearing before an impartial tribunal.  By signing the state's order without even changing a comma, the court violated Mr. DeBruce's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."

(DeBruce's brief to this Court, p. 99).

As we stated in *Holladay v. State*, 629 So. 2d 673 (Ala. Crim. App. 1992), cert. denied, 510 U.S. 1171, 114 S. Ct. 1208, 127 L. Ed. 2d 555 (1994):

" 'While the practice of adopting the State's proposed findings of fact and conclusions of law is subject to criticism, the general rule is that even when the court adopts proposed findings and conclusions verbatim, the findings are those of the court and may be reversed only if clearly erroneous. *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985); *Hubbard v. State*, 584 So. 2d 895 (Ala. Cr. App. 1991); *Weeks v. State*, 568 So. 2d 864 (Ala. Cr. App. 1989), cert. denied, 498 U.S. 882, 111 S. Ct. 230, 112 L. Ed. 2d 184 (1990); *Morrison v. State*, 551 So. 2d 435 (Ala. Cr. App. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1938, 109 L. Ed. 2d 301 (1990).' "

629 So. 2d at 687, quoting *Wright v. State*, 593 So. 2d 111, 117-18 (Ala. Crim. App. 1991), cert. denied, 506 U.S. 844, 113 S. Ct. 132, 121 L. Ed. 2d 86 (1992).

Here, the circuit court's findings and conclusions of law are supported by the record of the hearing and the exhibits that were filed with the postconviction petition.[119]  The circuit court's findings are not clearly erroneous.

---

[119]Although not specifically mentioned by the state court, this court's examination of the record shows that DeBruce's complaints that he was not allowed to obtain jail records or certain FBI records also ultimately lacks merit.  At the hearing, DeBruce contended he needed the jail records in order to obtain the names of other inmates who could testify as to his medical state leading up to the trial.  DeBruce was aware of and had subpoenaed at least one inmate witness, who failed to appear at the evidentiary hearing, but counsel did not request the court order deputies to escort her to court.  (Rule 32 R. Vol. 16, pp. 358-60).  Moreover, a gastroenterologist testified at the hearing. *Id*. at 270-319.  This medical professional had access to DeBruce's medical history and spoke to DeBruce about his symptoms.  *Id*.  Notably, Dr. Kahn did not testify that DeBruce told him he was in excruciating pain at the time of trial. *Id*. Additionally, by examining DeBruce's ongoing, symptomatic care immediately before and during the trial, Dr. Kahn estimated DeBruce's pain level at trial to perhaps be moderate.  *Id*.

*DeBruce v. State*, 890 So. 2d at 1094-99.

In light of the careful, informed decision of the Alabama Court of Criminal Appeals, when compared to DeBruce's present allegations, DeBruce cannot show that the postconviction hearing he was afforded, either in form or substance, was fundamentally unfair such that his right to due process of law was violated. This claim is due to be denied.

> **Y.    The cumulative effect of the errors of state and federal law discussed above violated Derrick DeBruce's rights protected by Alabama law and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Doc. 1, ¶ 242, pp. 83-84)**

This claim was not raised at trial or on direct appeal. It was presented for the first time in DeBruce's Rule 32 petition, and found by the trial court to be procedurally barred pursuant to Rule 32.2(a)(3) & (5).[120] The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision during collateral proceedings. *See DeBruce v. State*, 890 So. 2d at 1099. For these reasons, and after a careful examination of the record and applicable law, this court finds it is precluded from further review of the claim. This claim is procedurally defaulted and due to be dismissed.

## V.    CONCLUSION

---

While DeBruce indicates that jail officers were investigated and one reprimanded for using excessive force against DeBruce and his co-defendants, DeBruce never describes the incident underlying such a claim. He complains that he should have been afforded an unredacted version of F.B.I. records (the investigating entity). However, as the 'victim' of the excessive force, DeBruce himself was more than aware of the underlying circumstances and those portions of any record this court was able to find in the postconviction record show that the excessive force allegations may have arisen out of a confrontation between jail officials, DeBruce and several co-defendants, whereupon DeBruce and others had to be relocated to another portion of the jail. (Rule 32 C.R. Vol. 24, pp. 1042-45). This information is immaterial and irrelevant to DeBruce's case.

[120]*See* Rule 32 C.R. Vol. 13, pp. 446-47, and the trial court's order regarding same. *Id*. at p. 579.

Premised on the foregoing analysis, the court finds that DeBruce's petition for a writ of habeas corpus is due to be denied.  The petitioner's request for relief is due to be denied.  An appropriate order will be entered.

**DONE**, this the 4th day of August 2010.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE